# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| GO LAB, INC., *et al.*,[1] | ) | Case No. 25-10557 (KBO) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |

## FIRST AMENDED COMBINED DISCLOSURE STATEMENT AND JOINT CHAPTER 11 PLAN OF REORGANIZATION OF GO LAB, INC. AND GO LAB MADISON, LLC, AS MODIFIED

Mark E. Felger, Esq. (No. 3919)
Simon E. Fraser, Esq. (No. 5335)
Cozen O'Connor
1201 N. Market Street, Suite 1001
Wilmington, Delaware 19801
Phone: (302) 295-2087
Fax: (302) 295-2013
mfelger@cozen.com
sfraser@cozen.com

Joel D. Nesset, Esq.
Cozen O'Connor
33 South 6th Street, Suite 3800
Minneapolis, MN 55402
Phone: (612) 260-9000
Fax: (612) 260-9080
jnesset@cozen.com
(Not admitted in DE; MN No. 030475X)

David R. Doyle, Esq.
Cozen O'Connor
123 N. Wacker Drive, Suite 1800
Chicago, Illinois 60606
Phone: (312) 474-1648
Fax: (312) 361-8378
(Not admitted in DE; IL ARDC 6303215)

*Counsel for Debtors and Debtors in Possession*

Dated: May 29, 2025

---

[1] The Debtors in these Chapter 11 Cases are the following entities (the last four digits of each Debtor's respective federal tax identification number, if any, follow in parentheses): GO Lab, Inc. (0447) and GO Lab Madison, LLC (6162). The Debtors' corporate headquarters are located at 1 Main Street, PO Box 119, Madison, ME 04950.

# TABLE OF CONTENTS

Page

ARTICLE 1 DISCLOSURES ....................................................................................... 1

1.1    Introduction ..................................................................................................... 1

1.2    Disclaimers ..................................................................................................... 1

1.3    Overview ......................................................................................................... 3

1.4    Debtors' Organizational Structure ................................................................. 5

1.5    Overview of Debtors' Business ...................................................................... 5

1.6    Debtors' Prepetition Indebtedness ................................................................. 6

    1.6.1    Loan Obligations – GO-Madison ................................................... 6

        Green Bonds .................................................................................. 6

        QLICI Loans ................................................................................. 7

        2024 SEDC Loan .......................................................................... 8

        2024 Intercreditor Agreement ...................................................... 8

        FNB Loan ..................................................................................... 8

    1.6.2    Loan Obligations – GO-Inc. .......................................................... 8

        1.6.2.1    Secured Debt – Go Inc. ................................................. 8

        Open Prairie Loan ......................................................................... 8

        Bridge Loans ................................................................................. 9

        Series B Senior Loans ................................................................. 10

        Subordination to Series B Senior Holders .................................. 10

        1.6.2.2    Unsecured Debt – GO-Inc. .......................................... 10

        QLICI Loans ............................................................................... 10

        Other Unsecured Loans to GO-Inc. ............................................ 10

    1.6.3    Trade Debt – GO Madison ........................................................... 11

1.7    Summary of Assets ....................................................................................... 12

1.8    Events Leading to Debtors' Chapter 11 Filing ............................................ 12

1.9    Developments in the Chapter 11 Cases ....................................................... 13

    1.9.1    DIP Order .................................................................................... 14

    1.9.2    Employee Compensation Order ................................................... 14

    1.9.3    Utilities Order .............................................................................. 14

    1.9.4    Cash Management Order .............................................................. 15

    1.9.5    Insurance Order ........................................................................... 15

1.10    Plan Overview ........................................................................... 15

1.11    Voting and Confirmation Procedures ...................................... 23

    1.11.1  Who May Vote on the Plan............................................ 24

    1.11.2  Voting Procedures........................................................ 24

    1.11.3  Confirmation Hearing .................................................. 25

    1.11.4  Voting Recommendation .............................................. 26

1.12    Statutory Requirements for Confirmation .............................. 26

1.13    Confirmation Without Acceptance by All Impaired Classes.............................. 29

1.14    Risk Factors ........................................................................... 30

    1.14.1  Failure to Obtain Confirmation of the Plan May Result in Liquidation or Confirmation of an Alternative Plan on Less Favorable Terms. ....................................... 31

    1.14.2  Other Risk Factors Related to the Debtors .................... 32

    1.14.3  Risks To Creditors Who Will Receive Securities.................... 33

        1.14.3.1  Lack of Market for Securities Issued Pursuant to the Plan........................... 33

        1.14.3.2  The Value of the Newly-Issued Common Stock May Fluctuate for Many Reasons........... 33

        1.14.3.3  The Value of the Newly-Issued Common Stock May Decline Due to Future Issuances of Shares................. 34

        1.14.3.4  The Reorganized Debtors Do Not Intend on Paying Any Dividends on the New Common Stock in the Foreseeable Future ....................... 34

1.15    Certain Tax Law Considerations ............................................. 34

1.16    General Federal Income Tax Consequences to Debtors ..................... 35

1.17    Certain Federal and State Securities Law Considerations .................... 35

    1.17.1  Exemption From Registration Requirements For New Securities Issued Pursuant to Plan ..................... 35

    1.17.2  Subsequent Transfers of New Securities ....................... 36

1.18    Alternatives to Confirmation and Consummation of the Plan................ 37

    1.18.1  Continuation of the Chapter 11 Cases ....................... 37

    1.18.2  Liquidation under Chapter 7 or Chapter 11 ................. 37

ARTICLE 2 DEFINITIONS, RULES OF INTERPRETATION,  COMPUTATION OF TIME, AND GOVERNING LAW ............................ 38

    2.1    Definitions............................................................... 38

2.2 Interpretation, Rules of Construction, Computation of Time, Settlement and Governing Law.................................................................... 53

 2.2.1 Defined Terms.. ............................................................... 53

 2.2.2 Rules of Interpretation.. .................................................. 53

 2.2.3 Computation of Time ...................................................... 54

 2.2.4 Governing Law ............................................................... 54

 2.2.5 Settlements Incorporated Into The Plan.......................... 54

ARTICLE 3 DESIGNATION OF CLAIMS AND INTERESTS........................... 55

3.1 Summary of Designation of Claim and Interests ....................... 55

ARTICLE 4 TREATMENT OF CLAIMS AND INTERESTS ............................ 56

4.1 Unclassified Claims .................................................................... 56

 4.1.1 Administrative Expense Claims........................................ 56

 4.1.2 Professional Fee Claims................................................... 56

 4.1.3 Priority Tax Claims and Secured Tax Claims................... 57

 4.1.4 DIP Claims....................................................................... 57

 4.1.5 Restructuring Fees and Expenses.................................... 57

4.2 Classified Claims. ....................................................................... 58

 4.2.1 Class 1 (Green Bond Claims). ......................................... 58

  4.2.1.1 Impairment ...................................................... 58

  4.2.1.2 Allowance ........................................................ 58

  4.2.1.3 Treatment ........................................................ 58

 4.2.2 Class 2 (2024 SEDC Secured Loan Claim). .................... 59

  4.2.2.1 Impairment ...................................................... 59

  4.2.2.2 Treatment ........................................................ 59

 4.2.3 Class 3 (QLICI Secured Claims). ..................................... 59

  4.2.3.1 Impairment ...................................................... 59

  4.2.3.2 Treatment ........................................................ 59

 4.2.4 Class 4 (Cianbro Mechanic's Lien). ................................ 59

  4.2.4.1 Impairment ...................................................... 59

  4.2.4.2 Treatment ........................................................ 59

 4.2.5 Class 5 (Gilman Mechanic's Lien). .................................. 60

  4.2.5.1 Impairment ...................................................... 60

iv

4.2.5.2    Treatment ............................................................................ 60

4.2.6    Class 6 (GO-Madison Other Secured Claims)........................................ 60

4.2.6.1    Non-Impairment................................................................. 60

4.2.6.2    Treatment ......................................................................... 60

4.2.7    Class 7 (Non-Tax Priority Claims). ..................................................... 60

4.2.7.1    Non-Impairment................................................................. 60

4.2.7.2    Treatment ......................................................................... 60

4.2.8    Class 8 (GO-Madison General Unsecured Claims). ............................... 60

4.2.8.1    Impairment........................................................................ 60

4.2.8.2    Treatment ......................................................................... 60

4.2.9    Class 9 (Convenience Class Claims). .................................................. 61

4.2.9.1    Non-Impairment................................................................. 61

4.2.9.2    Treatment ......................................................................... 61

4.2.10    Class 10 (Series B Senior Secured Claims). .......................................... 61

4.2.10.1    Impairment...................................................................... 61

4.2.10.2    Treatment ....................................................................... 61

4.2.11    Class 11 (Open Prairie Secured Claim). ............................................... 61

4.2.11.1    Impairment...................................................................... 61

4.2.11.2    Treatment ....................................................................... 61

4.2.12    Class 12 (Bridge Loan Claims)........................................................... 61

4.2.12.1    Impairment...................................................................... 61

4.2.12.2    Treatment ....................................................................... 62

4.2.13    Class 13 (GO-Inc. General Unsecured Claims). ..................................... 62

4.2.13.1    Impairment...................................................................... 62

4.2.13.2    Treatment ....................................................................... 62

4.2.14    Class 14 (Intercompany Claims).......................................................... 62

4.2.14.1    Impairment...................................................................... 62

4.2.14.2    Treatment. ...................................................................... 62

4.2.15    Class 15 (GO-Inc. Equity Interests)..................................................... 62

4.2.15.1    Impairment...................................................................... 62

4.2.15.2    Treatment ....................................................................... 62

4.2.16    Class 16 (GO-Madison Equity Interests)............................................... 63

|  | 4.2.16.1 | Impairment .............................................................. 63 |
|  | 4.2.16.2 | Treatment ............................................................... 63 |

ARTICLE 5 MEANS FOR EXECUTION AND IMPLEMENTATION OF THE PLAN .......... 63

| 5.1 | Cancellation and Surrender of Existing Securities and Agreements .................... 63 |
| 5.2 | Plan Transactions ................................................................................ 64 |
| 5.3 | Authorization and Issuance of the New Membership Interest and New Common Stock.................................................................................. 64 |
| 5.4 | Transfer of the New Membership Interest ................................................ 65 |
| 5.5 | Transfer of the Common Stock ............................................................. 65 |
| 5.6 | Plan Funding ..................................................................................... 65 |
| 5.7 | Exit Financing and Converted DIP Loan ................................................ 65 |
| 5.8 | Release of Liens ................................................................................. 66 |
| 5.9 | Vesting of Assets and Operation of Businesses....................................... 67 |
| 5.10 | Retention of Causes of Action ............................................................. 67 |
| 5.11 | Satisfaction of Claims or Interests ....................................................... 68 |
| 5.12 | Continuation of Bankruptcy Injunction or Stays .................................... 68 |
| 5.13 | Administration Pending Effective Date ................................................. 68 |
| 5.14 | Exemption From Securities Laws ......................................................... 68 |
| 5.15 | "Change of Control" Provisions .......................................................... 69 |

ARTICLE 6 CORPORATE GOVERNANCE AND  MANAGEMENT OF THE REORGANIZED DEBTORS .................................................................................. 69

| 6.1 | Corporate Action and Existence ........................................................... 69 |
| 6.2 | Management and Board of the Reorganized Debtors ............................... 70 |
| 6.3 | Disclosure of any Insiders to be Employed or Retained by the Reorganized Debtors................................................................................... 70 |
| 6.4 | Indemnification of Post-Effective Date Directors and Officers ............................ 70 |
| 6.5 | St. Gobain Board Representation and Related Matters ........................... 70 |

ARTICLE 7 VOTING .................................................................................. 71

| 7.1 | Voting Generally................................................................................. 71 |
| 7.2 | Nonconsensual Confirmation............................................................... 71 |

ARTICLE 8 DISTRIBUTIONS UNDER THE PLAN .......................................... 71

| 8.1 | Distributions to Holders of Allowed Claims Only ................................. 71 |

8.2     Distribution Record Date .................................................................. 71

8.3     Disbursing Agent ............................................................................. 71

8.4     Rights and Powers of Disbursing Agent ........................................... 72

8.5     Delivery of Distributions. ................................................................ 72

        8.5.1   In General............................................................................ 72

        8.5.2   Timing of Distributions........................................................ 72

        8.5.3   Distributions of Unclaimed Property ..................................... 72

        8.5.4   Distributions to Holders of Allowed Green Bond Claims and DIP
                Claims ................................................................................ 73

8.6     Time Bar to Cash Payments............................................................. 73

8.7     Setoffs ............................................................................................ 74

ARTICLE 9 PROCEDURES FOR DISPUTED CLAIMS ........................................... 74

9.1     Resolution of Disputed Claims ........................................................ 74

9.2     Estimation of Claims........................................................................ 74

9.3     No Partial Distributions Pending Allowance ..................................... 74

9.4     Distributions After Allowance ......................................................... 75

ARTICLE 10 EXECUTORY CONTRACTS AND UNEXPIRED LEASES............................ 75

10.1    Assumption or Rejection of Executory Contracts and Unexpired Leases ........... 75

10.2    Cure of Defaults of Assumed Executory Contracts and Unexpired Leases. ........ 75

10.3    Assumption of Compensation and Benefit Programs ........................... 76

10.4    Pass-Through .................................................................................. 77

10.5    Survival of Indemnification and Corporation Contribution................... 77

10.6    Insurance Policies ........................................................................... 77

10.7    Modifications, Amendments, Supplements, Restatements, or Other
        Agreements. ................................................................................... 77

10.8    Bar Date for Filing Claims for Rejection Damages............................. 78

10.9    Reservation of Rights....................................................................... 78

10.10   Contracts and Leases Entered Into After the Petition Date .................. 78

ARTICLE 11 RELEASES, INJUNCTIONS AND DISCHARGE ............................................ 78

11.1    Releases by the Debtors ................................................................... 78

11.2    Mutual Releases by Released Parties................................................. 79

11.3    Exculpation .................................................................................... 80

vii

11.4    Injunction ............................................................................................... 80

          11.4.1  Violation of Injunctions ................................................... 81

11.5    Discharge of Claims and Termination of Interests ............................... 81

ARTICLE 12 CONDITIONS PRECEDENT ......................................................... 81

12.1    Conditions Precedent to Confirmation.................................................. 81

12.2    Conditions Precedent to the Effective Date ......................................... 82

12.3    Waiver of Conditions............................................................................ 82

12.4    Effect of Failure of Conditions ............................................................ 82

12.5    Substantial Consummation ................................................................... 83

ARTICLE 13 JURISDICTION.............................................................................. 83

13.1    Retention of Jurisdiction ...................................................................... 83

ARTICLE 14 MISCELLANEOUS PROVISIONS ............................................... 84

14.1    Immediate Binding Effect..................................................................... 84

14.2    Effectuating Documents; Further Transactions .................................... 84

14.3    Reporting Requirements and Payment of Statutory Fees ..................... 85

14.4    Entire Agreement ................................................................................. 85

14.5    Exhibits ................................................................................................ 85

14.6    Exemption From Certain Transfer Taxes ............................................. 85

14.7    Amendment, Modification and Severability of Plan Provisions .......... 86

14.8    Withholding and Reporting Requirements ........................................... 86

14.9    Closing of Chapter 11 Cases................................................................ 86

14.10  Conflicts............................................................................................... 87

14.11  Notices ................................................................................................. 87

14.12  Binding Effect...................................................................................... 89

14.13  No Admissions..................................................................................... 89

14.14  Headings .............................................................................................. 89

# ARTICLE 1
# DISCLOSURES

## 1.1    Introduction

On March 25, 2025 (the "Petition Date"), GO Lab, Inc. ("GO-Inc.") and its affiliate, GO Lab Madison, LLC ("GO-Madison," and together with GO-Inc., the "Debtors") filed petitions under chapter 11 of title 11 of the U.S. Code (the "Bankruptcy Code") in the U.S. Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), commencing these Chapter 11 Cases.

The Debtors propose this first amended combined disclosure statement and plan of reorganization (the "Plan") for the resolution of outstanding Claims against and Interests in the Debtors pursuant to Chapter 11 of the Bankruptcy Code. Capitalized terms used but not otherwise defined herein shall have the meanings given to such terms in Article 2 below.

The information in this Article 1 is provided in order to permit the voting creditors to make an informed judgment regarding approval of the Plan. Where appropriate, this Article 1 includes summaries of, or cross-references to, operative provisions of the Plan in Articles 2 - 14 below. To the extent of any inconsistence between this Article 1 and any operative provision(s) of the Plan, the operative provision(s) of the Plan shall control.

## 1.2    Disclaimers

**ALL HOLDERS OF CLAIMS AND INTERESTS, TO THE EXTENT APPLICABLE, ARE ENCOURAGED TO READ THIS DOCUMENT IN ITS ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. FOR AVOIDANCE OF DOUBT, THE PLAN APPLIES AND PRESERVES THE MAXIMUM GLOBAL JURISDICTION POSSIBLE UNDER APPLICABLE U.S. LAW, INCLUDING, WITHOUT LIMITATION, OVER THE ASSETS OF THE DEBTORS WHEREVER LOCATED.**

**THIS PLAN HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125(a) OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016 AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-BANKRUPTCY LAW OR THE LAWS OF ANY FOREIGN JURISDICTION.**

**THIS PLAN HAS BEEN NEITHER APPROVED NOR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION ("SEC") OR ANY STATE OR FOREIGN SECURITIES REGULATOR, AND NEITHER THE SEC NOR ANY STATE OR FOREIGN SECURITIES REGULATOR HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN. THE DISTRIBUTION OF THIS PLAN, AND THE ISSUANCE OF ANY SECURITIES PURSUANT TO THE PLAN, SHALL BE IN RELIANCE UPON ONE OR MORE EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF FEDERAL AND STATE SECURITIES LAWS. ALL PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING SECURITIES OF OR CLAIMS AGAINST THE DEBTORS SHOULD EVALUATE THIS COMBINED PLAN AND DISCLOSURE STATEMENT IN LIGHT OF THE PURPOSE FOR WHICH THEY WERE PREPARED.**

CERTAIN OF THE INFORMATION CONTAINED IN THIS PLAN IS, BY ITS NATURE, FORWARD LOOKING AND CONTAINS ESTIMATES, ASSUMPTIONS AND PROJECTIONS THAT MAY BE MATERIALLY DIFFERENT FROM ACTUAL FUTURE RESULTS. THE WORDS "BELIEVE," "MAY," "WILL," "ESTIMATE," "CONTINUE," "ANTICIPATE," "INTEND," "EXPECT" AND SIMILAR EXPRESSIONS IDENTIFY THESE FORWARD-LOOKING STATEMENTS. THESE FORWARD-LOOKING STATEMENTS ARE SUBJECT TO A NUMBER OF RISKS, UNCERTAINTIES AND ASSUMPTIONS. IN LIGHT OF THESE RISKS AND UNCERTAINTIES, THE FORWARD-LOOKING STATEMENTS, EVENTS AND CIRCUMSTANCES DISCUSSED IN THIS PLAN MAY NOT OCCUR, AND ACTUAL RESULTS COULD DIFFER MATERIALLY FROM THOSE ANTICIPATED IN SUCH FORWARD-LOOKING STATEMENTS, EVENTS AND CIRCUMSTANCES. THE DEBTORS HAVE NO OBLIGATION TO UPDATE PUBLICLY OR REVISE ANY FORWARD-LOOKING STATEMENTS, EVENTS AND CIRCUMSTANCES, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS OR OTHERWISE.

EXCEPT WHERE SPECIFICALLY NOTED, THE FINANCIAL INFORMATION CONTAINED IN THIS COMBINED PLAN AND DISCLOSURE STATEMENT AND IN ITS EXHIBITS HAS NOT BEEN AUDITED BY A CERTIFIED PUBLIC ACCOUNTANT AND HAS NOT NECESSARILY BEEN PREPARED IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES.

THE DEBTORS' MANAGEMENT PREPARED THE PROJECTIONS PROVIDED IN THIS PLAN. WHILE THE DEBTORS HAVE PRESENTED THESE PROJECTIONS WITH NUMERICAL SPECIFICITY, THEY HAVE NECESSARILY BASED THE PROJECTIONS ON A VARIETY OF ESTIMATES AND ASSUMPTIONS WHICH, THOUGH CONSIDERED REASONABLE BY MANAGEMENT, MAY NOT BE REALIZED, AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, COMPETITIVE, INDUSTRY, REGULATORY, MARKET AND FINANCIAL UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH WILL BE BEYOND THE REORGANIZED DEBTORS' CONTROL. THE DEBTORS CAUTION THAT THEY CANNOT MAKE ANY REPRESENTATIONS AS TO THE ACCURACY OF THESE PROJECTIONS OR TO THE REORGANIZED DEBTORS' ABILITY TO ACHIEVE THE PROJECTED RESULTS. SOME ASSUMPTIONS INEVITABLY WILL NOT MATERIALIZE. FURTHERMORE, EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THESE PROJECTIONS WERE PREPARED MAY DIFFER FROM ANY ASSUMED FACTS AND CIRCUMSTANCES. ALTERNATIVELY, ANY EVENTS AND CIRCUMSTANCES THAT COME TO PASS MAY WELL HAVE BEEN UNANTICIPATED, AND THUS MAY AFFECT FINANCIAL RESULTS IN A MATERIALLY ADVERSE OR MATERIALLY BENEFICIAL MANNER. THE PROJECTIONS, THEREFORE, MAY NOT BE RELIED UPON AS A GUARANTY OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS, POTENTIAL ACTIONS OR THREATENED ACTIONS, THE PLAN SHALL

**NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS. THIS PLAN SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING NOR SHALL IT BE CONSTRUED TO BE ADVICE ON THE TAX, SECURITIES OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST, OR INTERESTS IN, EITHER THE DEBTORS OR THE REORGANIZED DEBTORS.**

**APPROVAL, CONFIRMATION AND CONSUMMATION OF THE PLAN ARE SUBJECT TO MATERIAL CONDITIONS PRECEDENT DESCRIBED IN ARTICLE 12 HEREIN. THERE CAN BE NO ASSURANCE THAT THE PLAN WILL BE CONFIRMED OR, IF CONFIRMED, THAT SUCH MATERIAL CONDITIONS PRECEDENT WILL BE SATISFIED OR WAIVED. YOU ARE ENCOURAGED TO READ THIS PLAN IN ITS ENTIRETY, AND THE SECTION HEREIN ENTITLED "RISK FACTORS" PRIOR TO SUBMITTING YOUR BALLOT TO ACCEPT OR REJECT THE PLAN.**

**INTERNAL REVENUE SERVICE CIRCULAR 230 DISCLOSURE**

**TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE INTERNAL REVENUE SERVICE, EACH HOLDER IS HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF U.S. FEDERAL TAX ISSUES IN THIS COMBINED PLAN AND DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE RELIED UPON, AND CANNOT BE RELIED UPON BY HOLDERS, FOR PURPOSES OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON SUCH HOLDERS UNDER THE INTERNAL REVENUE CODE OF 1986, AS AMENDED; (B) SUCH DISCUSSION IS WRITTEN TO SUPPORT THE PROMOTION OF THE PLAN; AND (C) EACH HOLDER OF A CLAIM SHOULD SEEK ADVICE BASED ON SUCH HOLDER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

## 1.3    Overview

The Debtors are the exclusive producer of dry-process wood fiber construction insulation in North America. The Debtors launched in 2017 and developed a form of insulation that leverages abundant wood waste resulting from the closure of paper mills. In 2019, the Debtors began redevelopment of a shuttered paper mill into a custom insulation production facility and began commercial production and sale of the first two of their three product lines in August 2023, and their second product line in February 2024. The Debtors are nearing completion of the full buildout and anticipate manufacturing high-performance and carbon-negative thermal and acoustic insulation to answer the growing market and code demands across the U.S. and Canada.

The Debtors believe strongly in the company's product and processes, as well as the future adoption of wood-fiber insulation across North American markets. As summarized below, however, the Debtors are facing a variety of financial challenges arising from the construction of its manufacturing plant and resulting litigation. In order to preserve the greatest amount of value for creditors, employees and other stakeholders, the Debtors filed the Chapter 11 Cases and propose to restructure their indebtedness and capital structure pursuant to this Plan.

3

*Why You are Receiving this Plan:*

Chapter 11 of the Bankruptcy Code allows a debtor to sponsor a plan of reorganization that proposes how it intends to administer or dispose of its assets, and how it intends to treat claims against, and interests in, the debtor. A plan of reorganization typically may provide for a debtor-in-possession to reorganize by continuing to operate upon emergence from chapter 11 protection, to liquidate by selling assets, or to implement a combination of both. Here, by their proposed Plan, the Debtors seek to implement a financial restructuring that will significantly de-lever their balance sheet, right-size their capital structure, and enable the Debtors to emerge from bankruptcy as a viable and competitive enterprise.

The Bankruptcy Code requires that a party filing a chapter 11 plan must also prepare and file a document called a "disclosure statement." The purpose of a disclosure statement is to provide creditors and interest holders that are entitled to vote on a chapter 11 plan with "adequate information" in order for such parties to make an informed decision in determining whether to vote to accept or reject the plan.

This Plan is a combined disclosure statement and chapter 11 plan, designed to provide adequate information to enable holders of claims that are impaired under (and entitled to vote on) the Plan to make an informed judgment in exercising their right to vote to accept or reject the Plan. The Bankruptcy Court has reviewed this Plan and has made a preliminary determination that it contains adequate information and may be circulated to creditors to solicit their votes. At this time, however, the Bankruptcy Court has not passed upon the merits of the Plan or determined that the Plan should be confirmed. That determination will be made at a combined hearing, presently scheduled to occur on **June 10, 2025 at 10:30 a.m.** prevailing Eastern Time (although it is possible that such hearing date could be adjourned to a different date), to consider (i) final approval of the adequacy of information and (ii) confirmation of the Plan.

Article 1 of the Plan provides disclosures to assist you in making an informed judgment whether to accept or reject the Plan. The table of contents at the beginning of this document provides an outline of the topics and areas covered in Article 1 and lists the exhibits that are annexed and incorporated hereto. In summary, Article 1: (a) discusses the Debtors' corporate history, organizational structure, business operations and prepetition capital structure, (b) describes the events leading to the Debtors' filing of their chapter 11 cases; (c) summarizes the Plan's content and provides other information relating to the Plan and the processes the Bankruptcy Court will follow in determining whether to confirm the Plan; (d) contains a summary of the terms of the Plan, including the proposed treatment of claims against, and interests in, the Debtors; (e) describes certain U.S. federal income tax consequences of the Plan to the Debtors and holders of claims and equity interests, voting procedures; and (f) includes a discussion of the confirmation process.

***All creditors entitled to vote on the Plan should carefully review the entire Plan and all exhibits hereto <u>before</u> voting to accept or reject the Plan. Indeed, creditors should not rely solely on <u>Article 1</u> but should read the Plan in its entirety.***

4

## 1.4    Debtors' Organizational Structure

Debtor GO-Inc. is the sole member of non-Debtor GO Lab Madison Holdings, LLC ("GO-Holdings") and non-Debtor GO Lab Madison Finance, LLC ("GO-Finance"), and the 95% member of non-Debtor GO Lab Lending, LLC ("GO-Lending").  The Debtors' manufacturing and related operations, discussed below, are conducted by Debtor GO-Madison, which is a wholly-owned subsidiary of Go-Holdings.   The following is an organizational chart illustrating the relationships between the Debtors and their non-Debtor affiliates.



The equity interests in GO-Inc. consist of common stock (approx. 18.5%), preferred stock (approx. 78.2%), and warrants (3.3%).

## 1.5    Overview of Debtors' Business

The Debtors, through their operating entity GO-Madison, are a start-up manufacturer and distributor of high-performing wood fiber insulation for use in the building construction industry. The Debtors are the first and only domestic producer of wood fiber insulation, using wood chips and thinnings left over from timber harvesting for the production of water-resistant, fire-resistant, and sound-dampening thermal insulation. All of the Debtors' products are manufactured with pure softwood chips from sustainable Maine forest management and lumber production, and arrive at construction sites with a negative carbon footprint.

The Debtors utilize clean softwood residuals (wood waste from saw mills and chips from low-value, small-diameter trees), which the Debtors grind into fiber and process into three different commercial products:  TimberBatt (insulation for wall cavities, ceiling joints, rafters, attics, and demising walls); TimberFill (loose fill and dense pack insultation for attics and stud cavities);  and TimberBoard (continuous interior and exterior, above-grade insulation).  The Debtors' products have insulative properties that are comparable or superior to other types of insulation, such as fiberglass and mineral wool, and have been positively received by builders.

Wood fiber insulation is a proven concept, a mainstream product offering in Europe for over twenty years, and well regarded as an effective insulator that is safe and environmentally sound, accounting for nearly $800 million in annual sales. Despite its many advantages and success overseas, however, wood fiber insulation was not available in North America to any significant extent until production began at the Debtors' manufacturing plant in Madison, Maine.

LEGAL\77640027\2

The Debtors were founded in 2017 by licensed architect Matthew O'Malia and chemist Joshua Henry. In 2019, GO-Inc. obtained a seed capital investment of approximately $12.5 million in the form of convertible instruments (the "Seed Investment"). The Debtors utilized the proceeds of the Seed Investment as well as various unsecured loans to purchase used manufacturing equipment and acquire a 600,000-sq. ft. shuttered paper mill in Madison, Maine (the "Madison Facility"). In 2021, the Debtors obtained funding pursuant to a "Series A" equity offering of approximately $27.5 million which, combined with the Seed Investment which converted to equity upon the funding of the Series A, comprised a total Series A investment of approx. $40 million. In 2022, the Debtors broke ground on the construction of the Madison Facility, converting the shuttered paper mill into a wood fiber insulation plant. The construction was financed, at least initially, through the Series A equity offering and certain tax-favored loans, discussed below.

In 2023, the Debtors began manufacture and sale of the first product line, TimberFill, and then in February of 2024 began manufacture and sale of the second production line, TimberBatt. The Debtors realized gross revenues of approx. $4.7 million in 2024. The sale of TimberBoard, which is the most market differentiated product, and expected to be the largest revenue contributor and have the highest margin of the Debtors' three products, has been delayed pending completion of its continuous board line (the "Board Line") at the Madison Facility (the "Board Line Construction"). When completed, the Madison Facility will have the capacity to manufacture product generating approx. $170 million in revenue.

The Debtors currently employ 54 full-time personnel. With positive market trends, an effective marketing plan, and increased production, the Debtors anticipate substantial growth.

## 1.6    Debtors' Prepetition Indebtedness

From 2019 through 2024, the Debtors entered into a series of financings to purchase the real estate in Madison, Maine, redevelop and build the Madison Facility, make equipment purchases, and fund operations.

### 1.6.1    Loan Obligations – GO-Madison

***Green Bonds***

To finance the construction of the Madison Facility, GO-Madison and the Finance of Authority of Maine ("FAME") entered into the FAME Loan Agreement in connection with FAME's issuance of the Green Bonds in the aggregate principal amount of $85,000,000. Pursuant to the Green Bond Indenture, FAME issued the Green Bonds and assigned its interests under the FAME Loan Agreement and related instruments to the Green Bond Trustee for the benefit of the Holders of the Green Bonds.

In addition, GO-Madison entered into the Green Bond Security Agreement and Green Bond Mortgage Deed and GO-Holdings entered into the Green Bond Pledge Agreement, pursuant to which GO-Madison and GO-Holdings granted or otherwise pledged to the Green Bond Trustee (directly or as FAME's assignee), for the benefit of the Holders of the Green Bonds, security interests in the Green Bond Collateral, including substantially all of GO-Madison's assets,

including the Madison Facility and all personal property, and GO-Holding's membership interest in GO-Madison (each as further described the Green Bond Documents).

The Bond Trustee perfected its security interests in and mortgage on the Green Bond Collateral by filing UCC financing statements against GO-Madison and GO-Holdings with the Delaware Secretary of State and recording the Bond Deed Mortgage on December 23, 2021 with the Somerset County Register of Deeds.

As of the Petition Date, the outstanding balance of GO-Madison's obligations under the FAME Loan Agreement and other obligations related to the Green Bonds was approximately $85 million.

### QLICI Loans

Concurrently with the Green Bonds, GO-Madison entered into certain qualified low income community investment loans (the "QLICI Loans") evidenced by that certain Loan Agreement, by and between GO-Madison and MCD Subsidiary CDE 16, LLC ("MCD 16") and MHIC NE CDE II Subsidiary 64 LLC ("MHIC," and with MCD 16, the "QLICI Lenders"), and certain promissory notes by GO-Madison in favor of the QLICI Lenders in the aggregate amount of approx. $23 million.

The transaction was structured, in part, as a $17.3 million loan (the "Leverage Loan") from GO-Lending to GO Lab Investment Fund, LLC ("GLIF"), a subsidiary of Wells Fargo Community Investment Holdings, LLC ("Wells Fargo"), which used the proceeds of the Leverage Loan, together with approximately $6.7 million in tax credit equity related to tax credits to be received by Wells Fargo, to fund the QLICI Loans. The funding for the Leverage Loan came from a capital contribution from GO-Inc. to GO-Lending.

GO-Madison's obligations under the QLICI Notes are secured by various security agreements including a mortgage on the Madison Facility (the "QLICI Mortgage"). The QLICI Lenders were also granted security interests in certain reserve accounts at Mascoma Bank (account ending -8577) and Eastern Bank (account ending -0786D, and both such accounts, the "NMTC Separate Accounts").

Wells Fargo and GO-Inc. are parties to an Investment Fund Put and Call Agreement, dated as of December 23, 2021 (the "Put and Call Agreement"). Under the Put and Call Agreement, upon certain circumstances, (i) Wells Fargo holds a put option to require GO-Inc. to purchase all of Wells Fargo's interest in GLIF; and (ii) GO-Inc. holds a call option to purchase all of Wells Fargo's interest in the GLIF.

In connection with the QLICI Loans, the QLICI Lenders, Wells Fargo, GO-Inc. and GO-Holdings are parties to a Completion, Performance and Limited Payment Guaranty, dated December 23, 2021 (the "QLICI Guaranty"), pursuant to which GO-Inc. and GO-Holdings agreed, among other terms, to guaranty the obligations of GO-Madison under the QLICI Loans.

In addition, the QLICI Lenders, GO-Inc. and GO-Holdings are parties to a Environmental and Hazardous Substances Indemnity Agreement, dated December 23, 2021 (the "QLICI Indemnity Agreement," and together with the QLICI Guaranty, Put and Call Agreement, QLICI

7

Mortgage, QLICI Notes, the QLICI Loan Agreement, and all other documents and agreements entered into by the Debtors in connection with the QLICI Loans, the "QLICI Documents"), pursuant to which GO-Inc. and GO-Holdings agreed, among other terms, to indemnify the QLICI Lenders in connection with any Environmental Proceedings and the use of any Hazardous Substance (as defined under the Indemnity Agreement).

***2024 SEDC Loan***

On December 30, 2024, GO-Madison entered into a Commercial Promissory Note (the "2024 SEDC Note") in favor of Sommerset Economic Development Corporation ("SEDC") in the amount of $2,990,000 (the "2024 SEDC Loan"). The 2024 SEDC Loan is secured pursuant to that certain Mortgage Deed, dated December 30, 2024, pursuant to which SEDC received a mortgage on the Madison Facility (the "SEDC Lien"). The SEDC Loan is forgivable under certain terms, including (as described in the 2024 SEDC Note) a Capital Raise Success (as defined in the 2024 Intercreditor Agreement (defined below)) and payment in full of the 2019 SEDC Note (as defined below).

***2024 Intercreditor Agreement***

Pursuant to an intercreditor agreement originally dated December 23, 2021, and as subsequently modified on December 30, 2024 (the "2024 Intercreditor Agreement"), SEDC and the Bondholders hold first priority liens on the Bond Collateral shared *pari passu* in respect of the 2024 SEDC Loan and Green Bonds, respectively. The QLICI Loans and the QLICI Mortgage are subordinate in both priority of liens and rights to payment to the 2024 SEDC Loan and the Green Bonds. However, the QLICI Lenders may exercise their remedies with respect to the NMTC Separate Accounts without the consent of the Bond Trustee.

***FNB Loan***

On May 17, 2023, GO-Madison entered into a Promissory Note dated March 17, 2023, in favor of First National Bank Belfast ("FNB") in the amount of $288,000 (the "FNB Loan"). The FNB Loan is secured by a Liebherr LX550XP Industrial Lift. As of the Petition Date, the outstanding balance of the FNB Loan was approximately $251,000.

### 1.6.2        Loan Obligations – GO-Inc.

GO-Inc.'s capital structure includes both secured and unsecured outstanding debt:

### 1.6.2.1        Secured Debt – Go Inc.

***Open Prairie Loan***

GO-Inc. is a party to that certain Loan and Security Agreement, dated December 9, 2021, pursuant to which GO-Inc. borrowed the original principal amount of $3 million from Open Prairie (the "OP Loan"). In connection with the OP Loan, GO-Inc. granted Open Prairie a security interest (the "Open Prairie Security Interest") on its membership interest in GO-Holdings and that certain Reserve Account at KeyBank (the "KeyBank Account").

As of the Petition Date, the aggregate principal outstanding under the OP Loan was approx. $1,540,371.

***Bridge Loans***

In 2024, GO-Inc. entered into a series of Secured Promissory Notes in favor of eleven separate lenders (the "Bridge Lenders") in connection with certain bridge loans (the "Bridge Loans"). In connection with the Bridge Loans, GO-Inc. granted the Bridge Lenders a security interest in substantially all assets of GO-Inc., including goods, inventory, equipment, investment property, instruments, and general intangibles (the "Bridge Loan Security Interest"). The Bridge Loans are evidenced by the following instruments:

(i)     Secured Promissory Note dated May 3, 2024 in favor of Steven Derry, in the amount of $70,000.00;

(ii)    Secured Promissory Note, dated April 20, 2024 in favor of the Entrust Group Inc., FBO Curtis R Welling IRA Account No. 7230026182, in the amount of $250,000.00;

(iii)   Secured Promissory Note, dated February 13, 2024, in favor of Diversified Communications, in the amount of $750,000.00;

(iv)    Secured Promissory Note, dated February 13, 2024 in favor of GH Wood Fiber Fund IV, LLC, in the amount of $1,100,000.00;

(v)     Secured Promissory Note, dated February 13, 2024 in favor of Grassi Family Trust, Anthony P. Grassi, Trustee, in the amount of $250,000.00;

(vi)    Secured Promissory Note, dated April 17, 2024 in favor of Andrew Linegar, in the amount of $125,000.00;

(vii)   Secured Promissory Note, dated April 15, 2024 in favor of Ulrik & Michaela Nielsen, in the amount of $125,000.00;

(viii)  Secured Promissory Note, dated April 9, 2024 in favor of Arlene Portney & Stephen Veach, in the amount of $60,000.00;

(ix)    Secured Promissory Note, dated March 4, 2024 in favor of Victor Bogachev, in the amount of $30,000.00;

(x)     Secured Promissory Note, dated April 10, 2024 in favor of Ilona and Justin Veach, in the amount of $40,000.00; and

(xi)    Secured Promissory Note, dated February 13, 2024 in favor of Waldron Family Trust, Benjamin Waldron, Trustee, in the amount of $200,000.00.

***Series B Senior Loans***

In 2024, GO-Inc. entered into two secured convertible promissory notes (the "<u>Series B Senior Loans</u>") in favor of Saint-Gobain Delaware Corporation ("<u>Saint-Gobain</u>") and D.R. Horton (a/k/a D.R. Opportunities I, Inc.) ("<u>D.R. Horton</u>," and together, the "<u>Series B Holders</u>"):

> (i)    Secured Convertible Promissory Note dated April 26, 2024 in the original principal amount of $10,000,000.00 in favor of Saint-Gobain; and

> (ii)    Secured Convertible Promissory Note dated May 20, 2024 in the original principal amount of $1,000,000.00 in favor of D.R. Horton.

In connection with the Series B Senior Loans, GO-Inc. granted Saint-Gobain, as agent for the Series B Holders (the "<u>Series B Agent</u>"), a security interest in all assets (the "<u>GO-Inc. Collateral</u>"), including without limitation, goods, inventory, equipment, investment property, instruments, general intangibles, accounts and proceeds and products thereof.  The Series B Agent perfected the liens of the Series B Holders by filing a UCC financing statement with the Delaware Secretary of State.

As of the Petition Date, the outstanding aggregate balance under the Series B Loans was $11.7 million.

***Subordination to Series B Senior Holders***

On April 24, 2024, the Bridge Lenders and the Series B Agent entered into a Subordination and Intercreditor Agreement (the "<u>Subordination Agreement</u>"), pursuant to which the Bridge Lenders agreed to subordinate their security interests to the liens of the Series B Holders.  On April 26, 2024, GO-Inc., Open Prairie and the Series B Agent entered into an Intercreditor Agreement (the "<u>2024 GO-Inc. Intercreditor Agreement</u>," and together with the Subordination Agreement, the "<u>2024 Subordination Agreements</u>").  Pursuant to the 2024 GO-Inc. Intercreditor Agreement, Open Prairie agreed, among other things, that the liens and security interest of the Series B Holders are senior to the liens and security interest of Open Prairie with respect to all collateral securing the OP Loan.

### 1.6.2.2    <u>Unsecured Debt – GO-Inc.</u>

***QLICI Loans***

As previously noted, GO-Inc. has certain obligations under the QLICI Documents.

***Other Unsecured Loans to GO-Inc.***

In addition, GO-Inc. received financing in connection with the following unsecured loans, which remain outstanding:

> • Commercial Promissory Note dated August 16, 2019 by GO-Inc. and GO-Madison in favor of SEDC with respect to a loan in the original principal amount of $300,000.00.    The parties subsequently entered into a Note Modification

10

Agreement and Allonge, dated September 24, 2020, pursuant to which the parties increased the principal amount of the loan to $400,000.00. On December 15, 2021, the parties entered into a Loan Modification and Release Agreement, pursuant to which SEDC made certain loan concessions, including a release of all security interests and liens and a release of GO-Madison from any liability on the loan.

- Promissory Note dated April 13, 2019 in favor of Anthony Maderal in the original principal amount of $100,000.00.

- Promissory Note dated August 16, 2019 in favor of Maine Rural Development Authority ("MRDA") in the original principal amount of $500,000. The parties subsequently entered into a Loan Modification and Partial Release Agreement, dated as of December 15, 2021, pursuant to which MRDA made certain loan concessions and released GO-Madison's liability on the guaranty.

- Economic Recovery Program Loan Promissory Note and Loan Agreement, dated August 16, 2019, between GO-Inc. and FAME pursuant to which FAME made a loan in the original principal amount of $1,200,000 to GO-Inc. The parties subsequently entered into a Loan Modification and Partial Release Agreement, dated as of December 15, 2021, pursuant to which GO-Madison was released from liability on the guaranty.

- GO-Inc. and the Kennebec Valley Council of Governments ("KVCOG") entered into that certain Commitment Letter and Loan Agreement, dated June 4, 2021, pursuant to which KVCOG made a loan to GO-Inc. in the original principal amount of $300,000.00.

- Note dated November 16, 2021 in favor of the Town of Madison in the original principal amount of $400,000.00.

- Convertible Note Purchase Agreement dated May 17, 2023 between GO Lab, Inc. and Small Enterprise Growth Fund d/b/a Maine Venture Fund ("MVF"), pursuant to which MVF made a loan in the original principal amount of $3,500,000.00 (the "MVF Loan").

- Commercial Promissory Note dated March 6, 2024 in favor of MRDA in the original principal amount of $500,000.00.

- GO-Inc. and FAME entered into that certain Economic Recovery Loan Agreement, dated March 6, 2024, pursuant to which FAME made a loan in the original principal amount of $500,000.00. As security for its obligations under the 2024 FAME Direct Loan, GO-Inc. granted FAME a security interest in the Leverage Loan.

### 1.6.3    Trade Debt – GO Madison

As of the Petition Date, GO-Madison had unsecured trade debt of approximately $6,294,231. In addition, two trade creditors – Cianbro Corporation and Gilman Electrical Supply

11

– have asserted claims secured by mechanic's liens against GO-Madison totaling over $15,000,000, as discussed further below.

### 1.7   Summary of Assets

The assets of the Debtors are summarized in the following chart.

| GO-Inc. Assets | Go-Madison Assets |
|---|---|
| 100% of the membership interests in GO-Lending, GO-Holdings, and GO-Finance | Madison Facility (real estate, improvements and fixtures) |
| Bank accounts | Substantially all of the Debtors' Equipment (at Madison Facility) |
| Three (3) vehicles | Bank accounts |
| Limited equipment at Madison Facility | Inventory |
| Intellectual property | Accounts Receivable |

Additionally, in 2024, GO-Inc. was approved for a federal Advanced Energy Project Credit under section 48C of the Internal Revenue Code in the amount of approximately $16.8 million, based upon the costs associated with equipment purchase, shipping, engineering and installation of its board production line (the "Board Line") at the Madison Facility. Subject to IRS approval, the Debtors may be entitled to claim the tax credit when the Board Line is placed in service for federal income tax purposes.

### 1.8   Events Leading to Debtors' Chapter 11 Filing

The Debtors' financial distress arose from unbudgeted cost increases and delays with the construction of the Madison Facility, which remains incomplete. Inflation and supply-chain issues caused by the pandemic resulted in substantial cost-overruns, particularly with respect to the price of steel and electrical components. In addition, there were unexpected engineering problems associated with retrofitting the paper mill that resulted in substantial change orders. Altogether, the cost overruns on the project exceeded $30 million and prevented completion of the Board Line Construction. Two of the contractors on the project, Cianbro Corporation ("Cianbro") and Gilman Electrical Supply ("Gilman"), recorded mechanic's liens against GO-Madison in excess of $15,000,000.

In response to the cost overruns, the Debtors drastically reduced their operating expenses, including by limiting marketing and personnel expenses otherwise budgeted for launching and providing on the ground support for TimberBatt and TimberFill to divert capital to completion of the construction. The production start for TimberBatt was delayed due to working capital limitations, and the production ramp and sales for TimberFill was initially hindered as the Debtors received feedback from contractors in the field, fine-tuned their manufacturing processes, and in

12

select cases, shipped replacement product.  Finally, as noted above, the Board Line Construction is not complete, which prevented the Debtors from launching their largest expected revenue producer, TimberBoard, and receiving related income.

The cost-overruns and delays severely strained the Debtors' operating capital.  In 2023 and 2024, the Debtors solicited a "Series B" equity offering with the goal of raising an additional $60 million to complete construction of the Madison Facility, fund operations and launch the TimberBoard line.  The Debtors were successful only in raising an additional $31 million of Series B funding.

On September 6, 2024, the Debtors and the Bond Trustee entered into a Standstill and Forbearance Agreement (the "Forbearance Agreement").  Among other terms, the Forbearance Agreement required the Debtors to engage an investment banking firm and meet certain capital raise and sale milestones, with a new capital deadline of November 20, 2024 and a sale deadline of December 20, 2024.  In September 2024, the Debtors' board appointed an independent director, and retained Jefferies LLC ("Jefferies") as investment banker.  Jefferies immediately launched a data room and began an exhaustive effort to market the Debtors' assets and identify sources of new capital, soliciting proposals from over 190 interested parties.

In the meantime, the Debtors received an indication of interest ("IOI") from a potential investor (the "Potential Investor") in September 2024.  The Debtors received a forgivable loan (*i.e.,* the 2024 SEDC Loan) in December 2024 to address the growing liquidity challenges and to fund operations while working with the Potential Investor towards a transaction close, targeted for February 2025.

However, in early February 2025, the Potential Purchaser informed the Debtors it was no longer able to pursue closing of a transaction.

The Debtors, through their principals and advisors, pivoted and began negotiations with the Bondholders, FAME, the Series B Senior Lenders, the QLICI Lenders, SEDC, trade creditors and other stakeholders, regarding a restructuring.  To fund operating expenses through the Petition Date and allow the Debtors to continue paying employees and professionals, the Bondholders permitted the Debtors to make certain draws on the Debt Service Reserve Fund.

The extensive discussions culminated in a series of restructuring support agreements (the "RSAs") with substantially all of the Debtors' secured and unsecured creditors to effect a consensual restructuring of the Debtors' balance sheet pursuant to this Plan.  The filing of the Chapter 11 Cases and this Plan allows the Debtors to address their liquidity challenges and continue operations, meet employee and other obligations, and implement the restructuring set forth in the RSAs.

## 1.9    Developments in the Chapter 11 Cases

Since the Petition Date, the Bankruptcy Court has entered various orders designed the facilitate the orderly administration of the Bankruptcy Cases and minimize the disruption of the Debtors' business affairs, summarized below.

### 1.9.1    DIP Order

On March 26, 2025, the Bankruptcy Court entered an interim order authorizing the Debtors to obtain postpetition financing, authorizing the Debtors to use cash collateral, granting adequate protection to prepetition secured parties, scheduling a hearing to consider entry of a final order, and granting related relief [D.I. 40] (the "Interim DIP Order"). The Interim DIP Order authorizes the Debtor to obtain financing in the amount of $3.25 million in order to meet payroll and other interim obligations and to provide the DIP Lender with first liens and super priority claims on the Debtors' assets. The Bankruptcy Court also scheduled a final hearing for April 21, 2025 at 11:30 a.m. ET to consider entering an order (the "Final DIP Order") authorizing the Debtors to obtain $10,000,000 in total postpetition financing. The United States Trustee raised certain issues regarding the proposed order attached to the motion, but no other parties contacted the Debtors with any objections, either formal or informal, by the April 14, 2025 objection deadline. The Debtors were able to resolve the United States Trustee's concerns, and submitted revised proposed order on April 15, 2025. On April 16, 2025, the Bankruptcy Court entered the Final DIP Order [D.I. 85].

### 1.9.2    Employee Compensation Order

On March 26, 2025, the Bankruptcy Court entered an interim order, among other things, authorizing the Debtors to pay prepetition wages, salaries, and other compensation, reimbursable employee expenses, contributions to prepetition employee benefit programs (and authorizing the Debtors to continue such programs), and workers' compensation obligations, and scheduling a hearing for April 21, 2025 at 11:30 a.m. ET to consider entering the relief on a final basis [D.I. 36]. The United States Trustee raised certain issues regarding the proposed order attached to the motion, but no other parties contacted the Debtors with any objections, either formal or informal, by the April 14, 2025 objection deadline. The Debtors were able to resolve the United States Trustee's concerns, and submitted revised proposed order on April 15, 2025. On April 16, 2025, the Bankruptcy Court entered the order granting the motion on a final basis [D.I. 90].

### 1.9.3    Utilities Order

On March 26, 2025, the Bankruptcy Court entered an interim order prohibiting utility providers from altering, refusing or discontinuing services to, or discriminating against, the Debtors on account of prepetition amounts due, authorizing the Debtors to establish an adequate assurance deposit account, and establishing procedures for determining requests for additional adequate assurance [D.I. 44]. The Bankruptcy Court also scheduled a final hearing for April 21, 2025 at 11:30 a.m. ET to consider granting the relief on a final basis. The United States Trustee raised certain issues regarding the proposed order attached to the motion, but no other parties contacted the Debtors with any objections, either formal or informal, by the April 14, 2025 objection deadline. The Debtors were able to resolve the United States Trustee's concerns, and submitted revised proposed order on April 15, 2025. On April 16, 2025, the Bankruptcy Court entered the order granting the motion on a final basis [D.I. 87].

### 1.9.4      <u>Cash Management Order</u>

On March 26, 2025, the Bankruptcy Court entered an interim order authorizing the Debtors to maintain their existing bank accounts and cash management systems and granting related relief [D.I. 37]. The Bankruptcy Court also scheduled a final hearing for April 21, 2025 at 11:30 a.m. ET to consider granting the relief on a final basis. The United States Trustee raised certain issues regarding the proposed order attached to the motion, but no other parties contacted the Debtors with any objections, either formal or informal, by the April 14, 2025 objection deadline. The Debtors were able to resolve the United States Trustee's concerns, and submitted revised proposed order on April 15, 2025. On April 16, 2025, the Bankruptcy Court entered the order granting the motion on a final basis [D.I. 88].

### 1.9.5      <u>Insurance Order</u>

On March 26, 2025, the Bankruptcy Court entered an interim order authorizing the Debtors to pay pre and postpetition amounts due under their insurance policies and policy premium financing agreements [D.I. 41]. No objections, either formal or informal, were raised by the April 14, 2025 objection deadline, and on April 16, 2025, the Bankruptcy Court entered the order granting the motion on a final basis [D.I. 86].

## 1.10     <u>Plan Overview</u>

The following is a brief overview of the material provisions of the Plan and is qualified in its entirety by reference to its operative provisions in <u>Articles 2 -14</u> below. The Plan effects a balance-sheet restructuring of the Debtors by: (i) cancelling all existing equity interests in the Debtors, including all preferred and common stock of GO-Inc. and all membership interests in GO-Madison, and all related rights and interests, including, but not limited to, warrants, options, and pledges, liens and security interests encumbering such equity interests; (ii) providing exit financing to the Reorganized Debtors in an amount not less than $19 million, in the form of newly issued tax-exempt bond funding advanced by the Participating Bondholders (as defined below), in return for a reissuance of prepetition bond debt on a 1:1 basis, and 100% of membership interests in the Reorganized GO-Madison (the "<u>New Membership Interest</u>"), which will immediately be contributed to the Reorganized GO-Inc.; (iii) issuing new common stock in GO-Inc., which will be granted to the Participating Bondholders in exchange for the contribution of the New Membership Interest, the DIP Lenders in the amount of the DIP Participation Fee and the Holders of Series B Senior Secured Claims in satisfaction of the Class 10 Claims; (iv) surrendering certain collateral in consideration of certain secured claims; (v) settling unsecured claims and mechanics liens against GO-Madison through partial payment; and (vi) cancelling all unsecured debt of GO-Inc. Except as otherwise expressly provided herein, upon the Effective Date of the Plan, all indebtedness of the Debtors will be discharged and all property of the estates will revest in the Debtors free and clear of liens, claims, encumbrances, and interests of any kind.

The Plan designates Classes of Claims against, and Interests in, the Debtors which Classes take into account the differing nature of the various Claims and Interests and their relative priorities under the Bankruptcy Code and applicable non-bankruptcy law.

The following table (the "Plan Summary Table") summarizes the classification and treatment of Claims (including certain unclassified Claims) and Interests, along with the projected recoveries for each class. **The Plan Summary Table is intended for illustrative purposes only and does not address all issues regarding the classification, treatment, and ultimate recoveries. The Plan Summary Table is not a substitute for a full review of this Plan in its entirety. In addition, nothing herein is intended, nor should it be construed, as an admission by the Debtors of the estimated Allowed amount of any Claim or Class thereof, or as a guarantee or assurance of a particular percentage recovery, or range of recoveries, on any Allowed Claim or Class thereof. The Debtors reserve all rights with respect to the estimation and allowance of Claims.**

| Class | Description | Estimated Allowed Claim Amounts | Treatment of Claims and Interests within Class | Anticipated Recovery | Voting Rights |
|---|---|---|---|---|---|
| - | Administrative Expense Claims | | Except for DIP Facility (discussed below), all administrative expenses will be paid in ordinary course of business, as authorized by Court, or as agreed between the parties. | 100% | |
| - | Priority Tax Claims | | Paid in full on Effective Date or as otherwise agreed. | 100% | |
| - | DIP Claims | | On the Effective Date, the DIP Claims shall receive (i) newly-issued common stock of GO-Inc. equal to the amount of the DIP Participation Fee; and (ii) the Converted DIP Loan pursuant to the Converted DIP Loan Documents, DIP Orders and DIP Loan Documents. | 100% | |
| 1 | Green Bond Claims | $85,000,000 | Except to the extent that a Holder of a Green Bond Claim has agreed to less favorable treatment, each Holder of a Green Bond Claim will be entitled to elect to (i) participate in the Exit Financing within the Exit Financing Contribution Limits or (ii) not participate in the Exit Financing. | 2% for Non-Participating Bondholders; dependent on the amount of Exit Financing contributed, up to 54.5455%, plus a pro rata share of 74.8125% of the New | Entitled to Vote |

16

| Class | Description | Estimated Allowed Claim Amounts | Treatment of Claims and Interests within Class | Anticipated Recovery | Voting Rights |
|---|---|---|---|---|---|
| | | | Participating Bondholders (*i.e.*, Holders of Green Bond Claims that timely elect to participate in the Exit Financing) will receive for each $1.00 in Exit Financing contributed within the Exit Financing Contribution Limits: (a) tax-exempt Exit Green Bonds in a principal amount equal to twice the amount of Exit Financing provided by such Participating Bondholder, with fifty percent (50%) of such amount attributed to the amount of Exit Financing, and fifty percent (50%) of such amount attributed to the existing Green Bond Claim held by such Participating Bondholder, secured by first priority lien on all assets of the Debtors shared *pari passu* with the liens of the Converted DIP Loan; and (b) a pro rata share of the New Membership Interest.<br><br>Each Non-Participating Bondholder (*i.e.*, Holders of Green Bond Claims that | Common Stock for Participating Bondholders[2] | |

---

[2] No formal valuation of the New Common Stock has been prepared for Plan purposes given the early-stage status, numerous uncertainties, and contingent events still to occur. Consequently, the value of the New Common Stock remains highly speculative and no fixed recovery percentage for Participating Bondholders has been estimated. Actual recoveries will depend on level of participation in Exit Financing and future operating performance. Any Holder of a Class 1 Claim with questions regarding the election to become a Participating Bondholder should promptly contact Jefferies by email at Project.Tango.Rx@jefferies.com.

LEGAL\77640027\2

| Class | Description | Estimated Allowed Claim Amounts | Treatment of Claims and Interests within Class | Anticipated Recovery | Voting Rights |
|---|---|---|---|---|---|
| | | | do not timely elect to participate in the Exit Financing) will receive distributions on or as soon as practicable after the Effective Date in an amount equal to two percent (2%) of its Allowed Green Bond Claim. All distributions to Holders of Green Bond Claims, whether to Participating Bondholders or Non-Participating Bondholders, are subject to the rights and terms of the Green Bond Documents and the rights of the Green Bond Trustee thereunder, including the right to assert any charging liens. | | |
| 2 | 2024 SEDC Secured Loan Claim | $3,000,000 | On or as soon as practicable after the Effective Date, the Holder of a Class 2 Claim will receive a Cash payment equal to two percent (2%) of its Allowed 2024 SEDC Secured Loan Claim. Any Liens held by Holders of Class 2 Claims shall be released and discharged on the Effective Date. | 2% | Entitled to Vote |
| 3 | QLICI Secured Claims | $22,974,872 | On or as soon as practicable after the Effective Date, the Debtors shall release the amounts in the NMTC Separate Accounts to the Respective QLICI Lenders. Any Liens held by Holders of Class 3 Claims shall be released and discharged on the Effective Date. | <1% | Entitled to Vote |

18

| Class | Description | Estimated Allowed Claim Amounts | Treatment of Claims and Interests within Class | Anticipated Recovery | Voting Rights |
|---|---|---|---|---|---|
| 4 | Cianbro Mechanic's Lien Claim | $15,202,547.84 | On or as soon as practicable after the Effective Date, Cianbro will receive a Cash payment of $3 million (the "First Cianbro Payment").<br><br>In addition, subject to the conditions herein, Cianbro will receive a $500,000 negotiated recovery payment in consideration of its agreement to enter into a construction contract with GO-Madison to complete the board line ("Board Line Contract") on a "cost plus" basis under GO-Madison's direction (the "Negotiated Recovery Payment"). The Negotiated Recovery Payment will be paid to Cianbro by the Debtor Parties upon the earlier of: (a) the substantial completion of Cianbro's scope of work under the Board Line Contract, (b) a material event of default by GO-Madison under the Board Line Contract which remains uncured for thirty (30) days or more after notice, or (c) upon GO-Madison's termination of the Board Line Contract for convenience.<br><br>Finally, Cianbro will receive a payment of $4.5 million (the "Final Cianbro Amount"), as follows: (a) Cianbro will receive forty percent (40%) of the net proceeds realized from monetization of the 48C Tax Credit up to the Final Cianbro Amount (the "Tax Credit | Approx 53% | Entitled to Vote |

| Class | Description | Estimated Allowed Claim Amounts | Treatment of Claims and Interests within Class | Anticipated Recovery | Voting Rights |
|-------|-------------|-------------------------------|------------------------------------------------|---------------------|---------------|
| | | | Payment"); and (b) solely to the extent that the Tax Credit Payment is less than the Final Cianbro Amount (the "Cianbro Deficiency"), Cianbro will receive the Cianbro Secured Note in the amount of the Cianbro Deficiency. <br><br> On the Effective Date, the Cianbro Adequate Protection Lien and any other Liens held by any Holder of a Class 4 Claim shall be released and discharged on the Effective Date. | | |
| 5 | Gilman Mechanic's Lien Claim | $144,952.93 | On or as soon as practicable after the Effective Date, but no later than thirty days after the Effective Date, Gilman will receive a Cash payment in the amount of $57,981.17, and any Lien held by Gilman, including without limitation the Gilman Mechanic's Lien, including the Gilman Mechanic's Lien, will be deemed released and discharged. | 40% | Entitled to Vote |
| 6 | GO-Madison Other Secured Claims | None | On the Effective Date, all Holders of GO-Madison Other Secured Claims will be Unimpaired. | 100% | Not Entitled to Vote |
| 7 | Non-Tax Priority Claims | | The legal, equitable and contractual rights of the Holders of Allowed Non-Tax Priority Claims are unaltered by the Plan. Each Allowed Non-Tax Priority Claim shall be paid in full, in Cash, on or as soon as reasonably practicable after the Effective Date, or on such other terms and conditions as are | 100% | Not Entitled to Vote |

20

| Class | Description | Estimated Allowed Claim Amounts | Treatment of Claims and Interests within Class | Anticipated Recovery | Voting Rights |
|---|---|---|---|---|---|
| | | | acceptable to the Reorganized Debtors and the Holder of an Allowed Non-Tax Priority Claim. | | |
| 8 | GO-Madison General Unsecured Claims | $5,500,000 | On or as soon as practicable after the Effective Date, each Holder of an Allowed GO-Madison General Unsecured Claim shall receive a Cash payment equal to ten percent (10%) of its Allowed GO-Madison General Unsecured Claim, except to the extent that a Holder of an Allowed GO-Madison General Unsecured Claim has agreed to less favorable treatment or has been paid previously. | 10% | Entitled to Vote |
| 9 | Convenience Class Claims (GO-Madison Unsecured Claims in Allowed amounts of $25,000.00 or less) | $660,000 | On or as soon as practicable after the Effective Date, each Holder of an Allowed Convenience Class Claim shall receive payment, in Cash, in the full amount of its Allowed Convenience Class Claim, except to the extent that a Holder of a Convenience Class Claim has agreed to less favorable treatment or has been paid previously. | 100% | Not Entitled to Vote |
| 10 | Series B Senior Secured Claims | $11,742,740 | On or as soon as practicable under the Effective Date, Saint-Gobain and D.R. Horton will receive shares of New Common Stock equal to 5% and .5%, respectively, of the New Common Stock issued pursuant to this Plan. Any Liens held by Holders of Class 10 Claims shall be released and discharged on the Effective Date. | | Entitled to Vote |
| 11 | Open Prairie Secured Claim | $1,540,372 | On or as soon as practicable after the Effective Date, the | <1% | Entitled to Vote |

21

| Class | Description | Estimated Allowed Claim Amounts | Treatment of Claims and Interests within Class | Anticipated Recovery | Voting Rights |
|---|---|---|---|---|---|
| | | | Debtors shall turnover and release the funds existing in the KeyBank Account as of the Petition Date. Any Liens held by any Holder of a Class 11 Claim shall be released and discharged on the Effective Date. | | |
| 12 | Bridge Loan Claims | $3,338,186 | On the Effective Date, all Bridge Loan Claims shall be cancelled and discharged, and Holders of Bridge Loan Claims shall not receive or retain any Property under the Plan on account of their Bridge Loan Claims. Any Liens held by Holders of Class 12 Claims shall be released and discharged on the Effective Date. | 0% | Not Entitled to Vote |
| 13 | GO-Inc. General Unsecured Claims | $7,411,742 | On the Effective Date, all GO-Inc. General Unsecured Claims shall be cancelled and discharged, and Holders of GO-Inc. General Unsecured Claims shall not receive or retain any Property under the Plan on account of their GO-Inc. General Unsecured Claims. Any Liens held by Holders of Class 12 Claims shall be released and discharged on the Effective Date. | 0% | Not Entitled to Vote |
| 14 | Intercompany Claims | | On the Effective Date, all Intercompany Claims shall be cancelled and discharged, and Holders of Intercompany Claims shall not receive or retain any Property under the Plan on account of their Intercompany Claims. | 0% | Not Entitled to Vote |
| 15 | GO-Inc. Equity Interests | | On the Effective Date, all GO-Inc. Equity Interests shall be retired, cancelled, | 0% | Not Entitled to Vote |

22

| Class | Description | Estimated Allowed Claim Amounts | Treatment of Claims and Interests within Class | Anticipated Recovery | Voting Rights |
|---|---|---|---|---|---|
| | | | extinguished and discharged in accordance with the terms of the Plan, and Holders of GO-Inc. Equity Interests shall not receive or retain any Property under the Plan on account of their GO-Inc. Equity Interests. | | |
| 16 | GO-Madison Equity Interests | | On the Effective Date, all GO-Madison Equity Interests shall be cancelled, and Holders of GO-Madison Equity Interests shall not receive or retain any Property under the Plan on account of their GO-Madison Equity Interests. | 0% | |

**\*\*The treatment and distributions, if any, provided to holders of Claims and Interests under this Plan will be in full and complete satisfaction of all legal, equitable, or contractual rights presented by such Claims and Interests.\*\***

## 1.11    Voting and Confirmation Procedures

Accompanying this Plan are copies of the following documents (collectively, the "Solicitation Package"):

(i)    cover letters from the Debtors;

(ii)    a Ballot (for Members of Classes entitled to vote); and

(vi)    A Convenience Class Election Form.

The Ballot is included for purposes of soliciting votes to accept or reject the Plan pursuant to Bankruptcy Rule 3018; provided, however, that the Debtors shall have the right to prepare and distribute other or modified forms of Ballots, substantially conforming with the Ballots and Official Form No. 14, as the Debtors deem necessary due to further refinement of the balloting process or modifications to the Plan.

The Ballots, and the related solicitation materials delivered together herewith, are being furnished for purposes of soliciting votes on the Plan to members of the Classes entitled to vote (identified below).  The Plan is also being provided to members of all other Classes solely for informational purposes.

### 1.11.1    Who May Vote on the Plan.

Pursuant to the provisions of the Bankruptcy Code, <u>only</u> impaired classes of claims or equity interests are entitled to vote to accept or reject a plan of reorganization.  A class which is not "impaired" (also referred to as "unimpaired") under a plan is deemed to have accepted such plan and is not entitled to vote.

A class is "impaired" under the Bankruptcy Code <u>unless</u> the legal, equitable, and contractual rights of the holders of claims or equity interests in such class are not modified or altered.  For purposes of the Plan, the Holders of the Claims or Interests in the following Classes are the only Impaired Classes entitled to Vote on the Plan:

> Class 1 (Green Bond Claims)
> Class 2 (2024 SEDC Secured Loan Claim)
> Class 3 (QLICI Secured Claims)
> Class 4 (Cianbro Mechanic's Lien)
> Class 5 (Gilman Mechanic's Lien)
> Class 8 (GO-Madison General Unsecured Claims)
> Class 10 (Series B Senior Secured Claims)
> Class 11 (Open Prairie Secured Claims)

Holders of Claims or Interests in the following Classes are unimpaired and therefore are not entitled to vote:

> Class 6 (GO-Madison Other Secured Claims)
> Class 7 (Non-Tax Priority Claims)
> Class 9 (Convenience Class Claims)

Finally, Holders of Claims or Interests in the following Classes will not receive or retain any property or interest in property under the Plan, and therefore are deemed to reject the Plan and are not entitled to vote:

> Class 12 (Bridge Loan Claims)
> Class 13 (GO-Inc. General Unsecured Claims)
> Class 14 (Intercompany Claims)
> Class 15 (GO-Inc. Equity Interests)
> Class 16 (GO-Madison Equity Interests)

### 1.11.2    Voting Procedures

All votes to accept or reject the Plan must be cast by using the form of Ballot enclosed with this Plan.  No votes other than ones using such Ballots will be counted except to the extent that the Bankruptcy Court may order otherwise.  The date on which the Court entered an order approving this Combined Plan and Disclosure Statement on an interim basis (the "<u>Voting Record Date</u>") is the time and date for the determination of holders of record of Claims and Interests who are entitled to (a) receive a copy of this Disclosure Statement and all of the related materials and (b) where applicable, vote to accept or reject the Plan.

24

After carefully reviewing the Plan and this Disclosure Statement, including the attached exhibits, please indicate your acceptance or rejection of the Plan on the Ballot and return such Ballot to Omni Agent Solutions, Inc. (the "Balloting Agent") as follows:

### If by First Class Mail, Overnight Courier, or Hand Delivery

**Go Lab, Inc. Ballot Processing**
**c/o Omni Agent Solutions, Inc.**
**5955 De Soto Ave., Suite 100**
**Woodland Hills, CA 91367**

### If by Electronic Submission

**If you prefer to submit your ballot online, properly completed Ballots may be submitted to the Balloting Agent via upload through the Balloting Agent's online portal by visiting https://omniagentsolutions.com/GoLab-Ballots and click on "Balloting" section and follow the instructions to submit your Ballot**

**The Balloting Agent's Ballot portal is the sole manner in which Ballots will be accepted via electronic or online transmission. Ballots submitted by facsimile, email or other means of electronic transmission will not be counted.** *Ballots must be actually received by 4:00 p.m., prevailing Eastern Time, on May 27, 2025 (the "Ballot Deadline"). The following Ballots will not be counted: any Ballot which (i) is not executed, (ii) is properly completed, executed and timely returned to the Debtors but which does not indicate an acceptance or rejection of the Plan, (iii) has both the acceptance and rejection boxes checked, (iv) does not bear an original signature, or (v) is not received by the Ballot Deadline.*

If you have any questions on the procedures for voting on the Plan, please contact the Balloting Agent by: (1) calling (888) 711-3084 (US & Canada) or (747) 293-0184 (International) or (2) sending an email to GoLabInquiries@OmniAgnt.com (any email should include reference to "GO Lab Ballot" in the subject line).

### 1.11.3   Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing (the "Confirmation Hearing") to consider (i) final approval of this Combined Plan and Disclosure Statement as providing adequate information pursuant to section 1125 of the Bankruptcy Code and (ii) confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code. The Debtors will request, on the Petition Date, that the Bankruptcy Court approve the Combined Plan and Disclosure Statement at a joint hearing. The Confirmation Hearing may, however, be continued from time to time without further notice other than an adjournment announced in open court or a notice of adjournment filed with the Bankruptcy Court and served in accordance with the Bankruptcy Rules, without further notice to parties in interest. The Bankruptcy Court, in its discretion and prior to the Confirmation Hearing, may put in place additional procedures governing the Confirmation Hearing. Subject to section 1127 of the Bankruptcy Code, the Plan may be modified, if necessary, prior to, during, or as a result of the Confirmation Hearing, without further notice to parties in interest.

LEGAL\77640027\2

Additionally, section 1128(b) of the Bankruptcy Code provides that a party in interest may object to Confirmation of the Plan. The Debtors, in the same motion requesting a date for the Confirmation Hearing, will request that the Bankruptcy Court set a date and time for parties in interest to file objections to Confirmation of the Plan. An objection to Confirmation of the Plan must be filed with the Bankruptcy Court and served on the Debtor and certain other parties in interest in accordance with the applicable order of the Bankruptcy Court so that it is actually received on or before the deadline to file such objections as set forth therein.

You will be provided with notice of the Confirmation Hearing, as well as the deadline and procedure for filing and serving objections to the Plan (the "Plan Objection Deadline").

### 1.11.4 Voting Recommendation

The Debtors have unanimously approved the solicitation of votes on the Plan, the Plan, and the transactions contemplated thereby, and ***recommend that all Impaired creditors submit ballots accepting the Plan.***

## 1.12 Statutory Requirements for Confirmation

At the Confirmation Hearing, the Debtors will request that the Bankruptcy Court determine that the Plan satisfies the requirements of section 1129 of the Bankruptcy Code. If so, the Court shall enter an order confirming the Plan. The applicable requirements of section 1129 of the Bankruptcy Code are as follows:

(a) The Plan must comply with the applicable provisions of the Bankruptcy Code.

(b) The Debtors must have complied with the applicable provisions of the Bankruptcy Code.

(c) The Plan has been proposed in good faith and not by any means forbidden by law.

(d) Any payment made or promised to be made by the Debtors under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, has been disclosed to the Bankruptcy Court, and any such payment made before Confirmation of the Plan is reasonable, or if such payment is to be fixed after Confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable;

(e) The Debtors must have disclosed the identity and affiliations of any individual proposed to serve, after Confirmation of the Plan, as a director, officer, or voting trustee of each of the Debtors under the Plan. Moreover, the appointment to, or continuance in, such office of such individual, is consistent with the interests of Holders of Claims and Interests and with public policy, and the Debtors have disclosed the identity of any insider that the Reorganized Debtors will employ or retain, and the nature of any compensation for such insider;

26

(f)     <u>Best Interests of Creditors Test</u>.  With respect to each Class of Impaired Claims or Interests, either each Holder of a Claim or Interest of such Class has accepted the Plan, or will receive or retain under the Plan on account of such Claim or Interest, property of a value, as of the Effective Date of the Plan, that is not less than the amount that such Holder would receive or retain if the Debtors were liquidated on such date under chapter 7 of the Bankruptcy Code.  In a chapter 7 liquidation, creditors and interest holders of a debtor are paid from available assets generally in the following order, with no lower class receiving any payments until all amounts due to senior classes have either been paid in full or payment in full is provided for: (i) first to secured creditors (to the extent of the value of their collateral), (ii) next to priority creditors, (iii) next to unsecured creditors, (iv) next to debt expressly subordinated by its terms or by order of the Court and (v) last to holders of interests.  The starting point in determining whether the Plan meets the "best interests" test is a determination of the amount of proceeds that would be generated from the liquidation of the Debtors' remaining assets in the context of a chapter 7 liquidation.  Such value must then be reduced by the costs of such liquidation, including costs incurred during the Chapter 11 Cases and allowed under chapter 7 of the Bankruptcy Code (such as fees and expenses of Professional Persons), a chapter 7 trustee's fees, and the fees and expenses of professionals retained by a chapter 7 trustee.  The potential chapter 7 liquidation distribution in respect of each class must be further reduced by the costs imposed as a result of the delay that would be caused by conversion of the Chapter 11 Cases to cases under chapter 7.  For the reasons set forth above and in the Liquidation Analysis (defined below), the Debtors submit that Holders of Claims will receive under the Plan a recovery at least equal in value to the recovery such Holders would receive pursuant to a liquidation of the Debtors under chapter 7 of the Bankruptcy Code.  The Debtors believe that under the Plan, Holders of Impaired Claims will receive property with a value equal to or in excess of the value such Holders would receive in a liquidation of the Debtors under chapter 7 of the Bankruptcy Code.

In this regard, the Debtors have prepared a liquidation analysis (the "<u>Liquidation Analysis</u>"), a copy of which is attached hereto as **<u>Exhibit A</u>**, which is premised upon a liquidation of the Debtors in a hypothetical chapter 7 case.  In the Liquidation Analysis, the Debtors have taken into account the nature, status and underlying value of the assets of the Debtors, the ultimate realizable value of such assets, and the extent to which the assets are subject to liens and security interests.  As demonstrated by the Liquidation Analysis, the Debtors believe that if the Chapter 11 Cases were converted to chapter 7 liquidations, Holders of Claims in Classes 1-5 and 8, 10 and 11 would receive less than they will receive under the Plan, and Holders of other Claims and Interests would receive no distributions.

(g)     Each class of Claims or Interests has either accepted the Plan or is not Impaired under the Plan;

(h)     Except to the extent that the Holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that (i) Holders of Allowed Administrative Expense Claims shall be paid in full in Cash; (ii) Holders of Allowed Priority Tax Claims shall receive on account of such Claims either payment in full in Cash or, in accordance with section 1129(a)(9)(C) of the Bankruptcy Code, regular installment payments in Cash: (w) of a total value, as of the Effective Date, equal to the Allowed amount of such Claim, (x) which total value shall include simple interest to accrue on any outstanding balance of such Allowed Priority Tax Claim starting on the Effective Date at the rate of interest determined under applicable nonbankruptcy

27

law pursuant to section 511 of the Bankruptcy Code, (y) over a period ending not later than five (5) years after the Petition Date, and (z) in a manner not less favorable than the most favored nonpriority Unsecured Claim provided for by the Plan (other than payments in Cash made to a Class of creditors under section 1122(b) of the Bankruptcy Code); and (iii) Holders of Allowed Non-Tax Priority Claims shall be paid in full in Cash;

      (i)    At least one Impaired class of Claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim of such Class;

      (j)    <u>Feasibility</u>.  Section 1129(a)(11) of the Bankruptcy Code provides that a Chapter 11 plan may be confirmed only if the bankruptcy court finds that such plan is feasible.  A feasible plan is one which will not lead to a need for further reorganization or liquidation of the debtor.  The Bankruptcy Court will find that the Plan is feasible if it determines that the Debtors will be able to satisfy the conditions precedent to the Effective Date and otherwise have sufficient funds to meet their post-Confirmation Date obligations to pay for the costs of administering and fully consummating the Plan and closing the Chapter 11 Cases.

For purposes of determining whether the Plan meets the feasibility requirement, the Debtors, in consultation with their financial advisors, have analyzed the Debtors' ability to meet their obligations under the Plan.  As part of that analysis, the Debtors have prepared consolidated projected financial results for the period beginning July 1, 2025 and ending December 31, 2029 ("<u>Projections</u>").  These Projections are attached hereto as **<u>Exhibit B.</u>**  The assumptions the Debtors considered to be significant are described in the notes which are part of the Projections.  Based on the Projections, the Debtors believe that the Plan is feasible and that the Reorganized Debtors will be able to satisfy their obligations under the Plan, as well as their obligations associated with post-Effective Date business operations.

THE PROJECTIONS WERE NOT PREPARED TO COMPLY WITH THE GUIDELINES FOR PROSPECTIVE FINANCIAL STATEMENTS PUBLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS.  THE DEBTORS' INDEPENDENT ACCOUNTANTS HAVE NEITHER EXAMINED NOR COMPILED THE PROJECTIONS AND, ACCORDINGLY, DO NOT EXPRESS AN OPINION OR ANY OTHER FORM OF ASSURANCE WITH RESPECT TO THE PROJECTIONS, ASSUME NO RESPONSIBILITY FOR THE PROJECTIONS, AND DISCLAIM ANY ASSOCIATION WITH THE PROJECTIONS.  EXCEPT FOR PURPOSES OF THIS DISCLOSURE STATEMENT, THE DEBTORS DO NOT PUBLISH PROJECTIONS OF THEIR ANTICIPATED FINANCIAL POSITION OR RESULTS OF OPERATIONS.  THE DEBTORS DO NOT INTEND TO UPDATE OR OTHERWISE REVISE THE PROJECTIONS TO REFLECT EVENTS OR CIRCUMSTANCES EXISTING OR ARISING AFTER MARCH 2025 OR TO REFLECT THE OCCURRENCE OF UNANTICIPATED EVENTS.

THE DEBTORS BELIEVE THAT THE PROJECTIONS ARE BASED ON ESTIMATES AND ASSUMPTIONS THAT ARE REASONABLE. THE ESTIMATES AND ASSUMPTIONS MAY NOT BE REALIZED, HOWEVER, AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC AND COMPETITIVE UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE DEBTORS' CONTROL.  NO REPRESENTATIONS CAN BE OR ARE MADE AS TO WHETHER THE ACTUAL RESULTS

WILL BE WITHIN THE RANGE SET FORTH IN THE PROJECTIONS.    SOME ASSUMPTIONS INEVITABLY WILL NOT MATERIALIZE, AND EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THE PROJECTIONS WERE PREPARED MAY BE DIFFERENT FROM THOSE ASSUMED, OR MAY BE UNANTICIPATED, AND THEREFORE MAY AFFECT FINANCIAL RESULTS IN A MATERIAL AND POSSIBLY ADVERSE MANNER.  THE PROJECTIONS, THEREFORE, MAY NOT BE RELIED UPON AS A GUARANTEE OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR.  *SEE* SECTION 1.15, "RISK FACTORS" HEREIN.

ALL HOLDERS OF CLAIMS THAT ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN ARE URGED TO EXAMINE CAREFULLY ALL OF THE ASSUMPTIONS ON WHICH THE PROJECTIONS ARE BASED IN EVALUATING THE FEASIBILITY OF THE PLAN.

## 1.13    Confirmation Without Acceptance by All Impaired Classes

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan, even if such plan has not been accepted by all impaired classes entitled to vote on such plan, provided that such plan has been accepted by at least one impaired class.

Section 1129(b) of the Bankruptcy Code provides that notwithstanding the failure of an impaired class to accept a plan of reorganization, the plan shall be confirmed, on request of the proponent of the plan, in a procedure commonly known as "cram-down," so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or interests that is impaired under and has not accepted the plan.

The condition that a plan be "fair and equitable" with respect to a non-accepting class of secured claims includes the requirements that (a) the holders of such secured claims retain the liens securing such claims to the extent of the allowed amount of the claims, whether the property subject to the liens is retained by the debtor or transferred to another entity under the plan, and (b) each holder of a secured claim in the class receive deferred cash payments totaling at least the allowed amount of such claim with a present value, as of the effective date of the plan, at least equivalent to the value of the secured claimant's interest in the debtor's property subject to the liens.

The condition that a plan be "fair and equitable" with respect to a non-accepting class of unsecured claims includes the requirement that either (a) such class receive or retain under the plan property of a value as of the effective date of the plan equal to the allowed amount of such claim, or (b) if the class does not receive such amount, no class junior to the non-accepting class will receive a distribution under the plan.

The condition that a plan be "fair and equitable" with respect to a non-accepting class of interests includes the requirements that either (a) the plan provides that each holder of an equity interest in such class receive or retain under the plan, on account of such equity interest, property of a value, as of the effective date of the plan, equal to the greater of (i) the allowed amount of any fixed liquidation preference to which such holder is entitled, (ii) any fixed redemption price to which such holder is entitled, or (iii) the value of such equity interest, or (b) if the class does not

29

receive such amount, no class of interests junior to the non-accepting class will receive a distribution under the plan.

As noted, certain Classes are deemed to have rejected the Plan and the Debtors shall not solicit the votes of the Holders of Claims and Interests in those Classes. As a result, the Debtors may request Confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code.

**The Debtors believe that the Plan may be confirmed on a nonconsensual basis. Accordingly, the Debtors will demonstrate at the Confirmation Hearing that the Plan satisfies the requirements of Section 1129(b) of the Bankruptcy Code as to any non-accepting class**.

## 1.14   **Risk Factors**

THE IMPLEMENTATION OF THE PLAN AND THE ISSUANCE OF THE NEW COMMON STOCK ARE SUBJECT TO A NUMBER OF MATERIAL RISKS, INCLUDING THOSE ENUMERATED BELOW.

IN EVALUATING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN, HOLDERS OF CLAIMS AGAINST THE DEBTORS ENTITLED TO VOTE ON THE PLAN SHOULD READ AND CAREFULLY CONSIDER THE RISK FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT (AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH AND/OR INCORPORATED BY REFERENCE HEREIN), PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN. THESE RISK FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION, OR ALTERNATIVES TO THE PLAN.

THESE RISK FACTORS CONTAIN CERTAIN STATEMENTS THAT ARE "FORWARD-LOOKING STATEMENTS." THESE STATEMENTS ARE SUBJECT TO A NUMBER OF ASSUMPTIONS, RISKS AND UNCERTAINTIES, MANY OF WHICH ARE BEYOND THE CONTROL OF THE DEBTORS, INCLUDING THE IMPLEMENTATION OF THE PLAN, THE CONTINUING AVAILABILITY OF SUFFICIENT BORROWING CAPACITY OR OTHER FINANCING TO FUND OPERATIONS, THE EFFECT OF THE REORGANIZATION ON CUSTOMERS, SUPPLIERS, VENDORS AND EMPLOYEES, FLUCTUATIONS IN RAW MATERIAL PRICES AND ENERGY COSTS, DOWNTURNS IN INDUSTRIAL PRODUCTION, HOUSING AND CONSTRUCTION AND THE CONSUMPTION OF DURABLE AND NONDURABLE GOODS, THE DEGREE AND NATURE OF COMPETITION, DEMAND FOR THE DEBTORS' PRODUCTS AND SERVICES, THE DEGREE OF SUCCESS ACHIEVED BY THE DEBTORS' NEW PRODUCT AND SERVICE INITIATIVES, INCREASES IN INSURANCE COSTS, CHANGES IN GOVERNMENT REGULATIONS, THE APPLICATION OR INTERPRETATION OF THOSE REGULATIONS OR IN THE SYSTEMS, PERSONNEL, TECHNOLOGIES OR OTHER RESOURCES THE COMPANY DEVOTES TO COMPLIANCE WITH REGULATIONS, THE COMPANY'S ABILITY TO COMPLETE ACQUISITIONS AND SUCCESSFULLY INTEGRATE THE OPERATIONS OF ACQUIRED BUSINESSES, TERRORIST ACTIONS

OR ACTS OF WAR, OPERATING EFFICIENCIES, LABOR RELATIONS, PANDEMIC AND OTHER POTENTIAL PUBLIC HEALTH EMERGENCIES, TARIFFS AND INTERNATIONAL TRADE RELATIONS, AND OTHER MARKET AND COMPETITIVE CONDITIONS. HOLDERS OF CLAIMS AND INTERESTS ARE CAUTIONED THAT THE FORWARD-LOOKING STATEMENTS SPEAK AS OF THE DATE MADE AND ARE NOT GUARANTEES OF FUTURE PERFORMANCE. ACTUAL RESULTS OR DEVELOPMENTS MAY DIFFER MATERIALLY FROM THE EXPECTATIONS EXPRESSED OR IMPLIED IN THE FORWARD-LOOKING STATEMENTS. NO PARTY, INCLUDING, WITHOUT LIMITATION, THE DEBTORS OR THE REORGANIZED DEBTORS, UNDERTAKES AN OBLIGATION TO UPDATE ANY SUCH STATEMENTS.

### 1.14.1 Failure to Obtain Confirmation of the Plan May Result in Liquidation or Confirmation of an Alternative Plan on Less Favorable Terms.

Although the Debtors believe that the Plan will satisfy all requirements for confirmation under the Bankruptcy Code, there can be no assurance that the Bankruptcy Court will reach the same conclusion. Moreover, there can be no assurance that modifications to the Plan will not be required for confirmation or that such modifications would not be sufficiently material as to necessitate the re-solicitation of votes on the Plan.

In the event that the Bankruptcy Court refuses to confirm the Plan, either as a result of an objection to the Plan by a party in interest or otherwise, the Debtors may be required to seek an alternative restructuring of their obligations to creditors and equity security holders. There can be no assurance that the terms of any such alternative restructuring would be similar to, or as favorable to the Debtors' creditors and equity security holders as, those proposed in the Plan.

The confirmation of the Plan is subject to certain conditions and requirements of the Bankruptcy Code. The Bankruptcy Court may determine that one or more of those requirements is not satisfied. For example, the Bankruptcy Court might determine that the Plan is not "feasible" pursuant to section 1129(a)(11) of the Bankruptcy Code. For the Plan to be feasible, the Debtors must establish that the confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor of the Debtors under the Plan, unless such liquidation or reorganization is proposed in the Plan. While the feasibility requirement is not rigorous, it does require the Debtors to put forth concrete evidence indicating that the Debtors have a reasonable likelihood of meeting their obligations under the Plan and remaining a commercially viable entity. The Debtors believe that their projections demonstrate that the Plan is feasible in that the Debtors will be able to satisfy all of their obligations under the Plan and confirmation of the Plan is not likely to be followed by a liquidation or the need for a further financial reorganization.

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests of such class. The Debtors believe that the classification of claims and equity interests under the Plan complies with the requirements set forth in the Bankruptcy Code. However, a claim or equity interest holder could challenge the classification. In such event, the cost of the Plan and the time needed to confirm the Plan could increase and the Bankruptcy Court may not agree with the Debtors' classification of claims and equity interests. If the Bankruptcy

31

Court concludes that the classification of claims and equity interests under the Plan does not comply with the requirements of the Bankruptcy Code, the Debtors may need to modify the Plan. Such modification could require a resolicitation of votes on the Plan. If the Bankruptcy Court determines that the Debtors' classification of claims and equity interests is not appropriate or if the Bankruptcy Court determines that the different treatment provided to claim or equity interest holders is unfair or inappropriate, the Plan might not be confirmed. If this occurs, the amended plan of reorganization that may ultimately be confirmed may be less attractive to certain classes of the Debtors' creditors and equity interest holders than the Plan.

Also, the United States Trustee or other parties in interest could move the Bankruptcy Court to "designate" the votes of claimants pursuant to section 1126(e) of the Bankruptcy Code. Section 1126(e) permits a bankruptcy court to designate any entity whose acceptance or rejection of a plan was not, among other things, solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code. "Designation" in this context results in such party's votes not being counted for purposes of determining acceptances or rejections of the subject plan.

If the Bankruptcy Court were to find any of these deficiencies, the Debtors could be required to restart the process of filing another plan and disclosure statement, seeking Bankruptcy Court approval of a disclosure statement, soliciting votes from classes of debt and equity holders, and seeking Bankruptcy Court confirmation of the plan of reorganization. If this occurs, confirmation of the Plan would be delayed and possibly jeopardized. Additionally, should the Plan fail to be approved, confirmed, or consummated, the Debtors' creditors and equity interest holders may be in a position to propose alternative plans of reorganization. Any such failure to confirm the Plan would likely entail significantly greater risk of delay, expense and uncertainty, which would likely have a material adverse effect upon the Debtors' business and financial condition.

Finally, while the Debtors believe that the Plan satisfies the requirements for non-consensual confirmation under section 1129(b) of the Bankruptcy Code because it does not "discriminate unfairly" and is "fair and equitable" with respect to the Classes that reject or are deemed to reject the Plan, there can be no assurance that the Bankruptcy Court will reach the same conclusion. There can be no assurance that any such challenge to the requirements for non-consensual confirmation will not delay the Debtors' emergence from chapter 11 or prevent confirmation of the Plan. Moreover, the Plan might not be accepted by at least one impaired class.

If the Plan is not confirmed, there can be no assurance that the Chapter 11 Cases will continue rather than be converted into chapter 7 liquidation cases or that any alternative plan or plans of reorganization would be on terms as favorable to the Holders of Claims against the Debtors as the terms of the Plan. If a liquidation or protracted reorganization of the Debtors' Estates were to occur, there is a substantial risk that the Debtors' going concern value would be substantially eroded to the detriment of all stakeholders.

### 1.14.2    <u>Other Risk Factors Related to the Debtors</u>

There are also business-related risks specific to the Debtors' business, including without limitation:

- There is a risk the Debtors will not be able to realize the sales ramp necessary to support their business plan and thus not recognize revenues as anticipated.

- The Debtors are still in the process of constructing the Madison Facility and the Board Line.  It is possible that there will be unforeseen technical challenges that increase the cost and/or duration of the construction.

- Because the Board Line is not complete, there is a possibility the Debtors may have technical issues that would delay or prevent the Debtors from releasing TimberBoard. The failure to complete the Board Line would affect projected operational revenue, as well as the Debtors' ability to take advantage of certain tax credits.

- A shortage of feedstock, and/or an increase in the cost of feedstock, would negatively impact the Debtors' performance.

### 1.14.3    Risks To Creditors Who Will Receive Securities

The ultimate recoveries under the Plan to Holders of Claims that receive the New Common Stock pursuant to the Plan will depend on the realizable value of such securities.  The securities to be issued pursuant to the Plan are subject to a number of material risks, including, but not limited to, those specified below.  Prior to voting on the Plan, each Holder of such Claims should carefully consider the risk factors specified or referred to below, as well as all of the information contained in this Plan.

#### 1.14.3.1    Lack of Market for Securities Issued Pursuant to the Plan

There is no currently existing market for the New Common Stock, and there can be no assurance that an active trading market will develop.  Accordingly, no assurance can be given that a holder of securities issued pursuant to the Plan will be able to sell such securities in the future or as to the price at which any such sale may occur.  If such market were to exist, the liquidity of the market for such securities and the prices at which such securities will trade will depend upon many factors, including the number of holders, investor expectations for the Debtors, and other factors beyond the Debtors' control.  In addition, given the anticipated number of their equity holders, the Debtors believe that the Reorganized Debtors will not be required to file periodic reports pursuant to the Securities Exchange Act of 1934, as amended.  Accordingly, information that would be included in such reports (such as financial statements and other information about their businesses) may not be publicly available.

#### 1.14.3.2    The Value of the Newly-Issued Common Stock May Fluctuate for Many Reasons

The value of the New Common Stock could be subject to significant fluctuations.  Among the factors that could affect such value are: (a) variations in the respective companies' operating results; (b) their ability to meet their liquidity needs; (c) competitive conditions in their markets and strategic actions by these companies or their competitors, such as acquisitions or

restructurings; (d) general market conditions; and (f) domestic and international economic factors unrelated to their performance.

### 1.14.3.3    The Value of the Newly-Issued Common Stock May Decline Due to Future Issuances of Shares

The Reorganized Debtors may issue additional shares of stock in the future.  As a result, holders of the New Common Stock may experience dilution of their percentage ownership of their stock.

### 1.14.3.4    The Reorganized Debtors Do Not Intend to Pay Any Dividends on the New Common Stock in the Foreseeable Future

The Reorganized Debtors do not anticipate that they will pay any dividends on the New Common Stock in the foreseeable future.  The Reorganized Debtors intend to retain any future earnings to fund operations, future debt service requirements (if any) and other corporate needs.

## 1.15    Certain Tax Law Considerations

The tax consequences of the Plan to the Debtors and to Holders of Allowed Claims and Interests are discussed below.  This discussion is for general informational purposes only and should not be relied upon for the purpose of determining specific tax consequences of the Plan with respect to any particular Holder of Allowed Claim or Interest.  This discussion is not, and does not purport to be, a complete analysis or listing of all potential tax considerations.

This discussion of the federal income tax consequences of the Plan to the Debtors and Holders is under U.S. federal income tax law, including the Internal Revenue Code of 1986, as amended (the "Tax Code"), Treasury Regulations promulgated thereunder, judicial decisions, and published administrative rules and pronouncements of the Internal Revenue Service ("IRS") as in effect on the date hereof.  Legislative, judicial, or administrative changes or new interpretations enacted or promulgated after the date hereof could alter or modify the analyses set forth below with respect to the United States federal income tax consequences of the Plan.  Any such changes or new interpretations may have retroactive effect and could significantly affect the federal income tax consequences of the Plan.

The federal income tax consequences of the Plan are complex and are subject to significant uncertainties.  The Debtors have not requested a ruling from the IRS or an opinion of counsel with respect to any of the tax aspects of the Plan.  Thus, no assurance can be given as to the interpretation that the IRS will adopt.  In addition, this discussion does not address foreign, state, or local tax consequences of the Plan, nor does it purport to address the federal income tax consequences of the Plan to special classes of taxpayers (such as Persons who are related to the Debtors within the meaning of the Tax Code, foreign taxpayers, broker-dealers, bank, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax-exempt organizations, and investors in pass-through entities and Holders of Claims or Interests who are themselves in bankruptcy).

Holders should consult their own tax advisors regarding the tax consequences to them of the Plan and the transactions and distributions contemplated therein.

34

## 1.16    General Federal Income Tax Consequences to Debtors

Cancellation of Debt Income.  Under the Tax Code, a taxpayer generally must recognize income from the cancellation of debt ("COD Income") to the extent that its indebtedness is discharged during the taxable year.  Section 108(a)(1)(A) of the Tax Code provides an exception to this rule, however, where a taxpayer is in bankruptcy and where the discharge is granted, or is effected, pursuant to a plan approved by the bankruptcy court.  In that case, instead of recognizing income, the taxpayer is required, under section 108(b) of the Tax Code, to reduce certain of its tax attributes by the amount of the COD Income.  The attributes of the taxpayer are to be reduced in the following order: NOLs, general business and minimum tax credit carryforwards, capital loss carryforwards, the basis of the taxpayer's assets, and finally, foreign tax credit carryforwards (collectively, the "Tax Attributes").  In lieu of reducing net operating loss and carryovers, the taxpayer can elect to reduce tax basis first.  Such an election shall not apply to an amount greater than the aggregate adjusted bases of depreciable property held by the taxpayer as of the beginning of the taxable year following the taxable year in which the discharge occurs.

As a result of having their debt reduced in connection with their bankruptcy, the Debtors generally will not recognize COD income from the discharge of indebtedness pursuant to the Plan; however, certain Tax Attributes of the Debtors may be reduced or eliminated.  The Debtors will avoid recognition of COD Income and reduction of Tax Attributes pursuant to Section 108(e)(2) of the Tax Code to the extent that the discharge is of amounts that the Debtors would have been entitled to deduct if the Debtors had paid such amounts.

Net Operating Losses and Section 382.  The Debtors currently have net operating losses ("NOLs") that will carry forward to the extent that they are not offset by income and/or gain and are not eliminated by the attribute reduction rules of Section 180(b) of the Tax Code discussed above.  In addition, the Debtors may generate NOLs in future years to the extent that payments required under the Plan generate deductions that exceed their income and gain in those years.

## 1.17    Certain Federal and State Securities Law Considerations

### 1.17.1    Exemption From Registration Requirements For New Securities Issued Pursuant to Plan

With respect to the New Common Stock to be issued on the Effective Date, the Debtors intend to rely upon the exemption from the registration requirements of the Securities Act (and the equivalent state securities or "blue sky" laws) provided by section 1145(a)(1) of the Bankruptcy Code.  Generally, section 1145(a)(1) of the Bankruptcy Code exempts the issuance of securities from the requirements of the Securities Act and the equivalent state securities and "blue sky" laws if the following conditions are satisfied: (i) the securities are issued by a debtor, an affiliate participating in a joint plan of reorganization with the debtor, or a successor of the debtor under a plan of reorganization, (ii) the recipients of the securities hold a claim against, an interest in, or a claim for an administrative expense against, the debtor, and (iii) the securities are issued entirely in exchange for the recipient's claim against or interest in the debtor, or are issued "principally" in such exchange and "partly" for Cash or Property.  The Debtors believe that the issuance of securities contemplated by the Plan will satisfy the aforementioned requirements and therefore is exempt from federal and state securities laws, although as discussed in Section B below, under

35

certain circumstances, subsequent transfers of such securities may be subject to registration requirements under such securities laws.

### 1.17.2    Subsequent Transfers of New Securities

The securities issued pursuant to the Plan may be resold by the holders thereof without restriction unless, as more fully described below, any such holder is deemed to be an "underwriter" with respect to such securities, as defined in section 1145(b)(1) of the Bankruptcy Code. Generally, section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as any person who (1) purchases a claim against, or interest in, a bankruptcy case, with a view towards the distribution of any security to be received in exchange for such claim or interest, (2) offers to sell securities issued under a bankruptcy plan on behalf of the holders of such securities, (3) offers to buy securities issued under a bankruptcy plan from persons receiving such securities, if the offer to buy is made with a view towards distribution of such securities, or (4) is an issuer as contemplated by section 2(11) of the Securities Act. Although the definition of the term "issuer" appears in section 2(4) of the Securities Act, the reference (contained in section 1145(b)(1)(D) of the Bankruptcy Code) to section 2(11) of the Securities Act purports to include as "underwriters" all persons who, directly or indirectly, through one or more intermediaries, control, are controlled by, or are under common control with, an issuer of securities. "Control" (as such term is defined in Rule 405 of Regulation C under the Securities Act) means the possession, direct or indirect, of the power to direct or cause the direction of the policies of a person, whether through the ownership of voting securities, by contract or otherwise. Accordingly, an officer or director of a reorganized debtor (or its successor) under a plan of reorganization may be deemed to be a "control person," particularly if such management position is coupled with the ownership of a significant percentage of the debtor's (or successor's) voting securities. Moreover, the legislative history of section 1145 of the Bankruptcy Code suggests that a creditor who owns at least 10% of the voting securities of a reorganized debtor may be presumed to be a "control person."

**THE FOREGOING SUMMARY DISCUSSION IS GENERAL IN NATURE AND HAS BEEN INCLUDED IN THIS DISCLOSURE STATEMENT SOLELY FOR INFORMATIONAL PURPOSES. THE DEBTORS MAKE NO REPRESENTATIONS CONCERNING, AND DO NOT HEREBY PROVIDE ANY OPINION OR ADVICE WITH RESPECT TO, THE SECURITIES AND BANKRUPTCY LAW MATTERS DESCRIBED ABOVE. IN LIGHT OF THE COMPLEX AND SUBJECTIVE INTERPRETIVE NATURE OF WHETHER A PARTICULAR RECIPIENT OF SECURITIES UNDER THE PLAN MAY BE DEEMED TO BE AN "UNDERWRITER" WITHIN THE MEANING OF SECTION 1145(b)(1) OF THE BANKRUPTCY CODE AND/OR AN "AFFILIATE" OR "CONTROL PERSON" UNDER APPLICABLE FEDERAL AND STATE SECURITIES LAWS AND, CONSEQUENTLY, THE UNCERTAINTY CONCERNING THE AVAILABILITY OF EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND EQUIVALENT STATE SECURITIES AND "BLUE SKY" LAWS, THE DEBTORS ENCOURAGE POTENTIAL RECIPIENTS OF NEW COMMON STOCK TO CONSIDER CAREFULLY AND CONSULT WITH HIS, HER, OR ITS OWN LEGAL ADVISOR(S) WITH RESPECT TO SUCH (AND ANY RELATED) MATTERS.**

**1.18    Alternatives to Confirmation and Consummation of the Plan**

If the Plan is not confirmed, the alternatives include (a) continuing the Chapter 11 Cases and formulating an alternative plan or plans of reorganization or (b) liquidation of the Debtors under chapter 7 or chapter 11 of the Bankruptcy Code.  Each of these possibilities is discussed in turn below.

### 1.18.1    Continuation of the Chapter 11 Cases

If the Debtors cannot confirm this Plan, it is unlikely that the Debtors could pursue another plan of reorganization in chapter 11.  As discussed above, the Debtors have conducted extensive prepetition marketing efforts with the goal of entering into a transaction and do not believe an alternative transaction could be reached.  Pursuing an alternative transaction would also mean that the Debtors would not have access to the DIP Facility or the not less than $19 million in Exit Financing to be provided by the Participating Bondholders, and thus would have no funds for operations, thus forcing a quick shutdown and liquidation.

### 1.18.2    Liquidation under Chapter 7 or Chapter 11

If the Plan is not confirmed, the Debtors would likely proceed to convert the bankruptcy cases to chapter 7 of the Bankruptcy Code and thereby liquidate their assets.

Although it is impossible to predict precisely how the proceeds of a liquidation would be distributed to the respective Holders of Claims against or Interests in the Debtors, the Debtors believe that in a liquidation under chapter 7, before creditors received any distributions, additional administrative expenses involved in the appointment of a trustee and attorneys, accountants, and other professionals to assist such trustee, along with an increase in expenses associated with an increase in the number of unsecured Claims that would be expected, would cause a substantial diminution in the value of the Estates.  The assets available for distribution to creditors and Interest Holders would be reduced by such additional expenses and by Claims, some of which would be entitled to priority, which would arise by reason of the liquidation and from the rejection of leases and other executory contracts in connection with the cessation of the Debtors' operations and the failure to realize the greater going concern value of the Debtors' assets.  As discussed earlier in this Plan, attached as **Exhibit A** hereto is a chapter 7 liquidation analysis prepared by the Debtors.

In March 2025, the Debtors engaged Hilco Valuation Services ("Hilco") to prepare a liquidation appraisal of the Debtors' primary assets – their machinery and equipment, and their real estate in Madison, Maine.  Hilco has advised the Debtors that the orderly liquidation value of the Debtors' real estate and fixtures is approximately $6.1 million (6 – 12 month holding period).  In addition, Hilco has advised the Debtors that the net orderly liquidation value of the Debtors' machinery and equipment is approximately $350,000.  Based upon the results of Hilco's appraisal, the Debtors believe that confirmation of the Plan is in the best interests of Creditors, and that no Holder of any Claim or Interest would realize a greater recovery if the Chapter 11 Cases were converted and the Debtors' assets were liquidated under chapter 7 of the Bankruptcy Code.

The Debtors could also be liquidated pursuant to the provisions of a chapter 11 plan of reorganization.  In a liquidation under chapter 11, the Debtors' assets could be sold in a more

orderly fashion over a longer period of time than in a liquidation under chapter 7.  Thus, a chapter 11 liquidation might result in larger recoveries than in a chapter 7 liquidation, but the delay in distributions could result in lower present values being received and higher administrative costs. Because a trustee is not required in a chapter 11 liquidation, expenses for professional fees could be lower than in a chapter 7 liquidation, in which a trustee must be appointed.  Any distributions to the Holders of Claims under a chapter 11 liquidation plan probably would be delayed substantially.

It is highly unlikely that Interest Holders would receive any distribution in a liquidation under either chapter 7 or chapter 11.

Although a chapter 11 liquidation would be preferable to a chapter 7 liquidation, the Debtors believe that any liquidation is a much less attractive alternative for creditors than the Plan because of the greater return the Debtors anticipate will be provided by the Plan.  The Debtors believe that the Plan affords substantially greater benefits to Holders of Impaired Claims than would any other reasonably confirmable reorganization plan or liquidation under any chapter of the Bankruptcy Code.

## ARTICLE 2
## DEFINITIONS, RULES OF INTERPRETATION,
## COMPUTATION OF TIME, AND GOVERNING LAW

**2.1**    **Definitions**.  The following terms are not otherwise defined in Article 1 and shall have the following meanings in the Plan:

"2024 SEDC Loan" means the loan evidenced by that certain Commercial Promissory Note, dated December 30, 2024, by GO-Madison in favor of in the amount of $2,990,000.

"2024 SEDC Secured Loan Claim" means any Claim arising from, under, or in connection with the 2024 SEDC Loan.

"401(k) Plan" means any employee benefit plan established by the Debtors pursuant to Section 401(k) of the Internal Revenue Code.

"48C Tax Credit" refers to the Qualifying Advanced Energy Project 48C Tax Credit actually received by the Debtors or the Reorganized Debtors, as applicable.

"Accounts Receivable" means all accounts receivable of the Debtors as of the Effective Date.

"Adequate Protection Payments" means all adequate protection payments authorized or ordered to be made pursuant to the DIP Facility.

"Administrative Expense Claim" means a Claim for costs and expenses of administration of the Estates pursuant to sections 328, 330, 331, 503(b), 507(a)(2), 507(b) or, if applicable, 1114(e)(2) of the Bankruptcy Code, including without limitation: (a) any actual and necessary expenses of preserving the Debtors' Estates, including wages, salaries or commissions for services rendered after the commencement of the Chapter 11 Cases, certain taxes, fines and penalties, any actual and necessary post-petition expenses of operating the business of the Debtors, including post-petition

indebtedness or obligation, incurred by or assessed against the Debtors in connection with the normal, usual or customary conduct of their business, or for the acquisition or payment of goods or lease of property, or for providing of services to the Debtors; (b) expenses pursuant to section 503(b)(9) of the Bankruptcy Code; and (c) all fees and charges assessed against the Estates pursuant to sections 1911 through 1930 of Chapter 123 of the Judicial Code.  The Disbursing Agent shall timely pay all post-confirmation quarterly fees as they accrue until the date of the closing of the Chapter 11 Cases.

"Affiliate" has the meaning set forth in section 101(2) of the Bankruptcy Code.

"Allowed" means, with respect to any Claim or Interest, except as otherwise specified herein, any of the following:  (a) a Claim or Interest that has been scheduled by the Debtors in their Schedules as other than disputed, contingent or unliquidated and as to which (i) the Debtors or any other party in interest have not filed an objection, and (ii) no contrary Proof of Claim has been filed; (b) a Claim or Interest that is not a Disputed Claim or Disputed Interest, except to the extent that any such Disputed Claim or Disputed Interest has been allowed by a Final Order; or (c) a Claim or Interest that is expressly allowed (i) by a Final Order, (ii) by an agreement between the Holder of such Claim or Interest and the Debtors or the Reorganized Debtors, or (iii) pursuant to the terms of the Plan.

"Approved Budget" means the budget agreed to by the Debtors and the DIP Lenders.

"Assumed Liabilities" means all accounts payable and accrued expenses incurred in the ordinary course of the Debtors' business solely to the extent that, as of the Effective Date, such accounts payable and accrued expenses are not past due as of the Effective Date and were not incurred or accrued prior to the Petition Date; and (ii) all taxes incurred in the ordinary course of the Debtors' business from and after the Petition Date, including sales taxes, personal property taxes and commercial rent tax.  For the avoidance of doubt, Assumed Liabilities shall not include any Professional Fee Claims or any Claims in the Classes described in Articles 3 and 4 of this Plan.

"Bankruptcy Code" means the Bankruptcy Reform Act of 1978, as codified in title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.*, now in effect and as amended by the Bankruptcy Abuse Prevention and Consumer Prevention Act of 2005 or hereafter amended (to the extent any such amendments are applicable to the Chapter 11 Cases).

"Bankruptcy Court" means the United States Bankruptcy Court for the District of Delaware, or any other court having jurisdiction over these Chapter 11 Cases.

"Bankruptcy Rules" means, collectively, the (a) Federal Rules of Bankruptcy Procedure and (b) Local Rules of the Bankruptcy Court, all as now in effect or hereafter amended (to the extent any such amendments are applicable to the Chapter 11 Cases).

"Board Line Work" refers to the continued construction and other work by Cianbro at the Madison Facility necessary for the Debtors to be able to manufacture TimberBoard, the commencement and scope of which is subject to the Debtors (or the Reorganized Debtors, as applicable) and Cianbro negotiating reasonable parameters for the work and an agreed budget and timeframe.

"<u>Bridge Notes</u>" means the following notes: (i) Secured Promissory Note dated May 3, 2024, by Go Lab, Inc. in favor of Steven Derry, in the amount of $70,000.00; (ii) Secured Promissory Note, dated April 20, 2024, by Go Lab, Inc. in favor of the Entrust Group Inc., FBO Curtis R Welling IRA Account No. 7230026182, in the amount of $250,000.00; (iii) Secured Promissory Note, dated February 13, 2024, in favor of Diversified Communications, in the amount of $750,000.00; (iv) Secured Promissory Note, dated February 13, 2024, by Go Lab, Inc. in favor of GH Wood Fiber Fund IV, LLC, in the amount of $1,100,000.00; (v) Secured Promissory Note, dated February 13, 2024, by Go Lab, Inc. in favor of Grassi Family Trust, Anthony P. Grassi, Trustee, in the amount of $250,000.00; (vi) Secured Promissory Note, dated April 17, 2024, by Go Lab, Inc. in favor of Andrew Linegar, in the amount of $125,000.00; (vii) Secured Promissory Note, dated April 15, 2024, by Go Lab, Inc. in favor of Ulrik & Michaela Nielsen, in the amount of $125,000.00; (viii) Secured Promissory Note, dated April 9, 2024, by Go Lab, Inc. in favor of Arlene Portney & Stephen Veach, in the amount of $60,000.00; (ix) Secured Promissory Note, dated March 4, 2024, by Go Lab, Inc. in favor of Victor Bogachev, in the amount of $30,000.00; (x) Secured Promissory Note, dated April 10, 2024, by Go Lab, Inc. in favor of Ilona and Justin Veach, in the amount of $40,000.00; and (xi) Secured Promissory Note, dated February 13, 2024, by Go Lab, Inc. in favor of Waldron Family Trust, Benjamin Waldron, Trustee, in the amount of $200,000.00.

"<u>Bridge Loan Claims</u>" means all Secured and Unsecured Claims arising from, under or in connection with the Bridge Notes.

"<u>Business Day</u>" means any day, excluding Saturdays, Sundays or "legal holidays" as defined in Bankruptcy Rule 9006(a), or any other day on which banking institutions in New York, New York are required or authorized to close by law or executive order.

"<u>Cash</u>" means legal tender of the United States of America including, but not limited to, bank deposits, checks and other similar items.

"<u>Cash-on-Hand</u>" means all Cash reflected on the Debtors' balance sheet as of the Effective Date, including without limitation all drawn and unutilized advances from the DIP Facility, and all Cash in their bank accounts.

"<u>Causes of Action</u>" means any:  (a) Claims, causes of action, demands, rights, actions, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, and franchises; (b) all rights of setoff, counterclaim, or recoupment and Claims on contracts or for breaches of duties imposed by law; (c) rights to object to Claims or Interests; (d) Claims pursuant to sections 362, 510, 542, 543, 544, 545, 546, 547, 548, 549, 550, or 553 of the Bankruptcy Code; and (e) Claims and defenses as fraud, mistake, duress, and usury and any other defenses set forth in section 558 of the Bankruptcy Code of any kind or character whatsoever, known or unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, whether arising before, on, or after the Petition Date including through the Effective Date, in contract, in tort, in law, or in equity, or pursuant to any other theory of law, and whether asserted or assertable directly or derivatively.

"<u>Chapter 11 Cases</u>" means the above-captioned jointly administered bankruptcy cases of the Debtors commenced under Chapter 11 of the Bankruptcy Code, captioned "In re GO Lab, Inc., *et al*."

"Cianbro" means Cianbro Corporation.

"Cianbro Adequate Protection Lien" means any and all adequate protection liens granted in favor of Cianbro pursuant to the DIP Orders.

"Cianbro Mechanic's Lien" means all Secured and Unsecured Claims and Liens asserted by Cianbro against any of the Debtors or the Property, including without limitation Claims for breach of contract, violation of the Maine Prompt Payment Act (10 M.R.S. §§ 1111-1118), quantum meruit, unjust enrichment, and assertion of a mechanic's lien on the Madison Facility asserted by Cianbro against the Debtors, among others, in the action pending in Somerset Superior Court, Maine, as Docket No. SKOSC-RE-2024-08.

"Cianbro Mechanic's Lien Claim" means the Claim secured by the Cianbro Mechanic's Lien.

"Cianbro Secured Note" refers to a promissory note by GO-Madison in favor of Cianbro note in the amount of the Cianbro Deficiency secured by a Lien on all assets of the Reorganized Debtors that is of equal priority to and *pari passu* with the Exit Green Bonds and the Converted DIP Loan, accruing PIK interest at an annual rate of 4% and maturing on the tenth anniversary of the Effective Date of the Plan. The Cianbro Secured Note shall be included in the Plan Supplement.

"Claim" means a "claim," as defined in section 101(5) of the Bankruptcy Code.

"Claims Bar Date" means the date or dates previously fixed by order of the Bankruptcy Court by which Persons or Entities asserting a Claim against the Debtors, arising prior to the Petition Date, and who are required to file a Proof of Claim on account of such Claim, must file a Proof of Claim or be forever barred from asserting a Claim against the Debtors or their Property and from voting on the Plan and/or sharing in distributions under the Plan.

"Claims Objection Deadline" means the deadline for objecting to Proofs of Claim, which date shall be the date which is 60 days following the Effective Date, provided that the Debtors and the Reorganized Debtors and may seek additional extensions of this date from the Bankruptcy Court.

"Class" means a class of Claims or Interests as listed in Article 3 of the Plan pursuant to section 1122(a) of the Bankruptcy Code.

"Confirmation Date" means the day on which the Confirmation Order is entered by the Bankruptcy Court on its docket.

"Confirmation Hearing" means the hearing held pursuant to Bankruptcy Rule 3020(b)(2), including any adjournments thereof, at which the Bankruptcy Court will consider Confirmation of the Plan.

"Confirmation Order" means the order of the Bankruptcy Court approving Confirmation of the Plan, which shall be in form and substance acceptable to the Debtors and the Bond Holders.

"Confirmation" means the Bankruptcy Court's confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code, following the Debtors' satisfaction of the elements of section 1129.

"Consummation" means the closing of transactions and delivery of payments to be made on or as soon as reasonably practicable after the Effective Date.

"Convenience Claim Election" means a timely election by a Holder of a GO-Madison General Unsecured Claim to reduce its aggregate Allowed Claim to $25,000 and agree to the classification and treatment of its Allowed Claim as a Class 9 Convenience Class Claim made in connection with, and pursuant to the procedures approved by the Bankruptcy Court governing, voting on the Plan.

"Convenience Class Claim" means a GO-Madison General Unsecured Claim that is either (a) an Allowed Claim in an amount that is equal to or less than $25,000, or (b) an Allowed Claim in an amount that is greater than $25,000, but with respect to which the Holder of such Allowed Claim voluntarily and irrevocably reduces the aggregate amount of such Allowed Claim to $25,000 pursuant to a Convenience Claim Election.

"Convenience Class Recovery" the sum of (i) all Convenience Class Claims that are less than or equal to $25,000, plus (ii) $25,000 times the number of Allowed GO-Madison General Unsecured Claims that Holders elect to have treated as Convenience Class Claims.

"Converted DIP Loan" refers to the refinancing of the DIP Facility on the Effective Date through the issuance of $10 million in bonds pursuant to the Converted DIP Loan Documents.

"Converted DIP Loan Agent" means UMB Bank, NA, as trustee under the Converted DIP Loan Documents.

"Converted DIP Loan Documents" refers to the documents relating to the Converted DIP Loan filed with the Plan Supplement and all collateral and ancillary documents executed or delivered in connection therewith.

"Corporate Documents" means, as applicable, the certificate of incorporation and by-laws (or any other applicable organizational documents) of the Debtors in effect as of the Petition Date, as may be amended.

"Cure Claim" means a Claim (unless waived or modified by the applicable counterparty) based upon the Debtor's defaults under an Executory Contract or Unexpired Lease that is assumed by the Reorganized Debtor under the Plan pursuant to section 365 of the Bankruptcy Code, other than a default which is not required to be cured pursuant to section 365(b)(2) of the Bankruptcy Code.

"Cure Notice" means a notice of a proposed amount to be paid on account of a Cure Claim in connection with an Executory Contract or Unexpired Lease that is to be assumed by the Reorganized Debtor under the Plan pursuant to section 365 of the Bankruptcy Code, which notice shall: (a) include procedures for objecting to proposed assumptions of Executory Contracts and Unexpired Leases; (b) include the proposed amount of any Cure Claims to be paid in connection therewith; (c) include procedures for resolution by the Bankruptcy Court of any related disputes; and (iv) be included in the Plan Supplement and promptly served on all counterparties to such Executory Contracts and Unexpired Leases.

LEGAL\77640027\2

"Debtor Release" means the release given by the Debtors to the Released Parties as set forth in Section 11.1 of the Plan.

"Debtors In Possession" means the Debtors when acting in the capacity of representative of each of their Estates in the Chapter 11 Cases.

"Debtors" means, collectively, GO-Inc. and GO-Madison.

"Definitive Documents" means, without limitation, (a) the DIP Facility Documents, (b) the Plan (and all exhibits thereto), (c) the Confirmation Order, (d) the Green Bondholder RSA; (e) any other substantive motion or request for relief filed with the Bankruptcy Court, and (f) any other documents or exhibits related to or contemplated in the foregoing clauses (a) through (f), in each case in form and substance consistent with the Plan, the RSA and, except as otherwise set forth herein or in the RSA, reasonably acceptable to the Debtors and Participating Bondholders.

"DIP Agent" means UMB Bank, NA, as administrative agent under the DIP Credit Agreement, and any successors, assignees or delegees thereof.

"DIP Agent Advisors" means ArentFox Schiff, LLP, Womble Bond Dickinson LLP and other professionals or consultants retained by the DIP Agent from time to time, in connection with the DIP Facility and DIP Facility Documents, regardless of whether such advisor was retained prior to or following the Petition Date.

"DIP Claims" means any and all Claims on account of, arising from, arising under or related to the DIP Facility, the DIP Facility Documents, including Claims for the DIP Facility Claims and all fees (including the DIP Participation Fee) and other expenses related thereto and arising and payable under the DIP Facility.

"DIP Credit Agreement" means that certain Debtor-in-Possession Loan Agreement dated as of March 25, 2025, among the Debtors as borrowers, the DIP Lenders and the DIP Agent in respect of the DIP Facility, as amended, restated, modified, or supplemented from time to time in accordance with the terms thereof.

"DIP Facility" means the $10 million in debtor-in-possession credit facility provided by the DIP Lenders to the Debtors on the terms and conditions in the DIP Facility Documents.

"DIP Facility Documents" means, together, the DIP Orders, DIP Credit Agreement, and all other related documents, instruments and agreements in respect of the DIP Facility, in each case, as amended, restated, modified or supplemented from time to time in accordance with the terms thereof.

"DIP Lenders" means the lenders that are party to the DIP Credit Agreement and holding the DIP Claims.

"DIP Orders" mean, together, the Interim DIP Order and Final DIP Order.

"DIP Participation Fee" means, in exchange for the DIP Lenders' agreement to fund the DIP Facility, each DIP Lender shall receive its pro rata share of a participation fee equal to 19.6875%

43

of the New Common Stock (subject to dilution only by the Employee Equity Plan).  The DIP Participation Fee shall be earned on the date of entry of the Final DIP Order and thereby constitute DIP Claims.

"Disbursing Agent Restricted Accounts" means the separate accounts established on or as soon as reasonably practicable after the Effective Date to hold adequate funding to make payments required under the Plan.

"Disbursing Agent" means the Reorganized Debtors and/or one or more Persons or Entities designated by the Debtors prior to the Confirmation Hearing to serve as a disbursing agent under the Plan; *provided* that all non-Cash distributions on account of DIP Claims and Green Bond Claims shall be made pursuant to:  (a) the distribution of the New Common Stock and New Membership Interests, as applicable, as set forth in Sections 5.3–5.5 of the Plan; and (b) the Converted DIP Loan or Exit Financing pursuant to Section 5.7 of the Plan and the Converted DIP Loan Documents or Exit Financing Documents, as appliable; *provided, further*, that all distributions on account of the Green Bond Claims or DIP Claims shall be made to, or at the direction of, the Green Bond Trustee or DIP Agent, as applicable, for distribution in accordance with the Plan following the procedures specified in the Green Bond Documents or DIP Loan Documents and Converted DIP Loan Documents, as applicable.

"Disputed Claim or Interest" means a Claim or Interest, or any portion thereof, as to which any one of the following applies:  (a) that is listed on the Schedules as unliquidated, disputed, contingent or unknown; (b) that is the subject of a timely objection or request for estimation in accordance with the Bankruptcy Code, the Bankruptcy Rules, any applicable order of the Bankruptcy Court, the Plan or applicable non-bankruptcy law, which objection or request for estimation has not been withdrawn, resolved or overruled by a Final Order; (c) that is otherwise disputed by the Debtors or any other party in interest in accordance with applicable law, which dispute has not been withdrawn, resolved, or overruled by a Final Order; or (d) that is otherwise treated as a 'Disputed Claim' pursuant to the Plan.

"Distribution Record Date" means the record date for purposes of making distributions under the Plan on account of Allowed Claims, which date shall be the Confirmation Date or such other date prior to the Effective Date as may be designated in the Confirmation Order.

"D.R. Horton" means D.R. Horton (a/k/a D.R. Opportunities I, Inc.).

"DTC" means The Depository Trust Company, a limited purpose trust company organized under the laws of the State of New York, and its successors and assigns.

"Effective Date" means the date selected by the Debtors that is the first Business Day after the Confirmation Date on which (a) the conditions to the occurrence of the Effective Date have been satisfied or waived pursuant to Article X hereof and (b) no stay of the Confirmation Order is in effect.

"Employee Equity Plan" means any equity incentive program offering stock in GO-Inc. that the Debtors or Reorganized Debtors choose to make available to their employees.

"Entity" or "Entities" means, individually, an entity as such term is defined in section 101(15) of the Bankruptcy Code.

"Estate" or "Estates" means, individually, the estate of each Debtor in the Chapter 11 Cases, or, collectively, the estates of all of the Debtors in the Chapter 11 Cases, created pursuant to section 541 of the Bankruptcy Code.

"Exculpated Claim" means any Claim related to any postpetition act (*i.e.*, on and after the Petition Date), taken or omitted to be taken in connection with, relating to, or arising out of the Debtors' post-petition business operations, the Debtors' out-of-court restructuring efforts, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Plan, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Plan, the preparation or filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, and the administration and implementation of the Plan, including, without limitation, the issuance of the New Common Stock or New Membership Interest, or the distribution of Property under the Plan or any other agreement.

"Exculpated Party" means the Debtors and their current officers and directors and, to the extent their employment by the Debtors was approved by the Bankruptcy Court, attorneys, financial advisors, accountants, investment bankers, consultants, representatives, and other professionals, in each case in their capacity as such.

"Exit Financing" means the financing to be provided by the Participating Bondholders to the Debtor Parties on the Plan Effective Date in an amount not less than $19 million, pursuant to the terms of the Plan and exit financing documents that will be filed with a supplement to the Plan.

"Exit Financing Contribution Limits" means the minimum and maximum amount of the Exit Financing each Participating Bondholder may contribute to the Exit Financing, which amounts are equal to (a) a minimum contribution of $50,000.00; and; and (b) a maximum of 54.5455% of the outstanding principal  amount held by such Participating Bondholder.

"Exit Financing Documents" means the loan agreement, trust indenture and other documents relating to the Exit Financing and Exit Green Bonds, in form and substance reasonably acceptable to the Green Bondholder RSA Parties, to be filed with the Plan Supplement.

"Exit Green Bonds" means the tax-exempt bonds in a principal amount equal to twice the amount of Exit Financing provided by a Participating Bondholder to the Reorganized Debtor pursuant to the Exit Financing Documents.

"Exit Green Bond Trustee" means UMB Bank, NA, as trustee for the Exit Green Bonds under the Exit Financing Documents.

"FAME Loan Agreement" means that certain Loan Agreement dated December 1, 2021 by and between GO-Madison and FAME.

"FAME" means the Finance Authority of Maine.

"Final Order" means, as applicable, an order or judgment entered by the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter that has not been reversed, stayed, modified or amended, and as to which the time to appeal, petition for certiorari, or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for certiorari, or motion or other proceedings for a new trial, reargument or rehearing shall then be pending or as to which any right to appeal, petition for certiorari, move for a new trial, reargue, or rehear shall have been waived in writing in form and substance satisfactory to the Debtors or, in the event that an appeal, writ of certiorari, new trial or reargument or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court or other applicable court shall have been affirmed by the highest court to which such order or judgment was appealed, or certiorari has been denied, or from which a new trial, reargument or rehearing was sought, and the time to take any further appeal, petition for certiorari or move for a new trial, reargument or rehearing shall have expired; provided, however, that the possibility that a motion under section 502(j) of the Bankruptcy Code, Rules 59 or 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules may be but has not then been filed with respect to such order or judgment shall not cause such order or judgment not to be a Final Order.

"Forbearance Agreement" has the meaning given to such term in Article 1 of this Plan.

"Gilman" means Consolidated Electrical Distributors, Inc. d/b/a Gilman Electrical Supply.

"Gilman Mechanic's Lien" means all Secured and Unsecured Claims and Liens asserted by Gilman against any of the Debtors or the Property, including without limitation Claims of enforcement of lien, breach of contract, quantum meruit, unjust enrichment, and violation of the Maine Prompt Payment Act (10 M.R.S. §§ 1111-1118), and assertion of a mechanic's lien on the Madison Facility asserted by Gilman against the Debtors, among others, in the action pending in Somerset Superior Court, Maine, as Docket No. SKOSC-RE-2024-07.

"Gilman Mechanic's Lien Claim" means the Claim secured by the Gilman Mechanic's Lien.

"GO-Inc. Equity Interest" means any Interest in GO Lab, Inc. represented by ownership of common or preferred stock, including, to the extent provided by applicable law, any purchase right, warrant, stock option or other equity or debt security (convertible or otherwise) evidencing or creating any right or obligation to acquire or issue any of the foregoing the common stock of GO Lab, Inc., and including any rights granted to investors under the SAFE Agreements, and all unissued and/or authorized shares of such common or preferred stock.

"GO-Inc. General Unsecured Claim" means any prepetition Claim against GO-Inc. that is not an Administrative Claim, DIP Claim, Priority Tax Claim, Bridge Loan Claim, GO-Inc. Equity Interest, Intercompany Claim, Non-Tax Priority Claim, Open Prairie Secured Claim, or Series B Senior Secured Claim.

"GO-Madison" means GO Lab Madison, LLC.

"GO-Madison Equity Interest" means any Interest in GO-Madison represented by ownership of a membership interest or other equity interest in GO-Madison, including, to the extent provided by applicable law, any purchase right, warrant, option or other equity or debt security (convertible or

46

otherwise) evidencing or creating any right or obligation to acquire or issue any of equity interest in GO-Madison, and including any rights granted to investors under the SAFE Agreements, and all unissued and/or authorized shares of such common or preferred stock.

"GO-Madison General Unsecured Claim" means any prepetition Claim against GO-Madison that is both Unsecured and not an Administrative Claim, DIP Claim, Priority Tax Claim, 2024 SEDC Secured Loan Claim, Cianbro Mechanic's Lien Claim, Convenience Class Claim, Gilman Mechanic's Lien Claim, GO-Madison Equity Interests, Green Bonds Claim, Intercompany Claim, Non-Tax Priority Claims, GO-Madison Other Secured Claim, QLICI Secured Claim, or Series B Senior Secured Claim.

"GO-Madison Membership Interest" means the membership Interest in GO-Madison owned by GO-Holdings.

"GO-Madison Other Secured Claim" any Claim against GO-Madison that is both Secured and not an Administrative Claim, DIP Claim, Priority Tax Claim, 2024 SEDC Secured Loan Claim, Cianbro Mechanic's Lien Claim, Convenience Class Claim, Gilman Mechanic's Lien, GO-Madison Equity Interests, GO-Madison General Unsecured Claim, Green Bonds Claim, Intercompany Claim, Non-Tax Priority Claims, or QLICI Secured Claim.

"Green Bond Claim" means all Secured and Unsecured Claims and Liens against GO-Madison for bond debt arising from, under or in connection with the Green Bonds.

"Green Bond Collateral" means the collateral pledged to the Green Bond Trustee for the benefit of the Holders of the Green Bonds pursuant to the Green Bond Documents, including substantially all assets GO-Madison, including limitation the Madison Facility and all personal property, and GO-Holding's membership interest in GO-Madison, each as further described in the Green Bond Documents.

"Green Bond Documents" means the FAME Loan Agreement, Green Bonds, Green Bond Indenture, Green Bond Security Agreement, Green Bond Deed Mortgage, Green Bond Deed Mortgage Assignment, Green Bond Pledge Agreement and all collateral and ancillary documents executed or delivered in connection therewith.

"Green Bond Deed Mortgage" means, collectively, that certain Mortgage Deed, Security Agreement and Financing Statement, dated December 23, 2021 executed by GO-Madison for the benefit of FAME.

"Green Bond Deed Mortgage Assignment" means Assignment of Mortgage, dated December 23, 2021, executed by FAME, to assign all of its rights, title and interest in and to the Green Bond Mortgage to the Green Bond Trustee.

"Green Bond Indenture" means that certain Indenture of Trust dated December 1, 2021 (as amended, restated, supplemented or otherwise modified from time to time) between FAME and the Green Bond Trustee.

"Green Bond Pledge Agreement" means that certain Membership Interest Pledge Agreement dated December 1, 2021, pursuant to which GO-Holdings pledged its membership interest in GO-Madison in favor of the Bond Trustee.

"Green Bond Security Agreement" means that certain Security Agreement dated as of December 1, 2021, executed by GO-Madison for the benefit of the Green Bond Trustee.

"Green Bond Trustee" means UMB Bank, N.A. (as successor to Citibank, N.A.), as trustee under the Green Bond Indenture.

"Green Bond Trustee Advisors" means ArentFox Schiff, LLP, Womble Bond Dickinson LLP and other professionals or consultants retained by the Green Bond Trustee from time to time, in connection with the Green Bond Documents, regardless of whether such advisor was retained prior to or following the Petition Date.

"Green Bond Trustee Fees" means the reasonable and documented compensation, costs, advances, fees, expenses, disbursements, and claims for indemnity, subrogation, and contribution, including the Green Bond Trustee Advisor's fees, expenses, and disbursements.

"Green Bondholder RSA" refers to that certain Restructuring Support Agreement, dated March 25, 2025, by and between the Debtors and certain of Holders of the Green Bonds.

"Green Bondholder RSA Parties" means the Holders of the Green Bonds that are party to the Green Bondholder RSA.

"Green Bonds" means the Revenue Bonds (GO Lab Madison, LLC Project), Series 2021 (Green Bonds) issued in the aggregate principal amount of $85,000,000 pursuant to the Green Bond Indenture and in connection with the FAME Loan Agreement.

"Holder" means the beneficial holder of any Claim or Interest.

"Impaired" means, when used with reference to a Claim or Interest, a Claim or Interest that is impaired within the meaning of section 1124 of the Bankruptcy Code.

"Instrument" means any share of stock, security, promissory note, bond, or any other 'Instrument,' as that term is defined in section 9-102(47) of the Uniform Commercial Code in effect on the Petition Date.

"Intercompany Claim" means any Claim held by a Debtor against another Debtor.

"Interest" means the interest of any holder of an "equity security" (as defined in section 101(16) of the Bankruptcy Code) represented by any issued and outstanding shares of GO-Inc. Equity, Subsidiary Equity Interests, or other Instrument evidencing a present ownership interest in any of the Debtors, whether or not transferable, or any option, warrant or right, contractual or otherwise, to acquire any such interest and any redemption, conversion, exchange, voting, participation and dividend rights and liquidation preferences relating to any such equity securities.

"Judicial Code" means title 28 of the United States Code, 28 U.S.C §§1-4001.

"KeyBank" refers to KeyBank National Association.

"KeyBank Account" refers to that certain account no. ending -6208 at KeyBank owned by GO-Inc.

"KeyBank DACA" refers that to that certain Deposit Account Control Agreement, dated December 23, 2021, by and between KeyBank, Open Prairie, and GO-Inc.

"Lien" has the meaning set forth in section 101(37) of the Bankruptcy Code, and includes, without limitation, any  mortgage, pledge, lien, deed of trust, deed to secure debt, security interest, right of first offer, right of first refusal, claim, charge, easement, restriction, covenant, option, title defect, or other encumbrance of any kind or nature.

"MCD 16" means MCD Subsidiary CDE 16, LLC.

"MCD Note A" means that certain Promissory Note A (MCD) dated December 23, 2021 in the principal amount of $14,806,000 payable to MCD 16.

"MCD Note B" means that certain Promissory Note B (MCD) dated December 23, 2021 in the principal amount of $4,794,000 payable to MCD 16.

"MCD Notes" means MCD Note A and MDC Note B.

"MCD Reserve Account" means account no. ending -9577 at Mascoma Bank pledged as collateral to MCD 16 pursuant to the QLICI Documents.

"MHIC Note A" means that certain Promissory Note A (MHIC) dated December 23, 2021 in the principal amount of $2,488,707 payable to MHIC.

"MHIC Note B" means the certain Promissory Note B (MHIC) dated December 23, 2021 in the principal amount of $886,165.

"MHIC Notes" means MHIC Note A and MHIC Note B.

"MHIC" means MHIC NE CDE II Subsidiary 64 LLC.

"MHIC Reserve Account" means account no. ending -0786 at Eastern Bank pledged as collateral to MHIC pursuant to the QLICI Documents.

"Mutual Release" means the release provision set forth in Section 11.2 of the Plan.

"New Common Stock" means the newly issued common stock in GO-Inc. pursuant to this Plan, which New Common Stock may be subject to dilution by the Employee Equity Plan.

"New Membership Interest" means the newly issued membership interest in Reorganized GO-Madison pursuant to this Plan.

"NMTC Separate Collateral" refers to the MCD Reserve Account and the MHIC Reserve Account.

"<u>Non-Green Bondholder RSA Parties</u>" means

"<u>Non-Green Bondholder RSA Parties</u>" means those Holders of the Green Bonds that are not party to the Green Bondholder RSA.

"<u>Non-Participating Bondholder</u>" means a Holder of a Green Bonds Claim that does not timely elect to be a Participating Bondholder.

"<u>Non-Tax Priority Claim</u>" means a Claim against the Debtors, other than an Administrative Expense Claim or a Priority Tax Claim, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

"<u>Open Prairie Loan</u>" has the meaning given to such term in Article 1 of this Plan.

"<u>Open Prairie Security Interest</u>" has the meaning given to such term in Article 1 of this Plan.

"<u>Open Prairie</u>" means Open Prairie Rural Opportunities Fund, LP.

"<u>Open Prairie Loan Agreement</u>" refers to the Open Prairie Loan and Security Agreement, by and between GO-Inc. and Open Prairie dated December 9, 2021.

"<u>Open Prairie Secured Claim</u>" means the portion of Open Prairie's Claim against GO-Inc. that is Secured with respect to the KeyBank Account pursuant to the Open Prairie Loan Agreement and the KeyBank DACA.

"<u>Ordinary Course Liability</u>" means indebtedness arising in the ordinary course of the Debtors' business operations, solely to the extent provided for in the Approved Budget, and the post-petition financing incurred to fund such business operations following Bankruptcy Court approval.

"<u>Participating Bondholder</u>" means a Holder of a Green Bonds Claim who, pursuant to Class 1 of this Plan, timely elects to provide Exit Financing pursuant to the Exit Financing Documents.

"<u>Person</u>" has the meaning set forth in section 101(41) of the Bankruptcy Code.

"<u>Petition Date</u>" means March 24, 2025, the date on which each of the Debtors filed their voluntary petitions under Chapter 11 of the Bankruptcy Code commencing these Chapter 11 Cases.

"<u>Plan</u>" means this joint combined disclosure statement and plan of reorganization and any schedules, exhibits, and other attachments hereto, as it may be amended, modified, or supplemented from time to time.

"<u>Plan Supplement</u>" means the compilation of documents, including any exhibits to this Plan not included herewith, that the Debtors shall file with the Bankruptcy Court in form and substance reasonably acceptable to the Green Bondholder RSA Parties.

"<u>Plan Supplement Deadline</u>" means such date that is seven (7) days prior to the deadline to object to confirmation of the Plan (or such later date as may be authorized by the Bankruptcy Court) or if such date is not a Business Day, the first date proceeding that date that is a Business Day.

"Priority Tax Claim" means a Claim that is entitled to priority pursuant to section 507(a)(8) of the Bankruptcy Code.

"Professional Fee Claims" means the Claims of (a) Professional Persons and (b) any Person making a Claim for compensation or expense reimbursement under section 503(b) of the Bankruptcy Code, in each case for reasonable compensation or reimbursement of reasonable costs and expenses relating to services performed during the period commencing on the Petition Date and ending on (and including) the Confirmation Date.

"Professional Person" means a Person or Entity who is employed pursuant to a Final Order in accordance with sections 327 or 1103 of the Bankruptcy Code and is to be compensated for services rendered prior to the Confirmation Date pursuant to sections 327, 328, 329, 330 and 331 of the Bankruptcy Code.

"Proof of Claim" means any proof of claim that is filed by a Holder of a Claim.

"Property" means any and all right, title and interest in and to all property of any kind or nature whatsoever owned by the any of the Debtors or their Estates on the Effective Date as defined by 11 U.S.C. § 541, whether real, personal, or mixed, and whether tangible or intangible.

"QLICI Collateral" means the NMTC Separate Accounts and all collateral on which the Debtors granted a security interest to the QLICI Lenders pursuant to the QLICI Mortgage.

"QLICI Documents" means the QLICI Indemnity Agreement, the QLICI Guaranty, the Put and Call Agreement, QLICI Mortgage, QLICI Notes, QLICI Loan Agreement and all other documents agreements entered into by the Debtors in connection with the QLICI Loans.

"QLICI Guaranty" means the Completion, Performance and Limited Payment Guaranty, dated December 23, 2021, by and between the QLICI Lenders, Wells Fargo, GO-Inc. and GO-Holdings.

"QLICI Indemnity Agreement" means Environmental and Hazardous Substances Indemnity Agreement, dated December 23, 2021, by and between the QLICI Lenders, GO-Inc. and GO-Holdings.

"QLICI Lenders" means MCD 16 and MHIC.

"QLICI Loans" means the qualified low income community investment loans to GO-Madison by the QLICI Lenders pursuant to the QLICI Documents.

"QLICI Mortgage" means all security agreements and mortgages executed by the Debtors in favor of the QLICI Lenders to secure the indebtedness under the QLICI Loans.

"QLICI Notes" means the MDC Notes and the MHIC Notes.

"QLICI Secured Claims" refers to all Secured and Unsecured Claims against GO-Madison arising from, under or in connection with the QLICI Documents.

"Released Party" means each of: (a) the Green Bond Trustee; (b) the Participating Bondholders; (c) the DIP Lenders and DIP Agent; and (d) their respective current and former officers, directors, employees, members, managers, partners, principals, agents, attorneys, financial advisors, accountants, investment bankers, consultants, representatives, and other professionals, in each case in their capacity as such.

"Reorganized Debtors" means each of the Debtors as vested with the Property of the Estates on and after the Effective Date.

"Reorganized GO-Inc." means GO-Inc. as vested with Property of its Estate on and after the Effective Date.

"Reorganized GO-Madison" means GO-Madison as vested with Property of its Estate on and after the Effective Date.

"Respective QLICI Lenders" refers to the receipt by MHIC of the amounts in the MHIC Reserve Account, and the receipt by MCD to the amounts in the MDC Reserve Account, in accordance with their secured first priority Liens on such accounts.

"Restructuring Fees and Expenses" means all reasonable and documented compensation, costs, advances, fees, disbursements, expenses, and claims for indemnity, subrogation, and contribution of the (a) Green Bond Trustee; (b) Green Bond Trustee Advisors; (c) DIP Agent; and (d) DIP Agent Advisors, whether incurred before or after the Petition Date or the Effective Date, payable in accordance with the terms hereof, the applicable engagement and/or fee letters with the Debtors, the Green Bondholder RSA, Green Bond Documents, and the DIP Facility Documents, as applicable, and subject to any order of the Bankruptcy Court and any other applicable agreements by such party with respect thereto.

"Restructuring Transactions" means any transaction and any actions as may be necessary or appropriate to effect a restructuring of the Debtors' respective businesses or a corporate restructuring of the overall corporate structure of the Debtors on the terms set forth in this Plan, the issuance of all Securities, bonds, notes, instruments, certificates, and other documents required to be issued or executed pursuant to this Plan, one or more intercompany mergers, amalgamations, consolidations, arrangements, continuances, restructurings, transfers, conversions, dispositions, liquidations, formations, dissolutions, or other corporate transactions described in, approved by, contemplated by, or undertaken to implement this Plan (including the Plan Supplement), the Green Bondholder RSA, the Definitive Documents, including those described in Article V hereof, in all cases, in accordance with the terms of the Green Bondholder RSA.

"Saint-Gobain" means Saint-Gobain Delaware Corporation.

"Schedule of Assumed Contracts and Unexpired Leases" means the schedule identifying the executory contracts and unexpired leases to be assumed under the Plan. The Schedule of Assumed Contracts and Unexpired Leases is attached as an exhibit to the Plan Supplement as may be amended.

"Schedules" means the schedules of assets and liabilities, the list of equity interests, and the statement of financial affairs filed by the Debtors with the Bankruptcy Court pursuant to section

521 of the Bankruptcy Code and Bankruptcy Rule 1007(b), as the same may be amended or supplemented from time to time.

"Secured Tax Claim" means any Secured Claim which, absent its secured status, would be entitled to priority in right of payment under section 507(a)(8) of the Bankruptcy Code.

"Secured" means when referring to a Claim:  (a) secured by a Lien on Property in which the Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in the Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code; or (b) Allowed as such pursuant to the Plan.

"Securities Act" means the Securities Act of 1933, 15 U.S.C. §§ 77a-77aa, together with the rules and regulations promulgated thereunder.

"Security" means a security as defined in section 2(a)(1) of the Securities Act.

"SEDC" means Sommerset Economic Development Corporation.

"SEDC Lien" means the Lien held by the SEDC on Property in connection with the 2024 SEDC Loan.

"Series B Notes" means that certain Secured Convertible Promissory Note dated April 26, 2024 in the original principal amount of $10,000,000.00 by GO-Inc. in favor of Saint-Gobain; that certain Secured Convertible Promissory Note dated May 20, 2024 in the original principal amount of $1,000,000.00 by GO-Inc., in favor of D.R. Horton.

"Series B Senior Secured Claim" means all Secured and Unsecured Claims and Liens arising from, under or in connection with the Series B Notes.

"Unimpaired" means, when used with reference to a Claim or Interest, a Claim or Interest that is not Impaired.

"United States Trustee" means the Office of the United States Trustee for Region 3.

"Unsecured" means a Claim that is not Secured.

## 2.2    Interpretation, Rules of Construction, Computation of Time, Settlement and Governing Law.

**2.2.1**    Defined Terms.  Any term used in the Plan that is not defined in the Plan, either in Section 2.1 or elsewhere, but that is used in the Bankruptcy Code or the Bankruptcy Rules has the meaning given to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.

**2.2.2**    Rules of Interpretation.  For purposes of the Plan: (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall

53

include both the singular and the plural; (b) any reference in the Plan to a contract, Instrument, release or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions, but if there exists any inconsistency between a summary of, or reference to, any document in the Plan or Confirmation Order and the document itself, the terms of the document as of the Effective Date shall control; (c) any reference in the Plan to an existing document or Plan Supplement that is filed or to be filed means such document or Plan Supplement, as it may have been or may subsequently be amended, modified or supplemented; (d) unless otherwise specified in a particular reference, all references in the Plan to "section," "article" and "Plan Supplement" are references to a section, article and Plan Supplement of or to the Plan; (e) the words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to the Plan in its entirety rather than to only a particular portion of the Plan; (f) captions and headings to articles and sections are inserted for convenience or reference only and are not intended to be a part of or to affect the interpretation of the Plan; and (g) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply.

2.2.3    <u>Computation of Time</u>.  Unless otherwise specifically stated herein, in computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

2.2.4    <u>Governing Law</u>.  Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of Delaware, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, Instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control); provided, however, that corporate governance matters relating to the Debtors or the Reorganized Debtors, as applicable, not incorporated in Delaware shall be governed by the laws of the state of incorporation of the relevant Debtor or Reorganized Debtor, as applicable.

**2.2.5**    <u>Settlements Incorporated Into The Plan</u>.  With respect to any and all settlements incorporated into, or otherwise implemented pursuant to or in connection with the Plan, the Plan and Disclosure Statement shall be deemed to constitute a motion for approval of such settlements pursuant to Bankruptcy Rule 9019 and

any other applicable provisions of the Bankruptcy Rules and the Bankruptcy Code.

## ARTICLE 3
## DESIGNATION OF CLAIMS AND INTERESTS

**3.1**   **Summary of Designation of Claim and Interests**.  The following is a designation of the Classes of Claims and Interests under the Plan.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims have not been classified and are excluded from the following Classes.  A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest is within the description of that Class and is classified in another Class to the extent that any remainder of the Claim or Interest qualifies within the description of such other Class or Classes.  A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest is an Allowed Claim or Allowed Interest and has not been paid, released or otherwise satisfied before the Effective Date.

| Class | Claims and Interests | Status | Voting Rights |
|-------|---------------------|--------|---------------|
| Class 1: | Green Bond Claims | Impaired | Entitled to Vote |
| Class 2: | 2024 SEDC Secured Loan Claim | Impaired | Entitled to Vote |
| Class 3: | QLICI Secured Claims | Impaired | Entitled to Vote |
| Class 4: | Cianbro Mechanic's Lien | Impaired | Entitled to Vote |
| Class 5: | Gilman Mechanic's Lien | Impaired | Entitled to Vote |
| Class 6: | GO-Madison Other Secured Claims | Unimpaired | Not entitled to Vote |
| Class 7: | Non-Tax Priority Claims | Unimpaired | Not entitled to Vote |
| Class 8: | GO-Madison General Unsecured Claims | Impaired | Entitled to Vote |
| Class 9: | Convenience Class Claims | Unimpaired | Not entitled to Vote |
| Class 10: | Series B Senior Secured Claims | Impaired | Entitled to Vote |
| Class 11: | Open Prairie Secured Claims | Impaired | Entitled to Vote |
| Class 12: | Bridge Loan Claims | Impaired | Not entitled to Vote |
| Class 13: | GO-Inc. General Unsecured Claims | Impaired | Not entitled to Vote |
| Class 14: | Intercompany Claims | Impaired | Not entitled to Vote |
| Class 15: | GO-Inc. Equity Interests | Impaired | Not entitled to Vote |

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| Class 16: | GO-Madison Equity Interests | Impaired | Not entitled to Vote |

## ARTICLE 4
## TREATMENT OF CLAIMS AND INTERESTS

**4.1** **Unclassified Claims**. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, Professional Fee Claims, Priority Tax Claims and Secured Tax Claims, and DIP Claims are not classified, are Unimpaired, and are not entitled to vote on the Plan.

### 4.1.1    **Administrative Expense Claims.**

Except to the extent that a Holder of an Allowed Administrative Expense Claim has been paid by the Debtors prior to the Effective Date or such other treatment has been agreed to by the Holder of such Administrative Expense Claim and the Debtors, each Holder of an Allowed Administrative Expense Claim (other than a Professional Fee Claim and other than an Administrative Expense Claim that constitutes an Assumed Liability) shall be paid in full, in Cash, in such amounts as (a) are incurred in the ordinary course of business by the Debtors when and as such Claim becomes due and owing, (b) are Allowed by the Bankruptcy Court upon the later of the Effective Date, the date upon which there is a Final Order allowing such Administrative Expense Claim or any other date specified in such order, or (c) may be agreed upon between the Holder of such Administrative Expense Claim and the Debtors.

### 4.1.2    **Professional Fee Claims.**

All final requests for payment of Professional Fee Claims, including Professional Fee Claims incurred during the period from the Petition Date through the Effective Date, must be filed with the Bankruptcy Court and served on the Reorganized Debtors no later than thirty (30) days after the Effective Date. After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and any applicable orders of the Bankruptcy Court, the Allowed amounts of such Professional Fee Claims shall be determined and paid as directed by the Bankruptcy Court.

Except as otherwise specifically provided in the Plan, from and after the Effective Date, each of the Reorganized Debtors and the Disbursing Agent shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash their respective reasonable legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by such Reorganized Debtor.

Upon the Effective Date, any requirement that Professional Persons comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtors may employ and pay any Professional Person in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

### 4.1.3 **Priority Tax Claims and Secured Tax Claims.**

Except to the extent that a Holder of an Allowed Priority Tax Claim has been paid by the Debtors prior to the Effective Date or agrees to a different treatment, each Holder of an Allowed Priority Tax Claim shall receive on account of such Claim, payment in full in Cash as soon as reasonably practicable after the Effective Date.

### 4.1.4 **DIP Claims.**

On the Effective Date, unless the DIP Lender agrees otherwise, the DIP Facility shall be converted to a Converted DIP Loan pursuant to the Converted DIP Loan Documents and each Holder of an Allowed DIP Claim shall receive, on the Effective Date, its pro rata share of: (i) the New Common Stock equal to the amount of the DIP Participation Fee; and (ii) the Converted DIP Loan. All Converted DIP Loan Documents shall be subject to the DIP Lender's consent.

### 4.1.5 **Restructuring Fees and Expenses**

The Restructuring Fees and Expenses incurred, or estimated to be incurred, up to and including the Effective Date (or, with respect to necessary post-Effective Date activities, after the Effective Date), shall be paid in full in Cash on the Effective Date in accordance with, and subject to, the terms of the Green Bondholder RSA, Green Bond Documents, DIP Facility Documents or Exit Financing Documents, as applicable, without any requirement to file a fee application with the Bankruptcy Court or without any requirement for Bankruptcy Court or United States Trustee review or approval, or without notice and a hearing pursuant to section 1129(a)(4) of the Bankruptcy Code or otherwise; *provided that* to the extent Restructuring Expenses include any Adequate Protection Payments made to the Bond Trustee under the DIP Order, such payments shall be deemed Restructuring Expenses and shall be subject to the provisions of this paragraph. All Restructuring Fees and Expenses to be paid on the Effective Date shall be estimated in good faith before and as of the Effective Date and such estimates shall be delivered to the Debtors at least two (2) Business Days before the anticipated Effective Date; *provided*, *however*, that such estimates shall not be considered an admission or limitation with respect to such Restructuring Fees and Expenses. On the Effective Date, or as soon as practicable thereafter, final invoices for all Restructuring Fees and Expenses incurred before and as of the Effective Date shall be submitted to the Debtors in form of an invoice summary for fees and categorized expenses incurred during the pendency of the Chapter 11 Cases, and such invoice summary shall not be required to contain time entries, but shall include a list of professionals providing services, with rates, and a general, brief description of the nature of the matters for which services were performed, and which may be redacted modified to the extent necessary to delete any information subject to the attorney-client privilege, any work product doctrine, or any other evidentiary privilege or protection recognized under applicable law, or any other confidential information. Following the Effective Date, the Reorganized Debtors shall continue to pay, when due and payable in the ordinary course, pre-Effective Date Restructuring Fees and Expenses related to this Plan and the implementation, consummation, and defense of this Plan and the Restructuring Transactions, incurred before the Effective Date, in accordance with the Green Bondholder RSA, Green Bond Documents and the Exit Financing Documents. Notwithstanding the foregoing, if the Debtors object to any Restructuring Fees and Expenses that are not otherwise subject to the review process in the DIP Order, the Debtors may file a motion with the Bankruptcy Court within three (3) business days of

57

the Debtors' receipt of any invoice under this Section 4.1.5 to request a determination of the legally enforceable amount of any portion of the Restructuring Fees and Expenses under such invoice.

## 4.2     Classified Claims.

### 4.2.1     Class 1 (Green Bond Claims).

**4.2.1.1**     **Impairment**.  Class 1 consists of the Green Bond Claims.  Class 1 is Impaired, and the Holders of Claims in Class 1 are entitled to vote to accept or reject the Plan.

**4.2.1.2**     **Allowance**: The Green Bond Claims shall be deemed Allowed in the aggregate principal amount of $85,000,000.00, plus accrued and unpaid interest on such principal amount and any other premiums, fees, costs, or other amounts due and owing pursuant to the under the Green Bond Documents, including the Green Bond Trustee Fees.

**4.2.1.3**     **Treatment**.    Except to the extent that a Holder of a Green Bond Claim has agreed to less favorable treatment, each Holder of a Green Bond Claim will be entitled to elect to (i) participate in the Exit Financing within the Exit Financing Contribution Limits or (ii) not participate in the Exit Financing and instead receive a cash distribution.

Participating Bondholders (*i.e.*, Holders of Green Bond Claims that timely elect to participate in the Exit Financing) will receive for each $1.00 in Exit Financing contributed within the Exit Financing Contribution Limits: (a) tax-exempt Exit Green Bonds in a principal amount equal to twice the amount of Exit Financing provided by such Participating Bondholder, with fifty percent (50%) of such amount attributed to the amount of Exit Financing, and fifty percent (50%) of such amount attributed to the existing Green Bond Claim held by such Participating Bondholder, secured by first priority lien on all assets of the Debtors shared *pari passu* with the liens of the Converted DIP Loan; and (b) a pro rata share of the New Membership Interest.

Each Non-Participating Bondholder (*i.e.*, Holders of Green Bond Claims that do not timely elect to participate in the Exit Financing) will receive distributions on or as soon as practicable after the Effective Date in an amount equal to two percent (2%) of its Allowed Green Bond Claim.

All distributions to Holders of Green Bond Claims, whether to Participating Bondholders or Non-Participating Bondholders, are subject to the rights and terms of the Green Bond Documents and the rights of the Green Bond Trustee thereunder, including the right to assert any charging liens.

58

**4.2.2**    **Class 2 (2024 SEDC Secured Loan Claim).**

      **4.2.2.1**    **Impairment**.  Class 2 consists of the 2024 SEDC Secured Loan Claim.  Class 2 is Impaired, and the Holders of Claims in Class 2 are entitled to vote to accept or reject the Plan.

      **4.2.2.2**    **Treatment**.  On or as soon as practicable after the Effective Date, the Holder of the 2024 SEDC Secured Loan Claim will receive a Cash payment equal to two percent (2%) of its Allowed 2024 SEDC Secured Loan Claim.  Any Liens held by Holders of Class 2 Claims shall be released and discharged on the Effective Date.

**4.2.3**    **Class 3 (QLICI Secured Claims).**

      **4.2.3.1**    **Impairment**.  Class 3 consists of the QLICI Secured Claims.  Class 3 is Impaired, and the Holders of Claims in Class 3 are entitled to vote to accept or reject the Plan.

      **4.2.3.2**    **Treatment**.  On or as soon as practicable after the Effective Date, the Debtors shall release the amounts in the NMTC Separate Accounts to the Respective QLICI Lenders.  Liens held by Holders of Class 3 Claims shall be released and discharged on the Effective Date.

**4.2.4**    **Class 4 (Cianbro Mechanic's Lien).**

      **4.2.4.1**    **Impairment**.  Class 4 consists of the Cianbro Mechanic's Lien Claim.  Class 4 is Impaired, and the Holders of Claims in Class 4 are entitled to vote to accept or reject the Plan.

      **4.2.4.2**    **Treatment**.  On or as soon as practicable after the Effective Date of the Plan, Cianbro will receive a Cash payment of $3 million (the "First Cianbro Payment").  In addition, upon the Cianbro's completion of the Board Line Work, Cianbro will receive an additional $500,000 payment.  Finally, Cianbro will receive a payment of $4.5 million (the "Final Cianbro Amount"), as follows: (a) Cianbro will receive forty percent (40%) of the 48C Tax Credit up to the Final Cianbro Amount (the "Tax Credit Payment"); and (b) solely to the extent that the Tax Credit Payment is less than the Final Cianbro Amount (the "Cianbro Deficiency"), Cianbro will receive the Cianbro Secured Note in the amount of the Cianbro Deficiency.  On the Effective Date, any Lien held by Cianbro, including without limitation any mechanic's liens and the Cianbro Adequate Protection Lien, will be deemed released and discharged.

**4.2.5**    <u>Class 5 (Gilman Mechanic's Lien).</u>

      **4.2.5.1**    <u>**Impairment**</u>.  Class 5 consists of the Gilman Mechanic's Lien Claim. Class 5 is Impaired, and the Holders of Claims in Class 5 are entitled to vote to accept or reject the Plan.

      **4.2.5.2**    <u>**Treatment**</u>.  On or as soon as practicable after the Effective Date, but no later than thirty days after the Effective Date, will receive a Cash payment in the amount of $57,981.17, and any Lien held by Gilman, including without limitation the Gilman Mechanic's Lien, will be deemed released and discharged.

**4.2.6**    <u>Class 6 (GO-Madison Other Secured Claims).</u>

      **4.2.6.1**    <u>**Non-Impairment**</u>.   Class 6 consists of all GO-Madison Other Secured Claims.  Class 6 is Unimpaired, and the Holders of Claims in Class 6 are conclusively presumed to have accepted the Plan and are not entitled to vote to accept or reject the Plan.

      **4.2.6.2**    <u>**Treatment**</u>.  On the Effective Date, all Holders of Allowed GO-Madison Other Secured Claims will be Unimpaired.

**4.2.7**    <u>Class 7 (Non-Tax Priority Claims).</u>

      **4.2.7.1**    <u>**Non-Impairment**</u>.  Class 7 consists of all Non-Tax Priority Claims. Class 7 is Unimpaired, the Holders of Claims in Class 7 are conclusively presumed to have accepted the Plan and are not entitled to vote to accept or reject the Plan.

      **4.2.7.2**    <u>**Treatment**</u>.  The legal, equitable and contractual rights of the Holders of Allowed Non-Tax Priority Claims are unaltered by the Plan. Each Holder of an Allowed Non-Tax Priority Claim shall be paid in full, in Cash, on, or as soon as reasonably practicable after, the Effective Date, or on such other terms and conditions as are acceptable to the Reorganized Debtors and the Holder of an Allowed Non-Tax Priority Claim.

**4.2.8**    <u>Class 8 (GO-Madison General Unsecured Claims).</u>

      **4.2.8.1**    <u>**Impairment**</u>.   Class 8 consists of the GO-Madison General Unsecured Claims.  Class 8 is Impaired, and Holders of Claims in Class 8 are entitled to vote to accept or reject the Plan.

      **4.2.8.2**    <u>**Treatment**</u>.  Each holder of an Allowed Class 8 Claim shall receive on or as soon as practicable after the Effective Date, subject to the Holder's timely election to receive Convenience Class treatment in Class 9, a Cash payment equal to ten percent (10%) of its Allowed GO-Madison General Unsecured Claim, except to the extent that a

Holder of a GO-Madison General Unsecured Claim has agreed to less favorable treatment or has been paid previously.

**4.2.9**     **Class 9 (Convenience Class Claims).**

    **4.2.9.1**     **Non-Impairment**. Class 9 consists of all Convenience Class Claims. Class 9 is Unimpaired, and the Holders of Claims in Class 9 are conclusively presumed to have accepted the Plan and are not entitled to vote to accept or reject the Plan.

    **4.2.9.2**     **Treatment**.  On or as soon as practicable after the Effective Date, each Holder of an Allowed Convenience Class Claim, shall receive payment in Cash in the full amount of such Allowed Convenience Class Claim, except to the extent that a Holder of a Convenience Class Claim has agreed to less favorable treatment or has been paid previously.

**4.2.10**     **Class 10 (Series B Senior Secured Claims).**

    **4.2.10.1**     **Impairment**.  Class 10 consists of the Series B Senior Secured Claims. Class 10 is Impaired, and the Holders of Claims in Class 10 are entitled to vote to accept or reject the Plan.

    **4.2.10.2**     **Treatment**.  On or as soon as practicable under the Effective Date, Saint-Gobain and D.R. Horton will receive shares of New Common Stock equal to 5% and .5%, respectively, of the New Common Stock issued pursuant to this Plan.  Any Liens held by Holders of Class 10 Claims shall be released and discharged on the Effective Date.

**4.2.11**     **Class 11 (Open Prairie Secured Claim).**

    **4.2.11.1**     **Impairment**.  Class 11 consists of the Open Prairie Secured Claim. Class 11 is Impaired, and the Holders of Claims in Class 11 are entitled to vote to accept or reject the Plan.

    **4.2.11.2**     **Treatment**.  On or as soon as practicable after the Effective Date, the Debtors shall turnover and release the funds existing in the KeyBank Account as of the Petition Date to Open Prairie on account of the Open Prairie Secured Claim.  Any Liens held by Holders of Class 11 Claims shall be released and discharged on the Effective Date.

**4.2.12**     **Class 12 (Bridge Loan Claims).**

    **4.2.12.1**     **Impairment**.  Class 12 consists of all Bridge Loan Claims.  Class 12 is Impaired, and the Holders of Claims in Class 12 are conclusively presumed to have rejected the Plan and are not entitled to vote to accept or reject the Plan.

   **4.2.12.2**   <u>**Treatment**</u>.  On the Effective Date, all Bridge Loan Claims shall be cancelled and discharged, and Holders of Bridge Loan Claims shall not receive or retain any Property under the Plan on account of their Bridge Loan Claims.  Any Liens held by Holders of Class 12 Claims shall be released and discharged on the Effective Date.

**4.2.13**   <u>**Class 13 (GO-Inc. General Unsecured Claims)**</u>.

   **4.2.13.1**   <u>**Impairment**</u>.  Class 13 consists of all GO-Inc. General Unsecured Claims.  Class 13 is Impaired, and the Holders of Claims in Class 13 are conclusively presumed to have rejected the Plan and are not entitled to vote to accept or reject the Plan.

   **4.2.13.2**   <u>**Treatment**</u>.  On the Effective Date, all GO-Inc. General Unsecured Claims shall be cancelled and discharged, and Holders of GO-Inc. General Unsecured Claims shall not receive or retain any Property under the Plan on account of their GO-Inc. General Unsecured Claims.  Any Liens held by Holders of Class 13 Claims shall be released and discharged on the Effective Date.

**4.2.14**   <u>**Class 14 (Intercompany Claims)**</u>.

   **4.2.14.1**   <u>**Impairment**</u>.  Class 14 consists of all Intercompany Claims.  Class 14 is Impaired, and the Holders of Claims in Class 14 are conclusively presumed to have rejected the Plan and are not entitled to vote to accept or reject the Plan.

   **4.2.14.2**   <u>**Treatment.**</u>  On the Effective Date, all Intercompany Claims shall be cancelled and discharged, and Holders of Intercompany Claims shall not receive or retain any Property under the Plan on account of their Intercompany Claims.

**4.2.15**   <u>**Class 15 (GO-Inc. Equity Interests)**</u>.

   **4.2.15.1**   <u>**Impairment**</u>.  Class 15 consists of all GO-Inc. Equity Interests.  Class 15 is Impaired, and the Holders of Claims in Class 15 are conclusively presumed to have rejected the Plan and are not entitled to vote to accept or reject the Plan.

   **4.2.15.2**   <u>**Treatment**</u>.  On the Effective Date, all GO-Inc. Equity Interests shall be retired, cancelled, extinguished and discharged in accordance with the terms of the Plan , and Holders of GO-Inc. Equity Interests shall not receive or retain any Property under the Plan on account of their GO-Inc. Equity Interests.

4.2.16    **Class 16 (GO-Madison Equity Interests).**

    4.2.16.1    **Impairment**.  Class 16 consists of all GO-Madison Equity Interests. Class 16 is Impaired, and the Holders of Claims in Class 16 are conclusively presumed to have rejected the Plan and are not entitled to vote to accept or reject the Plan.

    4.2.16.2    **Treatment**.  On the Effective Date, all GO-Madison Equity Interests shall be cancelled, and Holders of GO-Madison Equity Interests shall not receive or retain any Property under the Plan on account of their GO-Madison Equity Interests.

## ARTICLE 5
## MEANS FOR EXECUTION AND IMPLEMENTATION OF THE PLAN

**5.1    Cancellation and Surrender of Existing Securities and Agreements**.  On the Effective Date, all GO-Inc. Equity Interests and GO-Madison Equity Interests will be retired, cancelled, extinguished and discharged in accordance with the terms of the Plan.  Except as otherwise provided in the Plan or the Plan Supplement, including with respect to the Exit Green Bonds and Exit Financing,[3] on the Effective Date: (1) the obligations of the Debtors under any certificate, share, note, bond, indenture, purchase right, option, warrant, or other instrument or document (collectively, the "Cancelled Instruments"), directly or indirectly, evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors giving rise to any Claim or Equity Interest shall be deemed cancelled without any need for further action or approval of the Bankruptcy Court or for a Holder to take further action, and the agents and trustees under such Cancelled Instruments (including the Green Bond Trustee and DIP Agent), as applicable, shall be discharged and released and shall not have any continuing duties or obligations thereunder and (2) the obligations of the Debtors and the agents and trustees under the Cancelled Instruments pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, purchase rights, options, warrants or other instruments or documents evidencing or creating any indebtedness or obligation of the Debtors or the agents or trustees under the Cancelled Instruments shall be deemed fully satisfied, released and discharged; *provided*, that the foregoing shall not impact any Claims that are Unimpaired by the Plan. The holders of or parties to such Cancelled Instruments, securities, and other documentation shall have no rights arising from or related to such Cancelled Instruments, securities, or other documentation or the cancellation thereof, except the rights provided for pursuant to the Plan.  Upon the final distributions in accordance with Article VIII hereof, or notice from the Debtors or the Reorganized Debtors, as applicable, (i) the applicable cancelled notes or bonds shall thereafter be drawn down or deemed null, void, and worthless, as applicable, and (ii) at the request of the Debtors or Reorganized Debtors, at the direction of the agent or trustee under the applicable indenture, including the Green Bond Trustee, DTC shall reduce or take down the relevant position relating to such notes or bonds

---

[3] For the avoidance of doubt, as will more fully be described and provided for in the Plan Supplement, the outstanding principal amount of the Green Bonds will be reduced and the remaining Green Bonds will be distributed to the Participating Bondholders in conjunction with the Exit Financing as the Exit Green Bonds and in accordance with the Green Bond Indenture, as amended.

without any requirement of indemnification or security on the part of the Debtors, the Reorganized Debtors, any agent or trustee, or any third party designated by the foregoing parties.

Notwithstanding anything to the contrary herein, but subject to any applicable provisions of Article 8 hereof, to the extent canceled pursuant to this paragraph, the Cancelled Instruments shall continue in effect solely to the extent necessary to:  (a) permit Holders of Claims or Interests under the Cancelled Instruments to receive and accept their respective distributions under this Plan on account of such Claims or Interests, if any, subject to any applicable charging liens; (b) permit the Disbursing Agent or other agents or trustees under the Cancelled Instruments, as applicable, to make Plan Distributions on account of the Allowed Claims under the Cancelled Instruments, subject to any applicable charging Liens; (c) preserve any rights of each agent or trustee under the Cancelled Instruments (on its own behalf or on behalf of any applicable Holder) thereunder, respectively, to maintain, exercise, and enforce any applicable rights of indemnity, reimbursement, or contribution, or subrogation or any other claim or entitlement; (d) preserve any rights of each agent or trustee under the Cancelled Instruments (on its own behalf or on behalf of any applicable Holder) thereunder, respectively, to maintain, enforce, and exercise their respective liens, including any charging liens, as applicable, under the terms of the applicable agreements, or any related or ancillary document, instrument, agreement, or principle of law, against any money or property distributed or allocable on account of such Claims or Interests, as applicable; and (e) preserve the rights of each agent or trustee under the Cancelled Instruments (on its own behalf or on behalf of any applicable Holder), to appear and be heard in the Chapter 11 Cases or in any proceeding in the Bankruptcy Court, including, but not limited to, enforcing any obligations owed to any such agent or trustee under the Cancelled Instruments (on its own behalf or on behalf of any applicable Holder), as applicable, under the Plan, the Plan Supplement, the Confirmation Order, or other document incorporated therein.

**5.2    Plan Transactions**.  Before, on, and after the Effective Date, the Debtor or Reorganized Debtor, as applicable, shall take all actions as may be necessary or appropriate to effectuate the terms of this Plan, including: (a) the execution and delivery of any appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution, or liquidation containing terms that are consistent with the terms of the Plan, and that satisfy the requirements of applicable law and any other terms to which the applicable Entities may agree; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree; (c) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable state law; (d) such other transactions that are required to effectuate the Plan; and (e) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law.

**5.3    Authorization and Issuance of the New Membership Interest and New Common Stock.**

The issuance of the New Membership Interest and the New Common Stock shall be authorized without the need for any further corporate action and without any further action by the Debtors or any other party.  All of the New Membership Interest and shares of New Common

Stock issued pursuant to the Plan shall be duly authorized, validly issued, fully paid, and non-assessable. Each distribution and issuance of the New Common Stock and New Membership Interest under the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance. The issuance, distribution, or authorization, as applicable or as described herein and in the Plan Supplement, of certain Securities in connection with this Plan, including the New Common Interests and new Membership Interest, will be exempt from SEC registration to the fullest extent permitted by law, as more fully described in Article V.14, below.

The New Common Stock and the New Membership Interest shall be free and clear of all Liens, Claims, interests, and encumbrances of any kind.

**5.4**     **Transfer of the New Membership Interest**.  On the Effective Date, the New Membership Interest issued to the Participating Bondholders pursuant to this Plan will be deemed immediately and instantaneously transferred to Reorganized GO-Inc.

**5.5**     **Transfer of the Common Stock**.  On the Effective Date, the shares of New Common Stock will be issued to the following entities in the amounts set forth below:

Saint-Gobain (5%)
D.R. Horton (0.5%)
Participating Bondholders (94.5%)

*Provided*, *however*, that the New Common Stock issued to the Participating Bondholders shall be subject to dilution by the New Common Stock issued to the DIP Lenders pursuant to the DIP Participation Fee.

**5.6**     **Plan Funding**. The funds utilized to make Cash payments under the Plan will generated from the Exit Financing, the 48C Tax Credit, collections from the sale of inventory, and Cash on hand.

**5.7**     **Exit Financing and Converted DIP Loan**.  On the Effective Date, entry into the Exit Financing and Converted DIP Loan, and any related guarantees and security and similar agreements, by the Reorganized Debtors shall be authorized without the need for any further corporate action or without any further action by the holders of Claims or Interests.  Confirmation of the Plan shall be deemed authorization for the Debtors or Reorganized Debtors, as applicable, to, without further notice to or order of the Bankruptcy Court, (i) execute and deliver the Exit Financing Documents, Converted DIP Loan Documents and any other documents and agreements necessary or appropriate enter into the Exit Financing and Converted DIP Loan, as applicable, and incur and pay any fees, premiums, and expenses in connection therewith, and (ii) act or take action under applicable law, regulation, order, or rule or vote, consent, authorization, or approval of any

person, subject to such modifications as the Debtors or the Reorganized Debtors, as applicable, may deem to be necessary to enter into the Exit Financing and Converted DIP Loan.

On the Effective Date, the Participating Bondholders will receive their allocated share of the Exit Green Bonds in exchange for providing the Exit Financing of not less than $19 million in additional funding to the Reorganized Debtors pursuant to the terms of the Exit Financing Documents. The Exit Financing will allow the Reorganized Debtors to fund operations, the completion of the Board Line Work, and the finishing of construction on the Madison Facility.

On the Effective Date, all liens and security interests granted pursuant to, or in connection with the Exit Financing or Converted DIP Loan, and any related guarantees, (i) shall be deemed to be approved and shall, without the necessity of the execution, recordation, or filing of mortgages, security agreements, control agreements, pledge agreements, financing statements, or other similar documents, be valid, binding, fully perfected, fully enforceable liens on, and security interests in, the collateral securing the Exit Financing or Converted DIP Loan and any related guarantees, with the priorities established in respect thereof, applicable non-bankruptcy law, the Plan, and the Confirmation Order; and (ii) shall not be enjoined or subject to discharge, impairment, release, avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any applicable non-bankruptcy law, the Plan, or the Confirmation Order.

The Reorganized Debtors and the persons granting liens and security interests under the Exit Financing or Converted DIP Loan and any related guarantees are authorized to make all filings and recordings and to obtain all governmental approvals and consents necessary to establish and perfect such liens and security interests under the provisions of the applicable state, federal, or other law that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order without the need for any filings or recordings) and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such liens and security interests to third parties.

Each DIP Lender and, by electing to be a Participating Bondholder, each Participating Bondholder thereby instructs and directs, and the Plan authorizes the Green Bond Trustee, Exit Green Bond Trustee, DIP Agent or Converted DIP Loan Agent, as applicable, to (a) act as Disbursing Agent to the extent required by the Plan, (b) execute and deliver the Exit Financing Documents or Converted DIP Loan Documents (each to the extent it is a party thereto), as well as to execute, deliver, file, record, and issue any notes, documents (including UCC financing statements), or agreements in connection therewith, to which the Exit Green Bond Trustee or Converted DIP Loan Agent, as applicable, is a party and to promptly consummate the transactions contemplated thereby, and (c) take any other actions required or contemplated to be taken by the Green Bond Trustee, Exit Green Bond Trustee, DIP Agent or Converted DIP Loan Agent (as applicable) under this Plan or any of the Exit Facility Documents or Converted DIP Loan Documents to which it is a party.

**5.8    Release of Liens**. Upon request by the Debtors or the Reorganized Debtors, any Person holding a Lien in any of the Debtors' Property shall execute any lien release or similar document(s)

required to implement the Plan or reasonably requested by the Debtors or the Reorganized Debtors in a prompt and diligent manner. Notwithstanding the foregoing, each of the Debtors and the Reorganized Debtors are authorized to execute any lien release or similar document(s) required to implement the Plan.

**5.9** **Vesting of Assets and Operation of Businesses**.   On the Effective Date, except as otherwise expressly provided in the Plan or Confirmation Order, all of the Debtors' Property shall vest in the Reorganized Debtors free and clear of all Liens, Claims, interests, and encumbrances of any kind. Following the Effective Date, the Reorganized Debtors shall operate their businesses and engage in transactions in accordance with their own governing documents without any restriction under this Plan.

Neither the issuance or transfer of the New Common Stock or New Membership Interest, nor any transfer of Property through the Plan, shall result in the Reorganized Debtors, or any of their subsidiaries or affiliates, (a) having any liability or responsibility for any Claim against or Interest in the Debtors, the Debtors' Estates, or any Insider of the Debtors, or (b) having any liability or responsibility to the Debtors, except as expressly provided in the Plan. Without limiting the effect or scope of the foregoing, and to the fullest extent permitted by applicable laws, neither the issuance of the New Common Stock or the New Membership Interest, nor the transfer of assets contemplated in the Plan, shall subject the Reorganized Debtors or their respective properties, subsidiaries or assets or affiliates, successors, or assigns to any liability for Claims against the Debtors' interests in such assets by reason of such issuance of the New Common Stock or New Membership Interest or transfer of assets under any applicable laws, including, without limitation, any successor liability, except as expressly provided in the Plan.

On the Effective Date, except as otherwise provided in the Plan, the Reorganized Debtors may operate their businesses and may use, acquire, or dispose of any and all of the Property, without supervision of or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, except as expressly provided in the Plan.

**5.10** **Retention of Causes of Action**.   Except as otherwise provided in the Plan, the Confirmation Order, or in any settlement agreement approved during the Chapter 11 Cases: (1) any and all rights, Claims, Causes of Action, defenses, and counterclaims of or accruing to the Debtors or their Estates shall remain assets of and vest in the Reorganized Debtors, whether or not litigation relating thereto is pending on the Effective Date, and whether or not any such rights, claims, Causes of Action, defenses, and counterclaims have been listed or referred to in the Plan, the Schedules, or any other document filed with the Bankruptcy Court, and (2) neither the Debtors nor the Reorganized Debtors waive, relinquish, or abandon (nor shall they be estopped or otherwise precluded from asserting) any right, Claim, Cause of Action, defense, or counterclaim that constitutes Property of the Estates:  (a) whether or not such right, Claim, Cause of Action, defense, or counterclaim has been listed or referred to in the Plan or the Schedules, or any other document filed with the Bankruptcy Court, (b) whether or not such right, Claim, Cause of Action, defense, or counterclaim is currently known to the Debtors, and (c) whether or not a defendant in any litigation relating to such right, Claim, Cause of Action, defense, or counterclaim filed a Proof of Claim in the Chapter 11 Cases, filed a notice of appearance or any other pleading or notice in the Chapter 11 Cases, voted for or against the Plan, or received or retained any consideration under the Plan.  Without in any manner limiting the generality of the foregoing, notwithstanding any

67

otherwise applicable principle of law or equity, including, without limitation, any principles of judicial estoppel, res judicata, collateral estoppel, issue preclusion, or any similar doctrine, the failure to list, disclose, describe, identify, or refer to a right, Claim, Cause of Action, defense, or counterclaim, or potential right, Claim, Cause of Action, defense, or counterclaim, in the Plan, the Schedules, or any other document filed with the Bankruptcy Court shall in no manner waive, eliminate, modify, release, or alter the Reorganized Debtors' right to commence, prosecute, defend against, settle, and realize upon any rights, Claims, Causes of Action, defenses, or counterclaims that the Debtors or the Reorganized Debtors has, or may have, as of the Confirmation Date. The Reorganized Debtors may commence, prosecute, defend against, settle, and realize upon any rights, Claims, Causes of Action, defenses, and counterclaims in their sole discretion in accordance with what is in the best interests, and for the benefit, of the Reorganized Debtors.

**5.11    Satisfaction of Claims or Interests**.    Unless otherwise provided in the Plan, any distributions and deliveries to be made on account of Allowed Claims shall be in full and final satisfaction, release, settlement and discharge of such Allowed Claims.

**5.12    Continuation of Bankruptcy Injunction or Stays**.    All injunctions or stays provided for in the Chapter 11 Cases under sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.

**5.13    Administration Pending Effective Date**.    Prior to the Effective Date, the Debtors shall continue to operate their businesses as debtors-in-possession, subject to all applicable requirements of the Bankruptcy Code and the Bankruptcy Rules. After the Effective Date, the Reorganized Debtors may operate their businesses, and may use, acquire, and dispose of property free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, but subject to the continuing jurisdiction of the Bankruptcy Court as set forth in Article 13 hereof.

**5.14    Exemption From Securities Laws and Certain DTC Matters**.    Any rights issued under, pursuant to or in effecting the Plan, including, without limitation, the New Common Stock and New Membership Interest, and the offering and issuance thereof by any party, including without limitation the Debtors or the Estates, shall be exempt from Section 5 of the Securities Act of 1933, if applicable, and from any state or federal securities laws requiring registration for offer or sale of a security or registration or licensing of an issuer of, underwriter of, or broker or dealer in, a security, and shall otherwise enjoy all exemptions available for Distributions of securities under a plan of reorganization in accordance with all applicable law, including without limitation section 1145 of the Bankruptcy Code. If the issuance of the New Common Stock or New Membership Interest does not qualify for an exemption under section 1145 of the Bankruptcy Code, the New Common Stock and New Membership Interest shall be issued in a manner which qualifies for any other available exemption from registration, whether as a private placement under Rule 506 of the Securities Act, Section 4(2) of the Securities Act, and/or the safe harbor provisions promulgated thereunder.

Should the Reorganized Debtors elect on or after the Effective Date to reflect any ownership of the New Common Stock or New Membership Interest to be issued under this Plan through the facilities of DTC (or another similar depository), the Reorganized Debtors need not provide any further evidence other than this Plan or the Confirmation Order with respect to the treatment of the New Interests to be issued under this Plan under applicable securities Laws. DTC

68

(or another similar depository) shall be required to accept and conclusively rely upon this Plan and the Confirmation Order in lieu of a legal opinion regarding whether the New Commons Stock and New Membership Interest to be issued under this Plan is exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.  Notwithstanding anything to the contrary in this Plan, no Entity (including, for the avoidance of doubt, DTC) may require a legal opinion regarding the validity of any transaction contemplated by this Plan, including, for the avoidance of doubt, whether the New Common Stock or New Membership Interest to be issued under this Plan is exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

It is not expected that any New Common Stock, New Membership Interest, or any other Securities, will be eligible for any depository services, including with respect to DTC, on or about the Effective Date.  Further, it is not intended that the New Common Stock or New Membership Interests will be listed on a national securities exchange registered under section 6 of the Securities Exchange Act of 1934, as amended (or a comparable non-U.S. securities exchange) on or about the Effective Date.

**5.15** **"Change of Control" Provisions**.  For purposes of effectuating the Plan, none of the transactions contemplated herein shall constitute a change of control under any agreement, contract, or document of the Debtors, or create, or be deemed to create, any right or any other claim in connection therewith based upon a provision related to a "change of control," or comparable term in any executory contract or unexpired lease being assigned and/or assumed pursuant to the Plan.

**ARTICLE 6**
**CORPORATE GOVERNANCE AND**
**MANAGEMENT OF THE REORGANIZED DEBTORS**

**6.1** **Corporate Action and Existence**.  The Debtors shall deliver all documents and perform all actions reasonably contemplated with respect to implementation of the Plan. The Debtors, or their designees, are authorized (i) to execute on behalf of the Debtors, in a representative capacity and not individually, any documents or instruments after the Confirmation Date that may be necessary to consummate the Plan and (ii) to undertake any other action on behalf of the Debtors to consummate the Plan. Each of the matters provided for under the Plan involving the corporate structure of the Debtors or corporate action to be taken by or required of the Debtors will, as of the Effective Date, be deemed to have occurred and be effective as provided herein, and shall be authorized, approved, and (to the extent taken before the Effective Date) ratified in all respects without any requirement of further action by stockholders, creditors, or directors of the Debtors. On the Effective Date, all matters provided for in the Plan involving the corporate structure of the Reorganized Debtors, and all corporate actions required by the Debtors and the Reorganized Debtors in connection with the Plan, shall be deemed to have occurred and shall be in effect, without any requirement of further action by the Debtors or the Reorganized Debtors.

Upon the Effective Date, and without any further action by the shareholders, directors, or officers of the Reorganized Debtors, the Reorganized Debtors' Corporate Documents shall be deemed amended (a) to the extent necessary, to incorporate the provisions of the Plan, and (b) to prohibit the issuance by the Reorganized Debtors of nonvoting securities to the extent required

69

under section 1123(a)(6) of the Bankruptcy Code, subject to further amendment of such Corporate Documents as permitted by applicable law, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval other than any requisite filings required under applicable state, provincial or federal law. The Corporate Documents shall be filed with the Plan Supplement.

Except as otherwise provided in the Plan, each Debtor shall continue to exist after the Effective Date as a separate corporate entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to its certificate of incorporation and bylaws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws (or other formation documents) are amended under the Plan, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law). Prior to the Effective Date, the Debtors may engage in such corporate and financial transactions, including mergers, asset transfers, consolidations, amalgamations, separations, series organizations, reorganization and otherwise for the purposes of optimizing the post Effective Date corporate and tax structure of the Reorganized Debtors. If proposed prior to the Effective Date, any such transaction will be subject to Court approval, if such approval would be necessary under the Bankruptcy Code.

**6.2**   **Management and Board of the Reorganized Debtors**.   In accordance with Section 1129(a)(5)(A) of the Bankruptcy Code, the Debtors will disclose in the Plan Supplement the identities of those individuals proposed to serve, following the Effective Date, as directors and officers of the Reorganized Debtors.

**6.3**   **Disclosure of any Insiders to be Employed or Retained by the Reorganized Debtors**. In accordance with Section 1129(a)(5)(B) of the Bankruptcy Code, the Debtors will disclose on or before the Confirmation Date the identity of any insider that will be employed or retained by the Reorganized Debtors, and the nature of any compensation for such insider.

**6.4**   **Indemnification of Post-Effective Date Directors and Officers**.   Except as provided in Article 10.5 hereinbelow, any obligation or agreement of the Debtors to indemnify, reimburse, or limit the liability of any Person, including any officer or director of the Debtors, or any agent, professional, financial advisor, or underwriter of any securities issued by the Debtors, relating to any acts or omissions occurring before the Effective Date, whether arising pursuant to corporate, bylaws, contract or applicable state law, shall be deemed to be, and shall be treated as, a General Unsecured Claim and/or Executory Contract and shall be deemed to be rejected, canceled, and discharged pursuant to the Plan as of the Effective Date and any and all Claims resulting from such obligations are disallowed under section 502(e) of the Bankruptcy Code or other applicable grounds, including section 502(d), or if any court of applicable jurisdiction rules to the contrary, such Claim shall be estimated pursuant to section 502(c) of the Bankruptcy Code in the amount of $0 or such other amount as the Bankruptcy Court shall determine.

**6.5**   **St. Gobain Board Representation and Related Matters**. From and after the Effective Date, St. Gobain shall be entitled to: (i) access to the Debtors' facilities and personnel during

normal business hours and with reasonable advance notification; (ii) annual and quarterly financial statements prepared by the Debtors, on a stand-alone, consolidated, and consolidating basis, when delivered to any other stockholders; (iii) a pro rata right, based upon its percentage ownership of GO-Inc. stock, to participate in subsequent issuances for capital raising purposes of equity securities of GO-Inc. (including options, rights, or other securities convertible into equity securities); and (iv) the right to designate two senior executives of CertainTeed Canada, Inc. to serve as members of the GO-Inc. board of directors.

## ARTICLE 7
## VOTING

**7.1**     **Voting Generally**.  Ballots and such related solicitation materials as are approved by the Court will be served on each holder of an Allowed Claim in an Impaired Class which is entitled to vote under the Plan.  Each such holder is entitled to vote separately to accept or reject the Plan and to indicate such vote on a duly executed and delivered ballot.

**7.2**     **Nonconsensual Confirmation**.  If any Impaired Class entitled to vote shall not accept the Plan by the requisite statutory majorities provided in section 1126 of the Bankruptcy Code, or if any Impaired Class is deemed to have rejected the Plan, the Debtors reserve the right (a) to undertake to have the Bankruptcy Court confirm the Plan under section 1129(b) of the Bankruptcy Code and (b) to amend the Plan to the extent necessary to obtain entry of the Confirmation Order.

## ARTICLE 8
## DISTRIBUTIONS UNDER THE PLAN

**8.1**     **Distributions to Holders of Allowed Claims Only**.  Until a Disputed Claim becomes an Allowed Claim, distributions of Cash and/or other Instruments or Property otherwise available to the Holder of such Claim shall not be made.  Prior to the Effective Date, Holders of Allowed Claims shall be required to provide the Disbursing Agent an Internal Revenue Service Form W-9 (or, if applicable, an appropriate Internal Revenue Service Form W-8).

**8.2**     **Distribution Record Date**.  As of the close of business on the Distribution Record Date, the various transfer registers for each of the Classes of Claims as maintained by the Debtors or their agents shall be deemed closed.  The Debtors shall have no obligation to recognize, but may, in their sole and absolute discretion, recognize any transfer of any such Claims occurring on or after the Distribution Record Date.  Otherwise, the Debtors or the Reorganized Debtors, as applicable, will recognize only those record holders of such Claims stated on the transfer ledgers as of the close of business on the Distribution Record Date.  Subject to the foregoing, the Distribution Record Date shall be the record date for purposes of making distributions under the Plan.  For the avoidance of doubt, the Distribution Record Date shall not apply to the Green Bond Claims, the Holders of which shall receive a distribution (if any) in accordance with the terms of this Article 8 on or as soon as practicable after the Effective Date.

**8.3**     **Disbursing Agent**.  The Debtors or the Reorganized Debtors, as applicable, shall have the authority to enter into agreements with one or more Disbursing Agents to facilitate the distributions required hereunder.  Except as otherwise expressly set forth herein, the Person(s) designated as a Disbursing Agent, shall make all distributions under the Plan when required by the Plan from the

71

Disbursing Agent Restricted Accounts.  A Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.

**8.4** **Rights and Powers of Disbursing Agent**.  The Disbursing Agent shall be empowered to (a) effect all actions and execute all agreements, Instruments and other documents necessary to perform its duties under the Plan, (b) make all distributions contemplated by the Plan, and (c) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions of the Plan. All compensation for the Disbursing Agent shall be paid from the Property (including the Plan Consideration) disbursed to the Disbursing Agent pursuant to the Plan.  Subject to the express written consent and direction of and with the cooperation of the Green Bond Trustee, the Disbursing Agent may make distributions on account of the Green Bond Claims, subject in all respects to the rights of the Green Bond Trustee under the Green Bond Documents, including the exercise of any charging lien against all such distributions.

**8.5** **Delivery of Distributions.**

    **8.5.1** **In General**.  Subject to Bankruptcy Rule 9010 and except as otherwise provided in Article 8.5.2 of the Plan, all distributions to any Holder of an Allowed Claim including, without limitation, distributions of New Common Stock and, to the extent applicable, Cash, to Holders of Allowed Claims, shall be made at the address of such Holder as set forth in the Debtors' books and records and/or on the Schedules filed with the Bankruptcy Court unless the Debtors or their Disbursing Agent have been notified in writing of a change of address including, without limitation, by the filing of a Proof of Claim by such Holder that contains an address for such Holder different from the address reflected on such books and records or Schedules for such Holder.

    **8.5.2** **Timing of Distributions**.  In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, and if so completed shall be deemed to have been completed as of the required date.

    **8.5.3** **Distributions of Unclaimed Property**.  In the event that any distribution to any Holder is returned as undeliverable, the Disbursing Agent shall use reasonable efforts to determine the current address of such Holder, but no distribution to such Holder shall be made unless and until the Disbursing Agent has determined the then current address of such Holder, at which time such distribution shall be made to such Holder without interest or accruals of any kind.  Such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code on the six-month anniversary of the date of the attempted delivery of such distribution.  After that date, all unclaimed property or interest in property shall

revert to the Reorganized Debtors and the Claim of any Holder to such property or interest in property shall be discharged and forever barred.

**8.5.4**  **Distributions to Holders of Allowed Green Bond Claims and DIP Claims**. Except as otherwise reasonably requested by the DIP Agent or Green Bond Trustee (as applicable), all distributions to holders of Allowed DIP Claims or Allowed Green Bond Claims shall be deemed completed when made to or at the direction of the DIP Agent or Green Bond Trustee (as applicable). The DIP Agent and Green Bond Trustee (as applicable) shall hold or direct such distributions for the benefit of the holders of Allowed DIP Claims or Green Bond Trustee (as applicable). As soon as practicable in accordance with the requirements set forth in this Article 8, the DIP Agent and Green Bond Trustee shall arrange to deliver or direct delivery of such distributions to or on behalf of their Holders (as applicable), subject to the Green Bond Trustee's charging lien. The Green Bond Trustee may, if applicable, transfer or direct the transfer of such distributions directly through the facilities of DTC (whether by means of book-entry exchange, free delivery or otherwise) and will be entitled to recognize and deal for all purposes under the Plan with Holders of Allowed Green Bond Claims, to the extent consistent with the customary practices of DTC. If the DIP Agent or Green Bond Trustee is unable to make, or the DIP Agent or Green Bond Trustee consents to the Disbursing Agent making such distributions, the Disbursing Agent, with the DIP Agent or Green Bond Trustee's (as applicable) cooperation, shall make such distributions to the extent practicable to do so; *provided* that until such distributions are made, the Green Bond Trustee's charging lien shall attach to the property to be distributed in the same manner as if such distributions were made through the Green Bond Trustee. The Green Bond Trustee or the Disbursing Agent (as applicable) shall seek the cooperation of DTC so that any distribution on account of an Allowed Green Bond Claim that is held in the name of, or by a nominee of, DTC, shall be made through the facilities of DTC on the Effective Date or as soon as practicable thereafter; *provided*, that neither the Green Bond Trustee nor DIP Agent shall have any duties or responsibility relating to any form of distribution to Holders of Green Bond Claims or DIP Claims, respectively, that are not DTC eligible and the Debtors, the Reorganized Debtors and/or the Disbursing Agent, as applicable, shall use reasonably commercial efforts to seek the cooperation of DTC so that any distribution on account of an Allowed Green Bond Claim or DIP Claim that is held in the name of, or by a nominee of, DTC, shall be made to the extent possible through the facilities of DTC (whether by means of book-entry exchange, or otherwise) on the Effective Date or as soon as practicable thereafter. Neither the Green Bond Trustee nor DIP Agent shall incur any liability whatsoever on account of any distributions under the Plan, whether such distributions are made by the Green Bond Trustee, DIP Agent, or by the Distribution Agent at the reasonable direction of the Green Bond Trustee or DIP Agent, except for fraud, gross negligence, or willful misconduct.

**8.6**  **Time Bar to Cash Payments**. Checks issued by the Reorganized Debtors on account of Allowed Claims shall be null and void if not negotiated within ninety (90) days from and after the

date of issuance thereof.  Holders of Allowed Claims shall make all requests for reissuance of checks to the Reorganized Debtors.  Any Claim in respect of a voided check must be made on or before the six-month anniversary of the date of issuance.  After such date, all Claims and respective voided checks shall be discharged and forever barred and the Reorganized Debtors shall retain all monies related thereto.

**8.7**    **Setoffs**.  The Debtors or the Reorganized Debtors, to the extent relating to Assumed Liabilities may, but shall not be required to, set off or recoup against any Allowed Claim, and the payments or other distributions to be made pursuant to the Plan in respect of such Allowed Claim, any claims, rights or Causes of Action of any nature whatsoever that the Debtors or Reorganized Debtors may have against the Holder of such Claim; provided, however, that neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or the Reorganized Debtors of any such claims, rights or Causes of Action.

## ARTICLE 9
## PROCEDURES FOR DISPUTED CLAIMS

**9.1**    **Resolution of Disputed Claims**.  Except as set forth in any order of the Bankruptcy Court (including prior bar date orders), any Holder of a Claim against the Debtors shall file a Proof of Claim with the Bankruptcy Court or with the agent designated by the Debtors for this purpose on or before the Claims Bar Date.  The Debtors prior to the Effective Date, and thereafter the Reorganized Debtors or Disbursing Agent, shall have the right to file objections to Proofs of Claim on or before the Claims Objection Deadline, and to settle, compromise, withdraw or litigate to judgment objections to any and all Claims, regardless of whether classified or otherwise.  From and after the Effective Date, the Reorganized Debtors or Disbursing Agent may settle or compromise any Disputed Claim without approval of the Bankruptcy Court.

**9.2**    **Estimation of Claims**.  Any Debtor may, at any time, request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to section 502(c) of the Bankruptcy Code, regardless of whether such Debtor has previously objected to such Claim or whether the Bankruptcy Court has ruled on such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal related to any such objection.  In the event the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on such Claim, the Debtors may elect to pursue any supplemental proceedings to object to any ultimate payment on such Claim.  All of the aforementioned objection, estimation and resolution procedures are cumulative and are not necessarily exclusive of one another.  Claims may be estimated and thereafter resolved by any permitted mechanism.

**9.3**    **No Partial Distributions Pending Allowance**.  Notwithstanding any other provision in the Plan, except as otherwise agreed by the Debtors, the Reorganized Debtors or the Disbursing Agent, no partial payments or distributions shall be made with respect to a Disputed Claim unless

74

and until all objections to such Disputed Claim have been settled or withdrawn or have been determined by a Final Order.

**9.4    Distributions After Allowance**.  To the extent that a Disputed Claim becomes an Allowed Claim, the Disbursing Agent shall distribute to the Holder thereof the distributions, if any, to which such Holder is then entitled under the Plan.  Any such distributions shall be made in accordance with and at the time mandated by the Plan.  No interest shall be paid on any Disputed Claim that later becomes an Allowed Claim.

**ARTICLE 10**
**EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

**10.1    Assumption or Rejection of Executory Contracts and Unexpired Leases**.  As of the Effective Date, all executory contracts and unexpired leases to which any Debtor is a party not assumed or assumed and assigned prior to the Effective Date or otherwise the subject of a motion to assume or assume and assign filed on or before the Effective Date shall be and shall be deemed to be assumed or assumed and assigned in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code except those which are listed in the Schedule of Rejected Contracts and Unexpired Leases, to be included in the Plan Supplement. All executory contracts and unexpired leases listed in the Schedule of Rejected Contracts and Unexpired Leases shall be rejected as of the Effective Date in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code.    Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such assumptions or assumptions and assignments and rejections pursuant to sections 365 and 1123 of the Bankruptcy Code.  Each executory contract and unexpired lease assumed or assumed and assigned pursuant to the Plan shall vest or re-vest in and be fully enforceable by the applicable Reorganized Debtor in accordance with its terms, except as modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption or assumption and assignment or applicable federal law.

**10.2    Cure of Defaults of Assumed Executory Contracts and Unexpired Leases.**

    10.2.1    The Reorganized Debtors shall pay Cure Claims on the Effective Date or as soon as practicable thereafter. Unless otherwise agreed upon in writing by the parties to the applicable Executory Contract or Unexpired Lease, all requests for payment of Cure Claims that differ from the amounts proposed in the Cure Notice, to be included in the Plan Supplement, must be filed with the Bankruptcy Court on or before 30 days after the Effective Date. Any such request that is not timely filed shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against the Reorganized Debtor, without the need for any objection by the Reorganized Debtor or any further notice to or action, order, or approval of the Bankruptcy Court. Any Cure Claim shall be deemed fully satisfied, released, and discharged upon payment by the Reorganized Debtor of the Cure Claim; *provided*, *however*, that nothing herein shall prevent the Reorganized Debtor from paying any Cure Claim despite the failure of the relevant counterparty to file such request for payment of such Cure Claim. The Reorganized Debtor also may settle any Cure Claim without any further notice to or action, order, or approval of the Bankruptcy Court. In

75

addition, any objection to the assumption of an Executory Contract or Unexpired Lease pursuant to the Plan must be filed with the Bankruptcy Court on or before 30 days after the Effective Date. Any such objection will be scheduled to be heard by the Bankruptcy Court at the Debtor's or Reorganized Debtor's, as applicable, first scheduled omnibus hearing for which such objection is timely filed. Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption of any Executory Contract or Unexpired Lease will be deemed to have consented to such assumption.

10.2.2    If there is a dispute regarding a Cure Claim, the ability of the Reorganized Debtor to provide "adequate assurance of future performance" within the meaning of section 365 of the Bankruptcy Code, or any other matter pertaining to assumption, then payment of the applicable Cure Claim shall occur as soon as practicable after entry of a Final Order resolving such dispute and approving such assumption, or as may be agreed upon by the Debtors or Reorganized Debtors, as applicable, and the counterparty to the Executory Contract or Unexpired Lease. The Debtors or Reorganized Debtors, as applicable, reserve the right either to reject or nullify the assumption of any Executory Contract or Unexpired Lease within 45 days after a Final Order resolving an objection to assumption or determining the Cure Claim or any request for adequate assurance of future performance required to assume such Executory Contract or Unexpired Lease, is entered.

10.2.3    Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Cure Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption. Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed in the Chapter 11 Case, including pursuant to the Confirmation Order, shall be deemed satisfied as of the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court.

**10.3    Assumption of Compensation and Benefit Programs**. The Debtors shall file with the Plan Supplement a schedule, listing all (if any) employment, retirement, indemnification, and other agreements or arrangements in place as of the Effective Date with the Debtors' officers or employees, 401(k) Plans or retirement income plans and welfare benefit plans for such persons, or discretionary bonus plans or variable incentive plans regarding payment of a percentage of annual salary based on performance goals and financial targets for certain employees identified as key leaders, top level managers, or sales leaders, to be assumed by the Reorganized Debtors.  Nothing in the Plan shall limit, diminish, or otherwise alter the Reorganized Debtors' defenses, claims, Causes of Action, or other rights with respect to any such contracts, agreements, policies, programs, and plans.  Notwithstanding the foregoing, pursuant to section 1129(a)(13) of the Bankruptcy Code, on and after the Effective Date, all retiree benefits (as that term is defined in section 1114 of the Bankruptcy Code), if any, shall be paid by the Reorganized Debtors in

accordance with applicable law (subject to any and all rights of the Debtors or Reorganized Debtors under applicable law, including, without limitation, the right to amend or terminate such benefits).

**10.4     Pass-Through**.  Any rights or arrangements or other assets necessary or useful to the operation of the Debtors' businesses but not otherwise addressed by treatment as a Claim or Interest or by assignment under this Plan, including non-exclusive or exclusive patent, trademark, copyright, maskwork or other intellectual property licenses and other executory contracts not assumable under section 365(c) of the Bankruptcy Code, shall, in the absence of any other treatment, be passed through the bankruptcy proceedings for the benefit of the Reorganized Debtors and shall otherwise be unaltered and unaffected by the bankruptcy filings or the Chapter 11 Cases.

**10.5     Survival of Indemnification and Corporation Contribution**.  The obligations of the Debtors, if any, to indemnify and/or provide contribution to its current and former directors, officers, employees, managing agents, and attorneys, and such current and former directors' and officers' respective affiliates, pursuant to the Corporate Documents and/or any employment contracts, applicable statutes or other contractual obligations, in respect of all past, present and future actions, suits and proceedings against any of such directors, officers, employees, managing agents, and attorneys, based on any act or omission related to the service with, for or on behalf of the Debtors after the Petition Date or immediately prior to the Petition Date in connection with the Chapter 11 Cases, will be deemed and treated as executory contracts that are assumed by the applicable Reorganized Debtor pursuant to the Plan and sections 365 and 1123 of the Bankruptcy Code as of the Effective Date.  Accordingly, such indemnification and contribution obligations will not be discharged, but will instead survive and become obligations of the applicable Reorganized Debtor upon entry of the Confirmation Order.

**10.6     Insurance Policies**.  Each of the Debtors' insurance policies and any agreements, documents, or Instruments relating thereto, are treated as executory contracts under the Plan.  On the Effective Date, the Debtors shall be deemed to have assumed all insurance policies and any agreements, documents, and Instruments relating to coverage of all insured Claims.

**10.7     Modifications, Amendments, Supplements, Restatements, or Other Agreements.**

10.7.1     Unless otherwise provided in the Plan, each executory contract or unexpired lease that is assumed or assumed and assigned shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such executory contract or unexpired lease, and all executory contracts and unexpired leases related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

10.7.2     Modifications, amendments, supplements, and restatements to prepetition executory contracts and unexpired leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature

of the executory contract or unexpired lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

**10.8**   **Bar Date for Filing Claims for Rejection Damages**.  If the rejection of an executory contract or unexpired lease pursuant to the Plan gives rise to a Claim, a Proof of Claim must be served upon the Debtors and the Debtors' counsel within 30 days after notice of entry of the Effective Date.  Any such Claim not served within such time period will be forever barred.  Each such Claim will constitute a GO-Madison General Unsecured Claim or a GO-Inc. General Unsecured Claim, depending on the applicable Debtor counterparty to such executory contract or unexpired lease, and solely to the extent such Claim is Allowed by the Bankruptcy Court.

**10.9**   **Reservation of Rights**.  Nothing contained in the Plan shall constitute an admission by the Debtors that any executory contract or unexpired lease is in fact an executory contract or unexpired lease or that any of the Reorganized Debtors has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Reorganized Debtors, as applicable, shall have 30 days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

**10.10**   **Contracts and Leases Entered Into After the Petition Date**.  Contracts and leases entered into after the Petition Date by any Debtor, including any executory contracts and unexpired leases assumed by such Debtor, will be performed by the applicable Debtor or Reorganized Debtor liable thereunder in the ordinary course of its business.  Accordingly, such contracts and leases (including any assumed executory contracts and unexpired leases) will survive and remain unaffected by entry of the Confirmation Order.

## ARTICLE 11
## RELEASES, INJUNCTIONS AND DISCHARGE

**11.1**   **Releases by the Debtors**.  **Pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, for good and valuable consideration, on and after the Effective Date, the Released Parties are deemed released and discharged by the Debtors, the Reorganized Debtors, and the Estates from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, whether for tort, fraud, contract, violations of federal or state securities laws, or otherwise, including any derivative Claims asserted or that could possibly have been asserted on behalf of the Debtors or the Estates, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that the Debtors or the Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the operations and financings in respect of the Debtors (whether before or after the Petition Date), the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the DIP Facility, the negotiation, formulation, or preparation of the Plan, the related Plan Supplement, or related agreements, instruments, or other documents, upon any other act or**

omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date of the Plan.  Notwithstanding anything to the contrary in the foregoing, the release set forth above does not release any post-Effective Date obligations of any party under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.  For the avoidance of doubt, claims or causes of action arising out of, or related to, any act or omission of a Released Party prior to the Effective Date that are determined by final order of the Bankruptcy Court or any other court of competent jurisdiction to have constituted actual fraud or willful misconduct, including findings after the Effective Date, are not released pursuant to the Plan. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any obligations of any Entity arising after the Effective Date under the Plan, the Confirmation Order, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or Restructuring Transactions.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Debtor Release, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is:  (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the Claims released by this Section 11.1; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the Debtors asserting any claim or Cause of Action released pursuant to the Debtor Release.

**11.2** **Mutual Releases by Released Parties**.  As of the Effective Date, each of the Released Parties hereby unconditionally forever releases, waives and discharges all known and unknown Causes of Action of any nature that such Released Party has asserted, may have asserted, could have asserted, or could in the future assert, directly or indirectly, against any of the other Released Parties based on any act or omission relating to the Debtors or their business operations (including, without limitation, the organization or capitalization of the Debtors or extensions of credit and other financial services and accommodations made or not made to the Debtors) or the Chapter 11 Cases on or prior to the Effective Date; provided, however, that the foregoing releases shall not apply to Causes of Action that arise post-Effective Date from obligations or rights created under or in connection with the Plan or any agreement provided for or contemplated in the Plan; provided further that any claims against the Debtors shall not be released under this Section 11.2 but shall be treated in accordance with this Plan.  For the avoidance of doubt, claims or causes of action arising out of, or related to, any act or omission of a Released Party prior to the Effective Date that are determined by final order of the Bankruptcy Court or any other court of competent jurisdiction to have constituted actual fraud, gross negligence, or willful misconduct, including findings after the Effective Date, are not released pursuant to the Plan. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any obligations of any Entity arising after the Effective Date under the Plan, the Confirmation Order, any Restructuring Transaction, or any document, instrument, or

79

**agreement (including those set forth in the Plan Supplement) executed to implement the Plan or Restructuring Transaction.**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Mutual Release, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that the Mutual Release is: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the Claims released by this Section 11.2; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any Entity granting a Mutual Release from asserting any claim or Cause of Action released pursuant to the Mutual Release.**

**11.3    Exculpation**.  To the greatest extent permissible by law, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from, any Exculpated Claim or any obligation, Cause of Action, or liability for any Exculpated Claim; provided, however, such Exculpated Parties shall be entitled to assert any applicable defense based upon their reasonable reliance upon the advice of counsel with respect to their duties and responsibilities pursuant to, or in connection with, the Plan, and provided further that the foregoing exculpation shall have no effect on the liability of any entity that results from any such act or omission that is determined in a final order to have constituted fraud, gross negligence, or willful misconduct.  The Debtors and the Reorganized Debtors (and each of their respective affiliates, officers, directors, employees, managers, principals, agents, attorneys, financial advisors, accountants, investment bankers, consultants, representatives, and other professionals) have participated in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation of the Plan and distributions made pursuant to the Plan, and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.  Notwithstanding anything to the contrary herein, nothing in this section shall exculpate any Exculpated Party for any act or omission arising before the Petition Date or after the Effective Date.

**11.4    Injunction**.  Except as otherwise expressly provided in the Plan or for obligations issued pursuant to the Plan, all Entities who have held, hold, or may hold Claims or Interests that have been released pursuant to Section 11.1 or Section 11.2 hereof, discharged pursuant to Section 11.5 hereof, or are subject to exculpation pursuant to Section 11.3 hereof are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Released Parties, or the Exculpated Parties (to the extent of the Exculpation provided pursuant to the Plan with respect to the Exculpated Parties):  (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (3) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; (4) asserting any right of subrogation against any obligation due from such Entities or against the property or Estates of such Entities on account of or in connection with or

with respect to any such Claims or Interests; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released or settled pursuant to the Plan.

> **11.4.1**   **Violation of Injunctions**.  Any Person injured by any willful violation of such injunction may seek to recover actual damages, including costs and attorneys' fees and, in appropriate circumstances, may seek to recover punitive damages from the willful violator.

**11.5**   **Discharge of Claims and Termination of Interests**.  **To the fullest extent provided under section 1141(d) and other applicable provisions of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in any contract, Instrument, or other agreement or document created pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of all Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests, and Causes of Action of any nature whatsoever (other than recoupment), including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any Property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code.  The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring.**

## ARTICLE 12
## CONDITIONS PRECEDENT

**12.1**   **Conditions Precedent to Confirmation**.  It shall be a condition precedent to Confirmation of the Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of Section 12.3 hereof:

> (a)   The Green Bondholder RSA shall not have been terminated;

> (b)   No termination event or continuing event of default under the DIP Facility Documents shall have occurred;

> (c)   The Confirmation Order shall be in a form and substance acceptable to the Debtors, Green Bondholder RSA Parties, DIP Lenders, DIP Agent, Green Bond Trustee and for the avoidance of doubt, shall provide for issuance of the New Common Stock and the New Membership Interest as provided by the Plan free and clear of all liens, claims, rights, interests, security interests and encumbrances of any kind;

> (d)   The Plan shall be in form and substance reasonably acceptable to the Debtors, Green Bondholder RSA Parties, DIP Lenders, DIP Agent and Green Bond Trustee;

81

(e)    The final version of the Plan Supplement and all of the schedules, documents, and exhibits contained therein shall have been filed with the Bankruptcy Court and the same shall be in form and substance reasonably acceptable to the Debtors, Green Bondholder RSA Parties, DIP Lenders, DIP Agent and Green Bond Trustee; and

(f)    No termination event, breach or failure to comply with the terms of the Definitive Documents, the Confirmation Order or any other material final order of the Bankruptcy Court shall have occurred and be continuing.

**12.2    Conditions Precedent to the Effective Date**.  It shall be a condition precedent to the Effective Date of the Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of Section 12.3:

12.2.1    all conditions to Confirmation in Section 12.1 of the Plan shall have been either (and shall continue to be) satisfied or waived pursuant to Section 12.3 of the Plan;

12.2.2    all documents required under the Plan, including lien releases, shall have been delivered;

12.2.3    the Confirmation Order, in form and substance reasonably acceptable to the Debtors, Green Bondholder RSA Parties, DIP Lenders, DIP Agent and Green Bond Trustee shall have been entered and shall have become a Final Order;

12.2.4    the Exit Financing, together with the Cash-on-Hand, shall be sufficient to fund all Plan obligations;

12.2.5    the Debtors and Insiders shall not have caused or permitted to occur an "ownership change" as such term is used in section 382 of title 26 of the United States Code;

12.2.6    all actions, documents, certificates, and agreements necessary to implement the Plan, including documents contained in the Plan Supplement, shall have been effected or executed and delivered, as the case may be, to the required parties and, to the extent required, filed with the applicable governmental units in accordance with applicable laws; and the New Common Stock, the New Membership Interest, and any and all agreements and documents relating thereto shall have been executed, issued and delivered by the Reorganized Debtors.

**12.3    Waiver of Conditions**.  The conditions to Confirmation and the Effective Date set forth in this Article 12 may be waived by the Debtors (with the express written consent of the Green Bondholder RSA Parties, DIP Lenders, DIP Agent and Green Bond Trustee) without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Plan.

**12.4    Effect of Failure of Conditions**.  If Consummation does not occur, the Plan shall be null and void in all respects, and nothing contained in the Plan shall:  (1) constitute a waiver or release of any claims by the Debtors, any Holders of Claims or Interests, or any other Entity; (2) prejudice

in any manner the rights of the Debtors, any Holders of Claims or Interests, or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders of Claims or Interests, or any other Entity in any respect.

**12.5    Substantial Consummation**.   On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

## ARTICLE 13
## JURISDICTION

**13.1    Retention of Jurisdiction**.   Under sections 105(a) and 1142 of the Bankruptcy Code, and notwithstanding the Plan's Confirmation and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction (except with respect to the purposes described under clauses (a) and (n) below, with respect to which jurisdiction shall not be exclusive) over all matters arising out of or related to the Chapter 11 Cases and the Plan, to the fullest extent permitted by law, including jurisdiction to:

(a)    determine any and all objections to the allowance of Claims or Interests;

(b)    determine any and all motions to estimate Claims at any time, regardless of whether the Claim to be estimated is the subject of a pending objection, a pending appeal, or otherwise;

(c)    determine any and all motions to subordinate Claims or Interests at any time and on any basis permitted by applicable law;

(d)    hear and determine all Administrative Expense Claims;

(e)    hear and determine all matters with respect to the assumption or rejection of any executory contract or unexpired lease to which one or more of the Debtors are parties or with respect to which a one or more of the Debtors may be liable, including, if necessary, the nature or amount of any required cure or the liquidation of any Claims arising therefrom;

(f)    hear and determine any and all adversary proceedings, motions, applications, and contested or litigated matters arising out of, under, or related to, the Chapter 11 Cases;

(g)    enter such orders as may be necessary or appropriate in aid of the Consummation hereof and to execute, implement, or consummate the provisions hereof and all contracts, Instruments, releases, and other agreements or documents created in connection with the Plan or the Confirmation Order;

(h)    hear and determine disputes arising in connection with the interpretation, implementation, Consummation, or enforcement hereof and all contracts, Instruments, and other agreements executed in connection with the Plan;

(i)    hear and determine any request to modify the Plan or to cure any defect or omission or reconcile any inconsistency herein or any order of the Bankruptcy Court;

(j)      issue and enforce injunctions or other orders, or take any other action that may be necessary or appropriate to restrain any interference with or compel action for the implementation, Consummation, or enforcement hereof or the Confirmation Order;

(k)      enter and implement such orders as may be necessary or appropriate if the Confirmation Order is for any reason reversed, stayed, revoked, modified, or vacated;

(l)      hear and determine any matters arising in connection with or relating to the Plan, the Confirmation Order or any contract, Instrument, release, or other agreement or document created in connection with the Plan or the Confirmation Order;

(m)      enforce all orders, judgments, injunctions, releases, exculpations, indemnifications and rulings entered in connection with the Chapter 11 Cases;

(n)      recover all assets of the Debtors and Property of the Debtors' Estates, wherever located;

(o)      hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

(p)      hear and determine all disputes involving the existence, nature, or scope of the discharge of the Debtors;

(q)      hear and determine such other matters as may be provided in the Confirmation Order or as may be authorized under, or not inconsistent with, provisions of the Bankruptcy Code;

(r)      hear and determine all other motions, applications and contested or litigated matters which were pending but not resolved as of the Effective Date including, without limitation, any motions, applications and contested or litigated matters to sell or otherwise dispose of assets and/or grant related relief; and

(s)      enter a final decree closing the Chapter 11 Cases.

## ARTICLE 14
## MISCELLANEOUS PROVISIONS

**14.1    Immediate Binding Effect**.    Subject to Section 12.2 hereof and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, and any and all Holders of Claims or Interests (irrespective of whether such Claims or Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring Property under the Plan, and any and all parties to executory contracts and unexpired leases with the Debtors.

**14.2    Effectuating Documents; Further Transactions**.    The Debtors and/or the Reorganized Debtors (as the case may be) are authorized to execute, deliver, file, or record such contracts,

84

Instruments, releases, indentures, and other agreements or documents, and take such actions, as may be necessary or appropriate to effectuate and further evidence the terms, conditions and transactions contemplated by the Plan. The secretary or any assistant secretary of the Debtors or the Reorganized Debtors is authorized to certify or attest to any of the foregoing actions. Each of the Debtors and/or the Reorganized Debtors shall take such actions and execute such documents as may be reasonably requested by one of the foregoing to effectuate and further evidence the terms, conditions and transactions contemplated by the Plan so long as such action does not require more than *de minimis* out-of-pocket expense by the Person for which action is requested.

**14.3** **United States Trustee Reporting Requirements and Payment of Quarterly Fees**. All fees due and payable pursuant to section 1930 of Title 28 of the U.S. Code ("Quarterly Fees") prior to the Effective Date shall be paid by the Debtors on the Effective Date. After the Effective Date, the Debtors, the Reorganized Debtors, and the Disbursing Agent (if different from the Reorganized Debtors (each a "Disbursing Entity"), shall be jointly and severally liable to pay any and all Quarterly Fees when due and payable. The Debtors shall file with the Bankruptcy Court all monthly operating reports due prior to the Effective Date when they become due, using UST Form 11-MOR. Within two business days of the Effective Date, the Reorganized Debtors and any other authorized parties who have been charged with administering the confirmed plan shall file a Notice of Occurrence of the Effective Date, identifying the Effective Date and indicating that it has occurred. After the Effective Date, each of the Reorganized Debtors and the Disbursing Agent (if different from the Reorganized Debtors) shall file with the Bankruptcy Court separate UST Form 11-PCR reports when they become due. Each and every one of the Debtors, the Reorganized Debtors, and Disbursing Agent shall remain obligated to pay Quarterly Fees to the Office of the U.S. Trustee until the earliest of that particular Debtor's case being closed, dismissed or converted to a case under Chapter 7 of the Bankruptcy Code. The U.S. Trustee shall not be required to file any Administrative Claim in the case and shall not be treated as providing any release under the Plan.

**14.4** **Entire Agreement**. On the Effective Date, except as otherwise indicated, the Plan and the Plan Supplement shall supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

**14.5** **Exhibits**. All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan. After the exhibits and documents are filed, copies of such exhibits and documents shall be available upon written request to the Debtors' counsel at the address below or by downloading such exhibits and documents from the Bankruptcy Court's website at www.deb.uscourts.gov. To the extent any exhibit or document is inconsistent with the terms of the Plan, unless otherwise ordered by the Bankruptcy Court, the non-exhibit or non-document portion of the Plan shall control.

**14.6** **Exemption From Certain Transfer Taxes**. Pursuant to section 1146(c) of the Bankruptcy Code, any transfers from the Debtors to the Reorganized Debtors or any other Person or Entity pursuant to or in connection with the Plan shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, or other similar tax or governmental assessment, and the Confirmation Order shall direct the appropriate state or local governmental officials or agents to

forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing Instruments or other documents without the payment of any such tax or governmental assessment.

**14.7    Amendment, Modification and Severability of Plan Provisions**.  If, prior to the Effective Date, any term or provision hereof is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtors (with the express written consent of the DIP Lender, Green Bondholder RSA Parties, DIP Agent and Green Bond Trustee), shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.   Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions hereof shall remain in full force and effect and shall in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.   The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision hereof, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

> 14.7.1    The Plan may be amended or modified before the Effective Date by the Debtors (with the express written consent of the DIP Lender) to the extent provided by section 1127 of the Bankruptcy Code.

> 14.7.2    The Debtors reserve the right to modify or amend the Plan (with the express written consent of the DIP Lender) upon a determination by the Bankruptcy Court that the Plan, in its current form, is not confirmable pursuant to section 1129 of the Bankruptcy Code.  To the extent such a modification or amendment is permissible under section 1127 of the Bankruptcy Code, without the need to resolicit acceptances, the Debtors reserve the right to sever any provisions of the Plan that the Bankruptcy Court finds objectionable.

> 14.7.3    The Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date.   If the Debtors revoke or withdraw the Plan, or if Confirmation does not occur, then the Plan shall be null and void, and nothing contained in the Plan shall:  (1) constitute a waiver or release of any Claims by or against, or any Interests in, the Debtors; or (2) prejudice in any manner the rights of the Debtors in any further proceedings.

**14.8    Withholding and Reporting Requirements**.   In connection with the Plan and all distributions hereunder, the Disbursing Agent shall, to the extent applicable, comply with all tax withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority, and all distributions hereunder shall be subject to any such withholding and reporting requirements.   The Disbursing Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements.

**14.9    Closing of Chapter 11 Cases**.   The Disbursing Agent shall, promptly after the full administration of the Chapter 11 Cases, file with the Bankruptcy Court all documents required by

Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases.

**14.10    Conflicts**.   To the extent that any provision of the Plan Supplement, or any other order (other than the Confirmation Order) referenced in the Plan (or any exhibits, schedules, appendices, supplements, or amendments to any of the foregoing), conflict with or are in any way inconsistent with any provision of the Plan, the Plan shall govern and control.

**14.11    Notices to Debtors**.   Any notice, request, or demand required or permitted to be made or provided under the Plan or any Plan-related document shall be (i) in writing, (ii) served by (a) certified mail, return receipt requested, (b) hand delivery, (c) overnight delivery service, (d) first class mail, or (e) facsimile transmission, and (iii) deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows, and shall also be sent to those Persons on the Rule 2002 service list as such list may be amended from time-to-time by written notice from the Persons on such service list:

If to the Debtors, at:

>   GO Lab, Inc.
>   1 Main Street
>   PO Box 119
>   Madison, ME 04950

With a copy to:

>   COZEN O'CONNOR
>   1201 North Market Street, Suite 1001
>   Wilmington, DE 19801
>   Attn: Mark E. Felger
>   Telephone: (302) 295-2087
>   Facsimile: (302) 295-2013

If to the DIP Lenders:

>   BlackRock
>   1 University Square Drive
>   4th Floor
>   Princeton, NJ 08540
>   Attention:     Ryan McDonald
>                  Matthew Hoffman
>   Email:         Ryan.McDonald@blackrock.com
>                  Matthew.Hoffman@blackrock.com
>                  GroupAMERCreditLegalTransactionsCounsel@blackrock.com

LEGAL\77640027\2

If to the Green Bondholder RSA Parties,

        BlackRock, Inc.
        1 University Square Drive
        4th Floor
        Princeton, NJ 08540
        Attention:    Ryan McDonald
                      Matthew Hoffman
        Email:       Ryan.McDonald@blackrock.com
                      Matthew.Hoffman@blackrock.com
                      GroupAMERCreditLegalTransactionsCounsel@blackrock.com

        Macquarie Asset Management
        610 Market Street
        Philadelphia, PA 19106
        Attention:    Kevin Bock
        Email:       Kevin.Bock@macquarie.com

        Easterly Asset Management
        138 Conant St., Suite 100
        Beverly, MA 01915
        Attention:    Troy Willis
        Email:       twillis@rocmuni.com

        Neuberger Berman Group LLC
        1290 Avenue of the Americas
        New York, NY 10104
        Attention:    Corey Issing, Legal & Compliance
                      Paul Charbonneau
        Email:       Paul.Charbonneau@nb.com
                      Corey.Issing@nb.com

If to the DIP Agent or Green Bond Trustee,

        UMB Bank, N.A.
        120 Sixth Street South, Suite 1400
        Minneapolis, MN 55402
        Attention:    Michael Slade
                      Joshua James
        Email:       Michael.Slade@umb.com
                      Joshua.James@umb.com

With a copy to:

> ArentFox Schiff LLP
> 1301 Avenue of the Americas, Floor 42
> New York, NY 10019
> Attention:    David L. Dubrow
>               Beth M. Brownstein
> Email:        David.Dubrow@afslaw.com
>               Beth.Brownstein@afslaw.com

**14.12    Binding Effect**.  The Plan shall be binding upon and inure to the benefit of the Debtors, all present and former Holders of Claims against and Interests in the Debtors, their respective successors and assigns, including the Reorganized Debtors, and all other parties-in-interest in the Chapter 11 Cases.

**14.13    No Admissions**.  Notwithstanding anything herein to the contrary, nothing contained in the Plan shall be deemed as an admission by the Debtors with respect to any matter set forth herein including, without limitation, liability on any Claim.

**14.14    Headings**.  Headings are used in the Plan for convenience and reference only, and shall not constitute a part of the Plan for any other purpose.

Dated:  May 29, 2025

GO Lab, Inc., *et al.*


By: */s/ Matthew O'Malia*
      President and CEO

COZEN O'CONNOR


By: */s/ Mark E. Felger*
    Mark E. Felger (No. 3919)
    Simon Fraser (No. 5335)
    1201 N. Market St., Ste. 1001
    Wilmington, DE  19801
    Telephone:  (302) 295-2000
    Facsimile:  (302) 295-2013
    E-mail:  mfelger@cozen.com
          sfraser@cozen.com

*Counsel for the Debtors and Debtors in Possession*

## **EXHIBIT A**

**Liquidation Analysis**

**GO Lab, Inc. and GO Lab Madison, LLC**
**Exhibit A - Chapter 7 Liquidation Analysis**

| Assets | GO Lab, Inc. | GO Lab Madison, LLC | Senior Secured Creditors' Projected Recovery Under Plan |
|---|---|---|---|
| Cash | $67,000.00 | $2,611,000.00 | |
| *Less* Chapter 7 Administrative Expense | ($2,211.00) | ($86,163.00) | |
| **Value Net of Administrative Expense** | **$64,789.00** | **$2,524,837.00** | 100% + Equity |
| *Less* Secured Debt (DIP Lender) | ($10,100,000.00) | ($10,100,000.00) | |
| **Value Net of Secured Debt** | **$0.00** | **$0.00** | |
| | | | |
| Accounts Receivable | $0.00 | $300,000.00 | |
| *Less* Chapter 7 Administrative Expense | $0.00 | ($19,900.00) | |
| **Value Net of Administrative Expense** | **$0.00** | **$280,100.00** | 100% + Equity |
| *Less* Secured Debt (DIP Lender) | ($7,510,374.00) | ($7,510,374.00) | |
| **Value Net of Secured Debt** | **$0.00** | **$0.00** | |
| | | | |
| Real Property and Fixtures | N/A | $6,130,000.00 | |
| *Less* Broker's Commission and Costs (6%) | N/A | ($367,800.00) | |
| **Value Net of Broker's Commission and Costs** | **N/A** | **$5,762,200.00** | |
| *Less* Chapter 7 Administrative Expense | N/A | ($175,000.00) | |
| **Value Net of Administrative Expense** | **N/A** | **$5,587,200.00** | $8,057,811* |
| Less Secured Debt (Cianbro and Gilman Mechanics' Liens (Class 4 and Class 5)) | N/A | ($15,347,500.00) | |
| **Value Net of Secured Debt** | **N/A** | **$0.00** | |
| | | | |
| Equipment** | $0.00 | $170,000.00 | |
| *Less* Broker's Commission and Costs (12.5%) | $0.00 | ($21,250.00) | |
| **Value Net of Broker's Commission and Costs** | **$0.00** | **$148,750.00** | |
| *Less* Chapter 7 Administrative Expense | $0.00 | ($120,000.00) | |
| **Value Net of Chapter 7 Administrative Expense** | **$0.00** | **$28,750.00** | $1,700,000*** |
| *Less* Secured Debt (Green Bond Claims (Class 1)) (Nonsubordinated) | | ($30,000,000.00) | |
| **Value Net of Secured Debt** | **$0.00** | **$0.00** | |
| | | | |
| Front End Loader | $0.00 | $180,000.00 | |
| *Less* Broker's Commission and Costs (12.5%) | $0.00 | ($22,500.00) | |
| **Value Net of Broker's Commission and Costs** | **$0.00** | **$157,500.00** | |
| *Less* Chapter 7 Administrative Expense | $0.00 | ($5,197.50) | |
| **Value Net of Chapter 7 Administrative Expense** | **$0.00** | **$152,302.50** | 100% (Unimpaired) |
| *Less* Secured Debt (First National Bank Belfast (Class 6)) | | ($251,000.00) | |
| **Value Net of Secured Debt** | **$0.00** | **$0.00** | |
| | | | |
| **Total Value of All Assets Net of Administrative Expense and Secured Debt** | **$0.00** | **$0.00** | |
| | | | |
| **Recovery for Junior Secured Creditors** | **$0.00** | **$0.00** | |
| **Recovery for Unsecured Creditors** | **$0.00** | **$0.00** | |
| **Recovery for Equity Holders** | **$0.00** | **$0.00** | |

\* $8 million for Cianbro and $57,981 for Gillman (40% of $144,953), as holders of senior liens on real property and fixtures.

\*\* The Debtors' books and records show a small amount of equipment as owned by GO Lab, Inc. Such equipment, however, has been installed in the Madison Facility, and is therefore a fixture that is included in and part of the real property.

\*\*\* This analysis assumes that all Class 1 Creditors would all be treated *pari passu* in the event of conversion to chapter 7.

**GO Lab, Inc. and GO Lab Madison, LLC**

**Exhibit A - Chapter 7 Liquidation Analysis - Comparison of Projected Recoveries (Impaired Classes Only)**

| Class | Description | Plan Recovery | Estimated Recovery in Chapter 7 |
|---|---|---|---|
| 1 | Green Bond Claims | Not less than $1,700,000 | $28,750 |
| 2 | 2024 SEDC Secured Loan Claim | $60,000 | $0.00 |
| 3 | QLICI Secured Claims | $530,000.00 | $530,000.00 |
| 4 | Cianbro Corporation Mechanic's Lien Claim | $8,000,000.00 | $5,534,775.00 |
| 5 | Gilman Mechanic's Lien Claim | $57,981.71 | $52,788.00 |
| 8 | GO-Madison General Unsecured Claims (GO-Madison Unsecured Claims in an allowable amount in excess of $25,000.00) | $800,000.00 | $0.00 |
| 10 | Series B Senior Secured Claims | 5.5% of New Common Stock | $0.00 |
| 11 | Open Prairie Secured Claim | $400.00 | $400.00 |
| 12 | Bridge Loan Claims | $0.00 | $0.00 |
| 13 | GO-Inc. General Unsecured Claims | $0.00 | $0.00 |
| 14 | Intercompany Claims | $0.00 | $0.00 |
| 15 | GO-Inc. Equity Interests | $0.00 | $0.00 |
| 16 | GO-Madison Equity Interests | $0.00 | $0.00 |

## **EXHIBIT B**

**Projections**

## I.    OVERVIEW

In connection with the Disclosure Statement, the Debtors' senior management team ("Management") prepared financial projections (the "Projections") from July 1, 2025, the assumed Effective Date of the Plan, through the end of fiscal year 2029 (the "Projection Period").

The Projections are based on several assumptions made by Management regarding the future performance of the reorganized Debtors' operations and were prepared using a bottoms-up approach, incorporating strategic reviews and Management's view of market dynamics and commercialization timeline. The projections should be read in conjunction with the significant assumptions, qualifications, and notes set forth herein.

ALTHOUGH MANAGEMENT HAS PREPARED THE PROJECTIONS IN GOOD FAITH AND BELIEVES THE ASSUMPTIONS TO BE REASONABLE, THE DEBTORS AND THE REORGANIZED DEBTORS CAN PROVIDE NO ASSURANCE THAT SUCH ASSUMPTIONS WILL BE REALIZED. AS DESCRIBED IN DETAIL IN THE DISCLOSURE STATEMENT, A VARIETY OF RISK FACTORS COULD AFFECT THE REORGANIZED DEBTORS' FINANCIAL RESULTS AND MUST BE CONSIDERED. ACCORDINGLY, ANY REVIEW OF THE PROJECTIONS SHOULD TAKE INTO ACCOUNT THE RISK FACTORS SET FORTH IN THE DISCLOSURE STATEMENT AND THE ASSUMPTIONS DESCRIBED HEREIN, INCLUDING ALL RELEVANT QUALIFICATIONS AND FOOTNOTES.

## II.    ACCOUNTING AND PRESENTATION POLICIES

These Financial Projections were not prepared with a view toward compliance with published guidelines of the United States Securities and Exchange Commission or the American Institute of Certified Public Accountants for the preparation and presentation of prospective financial information. The Financial Projections are unaudited and have been prepared using accounting policies generally consistent with those applied in the Debtor's historical financial statements (GAAP consolidated basis). They do not include adjustments or write-downs related to the predecessor Debtor's extinguishment of debt or other liabilities, nor do they reflect the formal implementation of reorganization accounting pursuant to FASB Accounting Standards Codification Topic 852, Reorganizations ("ASC 852"). The implementation of ASC 852 may or may not have a material impact on the underlying economics of the Plan.

## III.    GENERAL ASSUMPTIONS

### A.    Total Revenue

Total revenue is primarily comprised of product revenue net of sales deductions including returns, discounts, rebates, and allowances. Product revenue is expected to be generated from the sale of TimberBatt, and TimberFill insulation. Following commercialization and product certification, the Debtor also plans to offer a TimberBoard product.

### Operating Expenses

Operating Expenses consist of sales and marketing costs, general management, accounting and finance, and human resources ("HR") costs.

Sales and marketing primarily includes expenses related to sales personnel, travel, rental, insurance, and trade show costs.

General management expenses encompass the total executive team staffing costs, including payroll, additional compensation, and benefits. This category also includes corporate insurance, routine general counsel expenses, and consulting fees.

Accounting and finance covers costs associated with finance department staffing, third-party services (finance, accounting, IT), travel, legal, licensure, and software subscriptions.

Human Resource ("HR") costs consist of HR staffing expenses, legal and professional services, workers' compensation, training, and other insurance/compensation costs.

The Reorganized Debtor's projected operating expenses are forecasted based on current development and operational plans.

| | Forecast Through 2029 | | | | |
|---|---|---|---|---|---|
| *In $000s* | **Jul-Dec 2025** | **2026** | **2027** | **2028** | **2029** |
| Total Net Revenue | $15,695 | $101,871 | $133,029 | $154,832 | $154,832 |
| Total COGS | (15,964) | (77,477) | (95,089) | (106,913) | (106,913) |
| **Gross Profit** | **($269)** | **$24,394** | **$37,940** | **$47,919** | **$47,919** |
| **Total Operating Expenses** | **($4,910)** | **($9,447)** | **($9,309)** | **($9,319)** | **($9,319)** |
| **EBITDA** | **($5,179)** | **$14,947** | **$28,631** | **$38,601** | **$38,601** |